**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**(TAMPA DIVISION)**

| | |
|---|---|
| **ALVA JOHNSON,**<br>*Individually and On Behalf of All Others Similarly Situated*, | |
| | **CASE NO. _____** |
| Plaintiff, | |
| | **JURY TRIAL DEMANDED** |
| vs. | **INJUNCTIVE RELIEF SOUGHT** |
| | **COLLECTIVE ACTION COMPLAINT** |
| **DONALD J. TRUMP,**<br>*In his Individual Capacity* and<br>**DONALD J. TRUMP FOR PRESIDENT, INC.,** | |
| Defendants. | |

## INTRODUCTION

1.      Plaintiff Alva Johnson brings this lawsuit to hold the President of the United States, Defendant Donald J. Trump, accountable for his sexually predatory conduct.

2.      On October 7, 2016, *The Washington Post* published an article about an "extremely lewd conversation about women" between Defendant Trump and television host Billy Bush during a 2005 episode of *Access Hollywood*.[1] In a recording of that conversation, Defendant Trump describes his habit of forcibly kissing and groping women without their consent:

> Yeah, that's her. With the gold. I better use some Tic Tacs just in case I start kissing her. You know I'm automatically attracted to beautiful – ***I just start kissing them. It's like a magnet. Just kiss. I don't even wait.*** And when you're a star, they let you do it. You can do anything.

3.      This is exactly what Defendant Trump did to Ms. Johnson, a highly accomplished African American woman who served as a senior staffer for his presidential campaign (the

---

[1] Fahrenthold, David, "Trump recorded having extremely lewd conversation about women in 2005." *The Washington Post*, 7 July 2016, https://www.washingtonpost.com/politics/trump-recorded-having-extremely-lewd-conversation-about-women-in-2005/2016/10/07/3b9ce776-8cb4-11e6-bf8a-3d26847eeed4_story.html?noredirect=on&utm_term=.c47a7453221b.

"Campaign"). Ms. Johnson was an integral part of the Campaign's success and was repeatedly recognized for her contributions. She was the Campaign's Director of Outreach and Coalitions for the state of Alabama, and because of her success, was chosen to serve as a member of the exclusive National Strike Team and as Operations Administrative Director for the battleground state of Florida during the general election.[2] To Defendant Trump, however, Ms. Johnson was nothing more than a sexual object he felt entitled to dominate and humiliate. Like he has done with so many other women, Defendant Trump violated norms of decency and privacy by kissing Ms. Johnson on the lips without her consent in the middle of a Florida work event and in front of numerous other Campaign officials.

4.      While forcible kissing is a serious violation of bodily autonomy that can cause victims to experience feelings of physical alarm, fear, shame, guilt, and helplessness.[3] These feelings can be exacerbated when the predator is a boss or other authority figure. And when the predator happens to be one of the most powerful men in the world, the experience can be downright terrifying.

5.      In the moment that Defendant Trump forcibly kissed her, Ms. Johnson, a highly successful and widely respected Campaign staffer, felt reduced to just another object of Defendant Trump's unwanted sexual attention. Ms. Johnson brings this lawsuit against Defendant Trump for that humiliating violation, which amounts to common law battery, and seeks assistance from the Court to put a stop to his predatory conduct.

6.      Not only did Ms. Johnson endure forcible kissing by her boss, she experienced race and gender discrimination as one of the few females and one of only a handful of African American people on the Campaign payroll. Ms. Johnson was paid less than white employees, including both staff

---

[2]      Trump  2016  General  Election  Campaign  Organization,  Florida, http://www.p2016.org/trump/trumpgenfl.html (last visited Feb. 21, 2019).

[3] *See* Margolin, L., Miller, M., & Moran, P. B. (1989). "When a kiss is not just a kiss: Relating violations of consent in kissing to rape myth acceptance." *Sex Roles: A Journal of Research, 20* (5-6), 231-243. http://dx.doi.org/10.1007/BF00287721; Clark-Flory, Tracy. "A Forced Kiss is Never 'Just a Kiss.'" *Vocativ*, 13 Oct. 2016, https://www.vocativ.com/367496/donald-trump-forced-kiss/index.html.

with similar duties and lower-ranked staff. She was also paid less than similarly situated male employees. Indeed, the Campaign's pattern of underpaying female staffers is well documented.[4] For this reason, Ms. Johnson seeks to bring this case as a collective action on behalf of female Campaign employees who suffered unlawful pay discrimination at the hands of Defendant Donald J. Trump for President, Inc.

## PARTIES

7.      Ms. Johnson is a citizen and resident of the state of Alabama.

8.      Defendant Trump is a resident of the state of New York.

9.      The Campaign is a corporation organized under the laws of Virginia with a principal place of business in New York.

## JURISDICTION AND VENUE

10.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Plaintiff and the Defendants are citizens of different states and the amount in controversy exceeds $75,000.

11.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Ms. Johnson's claims occurred in this District.

12.      This Court has personal jurisdiction over Defendant Trump because he committed a tortious act within the state of Florida, owns property within the state of Florida, and conducts business within the state of Florida.

13.      This Court has personal jurisdiction over the Campaign because it maintained an office or agency within the state of Florida.

---

[4] Viser, Matt. "Donald Trump's Campaign Pays Women Less Than Men." *The Boston Globe*, 4 June 2016,      https://www.bostonglobe.com/news/politics/2016/06/04/donald-trump-campaign-pays-women-less-than-men/VIu0v2MUJiHqhvc5C0W5dO/story.html.

**FACTS**

14.     Defendant Trump has a long history of harassing and assaulting women, including forcibly kissing them on the mouth without their consent. He does so intentionally—just as he admitted on the *Access Hollywood* tape. Since the *Access Hollywood* tape became public, dozens of women have come forward with complaints that Defendant Trump forcibly kissed, groped, and/or harassed them—disturbing allegations that span nearly four decades.

15.     Ms. Johnson was not aware of Defendant Trump's long history of predatory conduct towards women when she first connected with the Campaign in late 2015. She joined the Campaign early in the primary season, worked hard, and became a valued Director who was integral to the Campaign's success. But instead of being rewarded for her hard work and accomplishments, Ms. Johnson was subjected to unwanted kissing by her boss and discrimination based on her race and her gender.

16.     Ms. Johnson signed up to help a long-shot nominee run a successful campaign. She did not sign up to be paid less than her colleagues because of her race and gender. And she certainly did not sign up to be forcibly kissed in public, then subjected to humiliating comments from her colleagues that caused her to relive the experience. But she experienced all of these things as a senior member of Defendant Trump's Campaign staff.

**Ms. Johnson Joins the Trump Presidential Campaign**

17.     Ms. Johnson initially became interested in joining the Campaign after her stepfather, who has decades of experience in Republican politics, asked her to help prepare a proposal to assist a Republican candidate, Donald J. Trump, with outreach to African Americans.

18.     Ms. Johnson, whose background is in event planning and human resources, had never considered working in politics. However, she was intrigued by the possibility of working on the campaign of a relatively unknown political outsider like Defendant Trump.

19.     Ms. Johnson voted for Barack Obama in 2008 and 2012. But during President Obama's two terms in office, she saw the African American community in Alabama continue to experience severe economic hardship, and felt that perhaps Defendant Trump, with his background in business, could help invigorate the economy and provide jobs for her community.

20.     Ms. Johnson agreed to help with the proposal, and joined her stepfather for a meeting with Chess Bedsole, a family friend and recent addition to the Trump Campaign.

21.     At the meeting, Mr. Bedsole remarked that he was impressed with Ms. Johnson's background, and that the Campaign could benefit from her expertise in successfully executing large-scale events.

22.     Mr. Bedsole informed Ms. Johnson that, before she could be hired, Defendant Trump needed to meet her in person.

23.     On November 21, 2015, at Mr. Bedsole's invitation, Ms. Johnson attended a rally in Birmingham, where she met Defendant Trump for the first time. Because she was a guest of Mr. Bedsole and was considering joining the Campaign as staff, Ms. Johnson was allowed to enter a VIP meet-and-greet area (typically reserved for significant donors), where Defendant Trump was greeting people and shaking hands.

24.     Approximately ten other people were in the meet-and-greet area, including Terry Lathan, Chairman of the Alabama Republican Party, and Ed Henry, an Alabama state representative.

25.     Ms. Johnson waited until the others had an opportunity to shake hands with Defendant Trump, then walked towards him so that she could introduce herself.

26.     As Ms. Johnson approached, Defendant Trump looked her up and down and said, "Oh, beautiful, beautiful, fantastic."

27.     Ms. Johnson tried to redirect Defendant Trump's attention by telling him that she was a political outsider, like him, and was coming from the private sector.

28.     Despite this uncomfortable interaction, Ms. Johnson believed that if she went to work for the Campaign, she could establish appropriate boundaries with Defendant Trump. At the time, she did not know of the many other allegations of his predatory behavior. So when the Campaign offered her a position, Ms. Johnson decided to take the opportunity. She was excited about the chance to showcase her skills in event planning and large-scale organizing, and was hopeful that she would be able to use a position in the Campaign to advocate on behalf of African Americans and other marginalized groups.

29.     Ms. Johnson officially joined the Campaign staff in January 2016—making her one of the earliest paid Campaign staffers.

**Ms. Johnson Shines in the Alabama Primary**

30.     Between January and March 2016, leading up to the Alabama primary election, Ms. Johnson served as Director of Outreach and Coalitions for the Campaign. She quickly made an impression on Campaign staff and proved herself to be a highly competent leader and a valuable asset to the Campaign. Her responsibilities included speaking to organizations, coordinating rallies, and engaging with diverse communities.



*Ms. Johnson's official business card for the Alabama Primary.*

31.     As one of just a few paid African American Campaign staffers, Ms. Johnson was also responsible for minority outreach throughout Alabama. She visited the so-called "Black Belt" of

Alabama, a historic region of the state populated by low-income African American farmers, seeking the African American vote.

32.     She also spoke on behalf of the Campaign at Republican political gatherings, including young Republican and college Republican events, as well as GOP Executive Committee meetings, and was in charge of building volunteer capacity in North Alabama.

33.     Ms. Johnson's skills shined most brightly when she helped organize Campaign rallies, which were a critical part of the Campaign's success in the primary and general elections.[5]

34.     One such rally held in Madison County, Ms. Johnson's home county, in February 2016, earned her praise from Campaign staff.

35.     Just three days before the February 2016 rally, the Campaign confirmed that Defendant Trump would attend. With just a few days to find space to hold the rally, Ms. Johnson coordinated with the Deputy State Campaign Director to find a venue, making numerous phone calls to find a space large enough to accommodate the crowd. She also worked to ensure that the flow of attendees would be efficient and manageable.

36.     The event was notable both for its large turnout and the surprise endorsement of Defendant Trump by then-Senator Jeff Sessions, the first senator to endorse Defendant Trump.

37.     Defendant Trump himself touted the size of the crowd, describing the rally as "the biggest crowd of the political season by far. We have 30,000 people. 30,000! Amazing!"[6] Later, in a tweet, Defendant Trump once again highlighted the size of the crowd:

---

[5] Rivero, Cristina. "How marketing helped Donald Trump win the 2016 election." *The Washington Post*, 17 Nov. 2016, https://www.washingtonpost.com/graphics/politics/2016-election/trump-campaign-marketing/ (describing how Defendant "Trump also used his numerous rallies to generate and perpetuate media attention").

[6] CSPANJUNKIEd0tORG, *Donald Trump 'This is the Biggest Crowd of the Political Season by Far! We Have 30,000 People!*, YouTube (Feb. 28, 2016), https://www.youtube.com/watch?v=JkWizCel968.



38.     Two days later, on March 1, 2016, Defendant Trump won the Alabama primary with 43.42% of the vote—including a resounding win in Madison County. The successful rally solidified Ms. Johnson's reputation in the Campaign as a talented strategist and essential member of the team.

### Ms. Johnson Joins the National Strike Team
### Because of her Success in Alabama

39.     As a direct result of her successful contributions to the Alabama primary win, Ms. Johnson was assigned to the National Strike Team, an elite group of Campaign staffers who traveled to the most critical states during the primary season.

40.     Over the next four months, Ms. Johnson traveled to Missouri, Utah, Wisconsin, Indiana, and California, helping organize and manage local volunteer offices.

41.     Opening volunteer offices was a core responsibility of the National Strike Team because the Campaign ordinarily did not operate wide-scale local volunteer offices until a few weeks before a state primary, at which point Ms. Johnson and the rest of the National Strike Team would arrive to set up an office, build a volunteer base, and generate voter engagement and excitement in advance of the election.

42.     As part of the National Strike Team, Ms. Johnson was responsible for recruiting and managing the many volunteers who conducted phone banking and canvassing for the Campaign. To keep volunteer morale high, Ms. Johnson planned outings for volunteers and organized a volunteer appreciation event called Super Saturday.

43.     In addition to her responsibilities overseeing Campaign volunteers, Ms. Johnson also helped local state staff coordinate successful rallies in Wisconsin, Missouri, Utah, and Indiana, serving as the point of contact for campaign accessories, like signs and stickers, that came in from out of state.

44.     In each state to which she traveled, Ms. Johnson also transformed the local office into a home base for volunteers and supporters, where they could pick up yard signs and bumper stickers and take photos.

45.     Ms. Johnson also continued to conduct outreach to minorities, as she did in Alabama. Ms. Johnson sought out African American communities and other communities of color wherever she traveled so that she could make sure that the Campaign placed signs, recruited volunteers, and conducted door-knocking in those neighborhoods in the weeks leading up to a primary.

46.     Thanks in part to Ms. Johnson's hard work, energy, and skills, Defendant Trump won the Republican primaries in California, Illinois, Missouri, and Indiana.

### Because of Ms. Johnson's Success on the National Strike Team, She is Assigned to the Florida Campaign

47.     At the end of July, after Defendant Trump secured the Republican nomination for president, the Campaign assembled top staff from across the country to go to Florida, an important battleground state, for the general election campaign. Because of her successes in Alabama and on the National Strike Team, Ms. Johnson was chosen to join the Campaign's team in Florida, where she ultimately attained the position of Operations Administrative Director.



*Ms. Johnson with the Florida team.*

48.     In Florida, Ms. Johnson worked closely with—among others—State Director Karen Giorno, Deputy State Director Jennifer Locetta, Director of Outreach and Coalitions Bibi Ramos, and Chess Bedsole, who was continuing to serve in a legal capacity.

49.     Initially, Ms. Johnson was tasked with helping then-Deputy State Director Jennifer Locetta and then-State Director Karen Giorno with onboarding new staff. Ms. Johnson's experience in human resources made her well suited for this position.

50.     Throughout her time in Florida, Ms. Johnson also worked closely with members of the communications team on various projects, including writing statements on behalf of Karen Giorno to be used by the Campaign.

51.     Ms. Johnson's most important responsibility, though, was managing the famous Trump RVs that navigated the state of Florida in advance of the general election. The RVs were

essentially mobile offices for the Campaign and were critical to the Campaign's success at registering and engaging voters.[7]



*One of the Florida Trump Campaign RVs.*

52.     Ms. Johnson selected the vendor who provided the RVs, hired the teams to drive and operate the RVs, and identified events at which the RVs would appear, including football games, rallies, and concerts.

53.     Ms. Johnson specifically arranged for the RVs to visit more remote areas of Florida that may have otherwise been neglected. In fact, the RVs visited 57 out of Florida's 61 counties.

54.     Additionally, after Hurricane Hermine, instead of campaigning, Ms. Johnson instructed the North Florida RV to purchase hundreds of dollars of supplies to deliver to community members who had been impacted by the hurricane.

---

[7] Atwood, Kylie. "How an RV organizes and energizes Trump voters in Florida" *CBS News*, 29 Sept. 2016, https://www.cbsnews.com/news/how-a-rv-organizes-and-energizes-trump-voters-in-florida/.

55.     Because of these and many other actions Ms. Johnson took to ensure the RVs were a positive presence in communities across Florida, they became one of the most successful facets of the Campaign's voter engagement efforts.

**Defendant Trump Kisses Ms. Johnson Without Her Consent**

56.     On August 24, 2016, Ms. Johnson helped organize a rally in Tampa, Florida. Prior to the rally, Defendant Trump met with volunteers and staff inside one of the famous RVs. During that meeting, Defendant Trump forcibly kissed Ms. Johnson without her consent.

57.     When Defendant Trump arrived for the rally, it was raining. Campaign staff ushered him inside the RV to get him out of the rain. Ms. Johnson and other members of the Florida Campaign staff followed him inside.



*Ms. Johnson and Defendant Trump at the RV.*

58.     Other supporters present in the RV included then-Florida Attorney General Pamela Jo Bondi, Ms. Giorno, and Regional Directors Earl "Tony" Ledbetter, Mitch Tyner, and Nick Corvino.

59.     Ms. Giorno instructed Ms. Johnson to bring some volunteers into the RV to meet Defendant Trump, and Ms. Johnson did so.

60.     Inside the RV, Defendant Trump chatted with staff and volunteers, took pictures, and shook hands. After posing for pictures, Defendant Trump sat at a desk in the RV and autographed campaign signs.



*Ms. Johnson took this picture of Defendant Trump signing autographs in the RV.*

61.     Ms. Johnson noticed that Defendant Trump was watching her and appeared to be trying to make eye contact with her.

62.     After fifteen minutes or so, Secret Service officers told Defendant Trump that he should leave so that he could get to the rally. As Defendant Trump approached the door, he passed Ms. Johnson. She told him she had been on the road since March, away from her family. So, she urged him to go in there and "kick ass."

63.     Defendant Trump grasped her hand and did not let go. He told her he knew she had been on the road for a long time and that she had been doing a great job. He also told Ms. Johnson that he would not forget about her, and that he was going to take care of her.

64.     As Defendant Trump spoke, he tightened his grip on Ms. Johnson's hand and leaned towards her. He moved close enough that she could feel his breath on her skin.

65.     Ms. Johnson suddenly realized that Defendant Trump was trying to kiss her on the mouth, and attempted to avoid this by turning her head to the right. Defendant Trump kissed her anyway, and the kiss landed on the corner of her mouth.

66.     Defendant Trump's kiss on Ms. Johnson's mouth was intentional. Indeed, Ms. Johnson was wearing a baseball cap with the bill facing forward. Given her baseball cap, Defendant Trump's kiss on Ms. Johnson's mouth was deliberate and required intention.

67.     Immediately afterwards, the Secret Service ushered Defendant Trump away, off the RV.

68.     Ms. Johnson stayed in the RV, in shock about what had just transpired. She felt confused and humiliated.

69.     As Ms. Bondi walked off the RV, she glanced at Ms. Johnson and smiled. Ms. Giorno, walking behind Ms. Bondi, grabbed Ms. Johnson's elbow and gave it an approving tug.

70.     Ms. Johnson was upset that Ms. Giorno and Ms. Bondi reacted this way, since she had not wanted Defendant Trump to kiss her and felt that it was completely inappropriate. She feared that this would impact how they viewed her as a colleague and cause them to take her less seriously.

71.     Driving back to Sarasota later that day, Ms. Johnson called her partner, and then her parents, to tell them about what had happened, crying as she recalled the incident.

72.     When Ms. Johnson arrived at Campaign headquarters in Sarasota, the story of Defendant Trump's kiss had beaten her back. Ms. Giorno had arrived earlier and was already sharing the details with other Campaign staff.

73.     As Ms. Johnson walked into the staff room, one staffer said, laughing, that he heard that she got a kiss from the boss. Though Ms. Johnson was deeply disappointed by this reaction, the fact that people seemed to be treating it as some kind of joke made her feel pressured to play it off.

74.     That staffer was not the only person to call attention to the fact that Defendant Trump had kissed Ms. Johnson. Florida Chief of Staff Darren Morris told her that she had become the Florida team's secret weapon because Defendant Trump had kissed her. These comments made Ms. Johnson feel extremely uncomfortable.

### The Access Hollywood Tape

75.     On October 7, 2016, a mere month and a half after the forcible kiss, *The Washington Post* published an article regarding an "extremely lewd conversation about women" between Defendant Trump and television host Billy Bush during a 2005 episode of *Access Hollywood*.[8]

76.     That same day, the *Post* released a recording of the "lewd conversation," now commonly known as the *Access Hollywood* tape. In the recording, Defendant Trump described his practice of committing sexual battery on women, including forcibly kissing them without their consent, and grabbing their genitals:

> DEFENDANT TRUMP:     Yeah, that's her. With the gold. I better use some Tic Tacs just in case I start kissing her. You know I'm automatically attracted to beautiful – **I just start kissing them. It's like a magnet. Just kiss. I don't even wait.** And when you're a star, they let you do it. You can do anything.

---

[8] *See* Fahrenthold, *supra* note 1.

BUSH:          Whatever you want.

DEFENDANT TRUMP:          Grab 'em by the pussy. You can do anything.

77.     When Ms. Johnson first learned of the *Access Hollywood* tape, she was instantly transported back to the moment in which Defendant Trump singled her out of all of the people on his staff and forcibly kissed her.

78.     She first listened to a recording of the tape while sitting in her car with her partner. As they listened, she felt horrified and sick to her stomach. She told her partner that the conduct Defendant Trump described in the tape was exactly what he had done to her. Her partner agreed.

79.     Ms. Johnson began to feel panicked, like she couldn't breathe, as she realized that what Defendant Trump had done to her was not an isolated incident, but part of a pattern of predatory behavior towards women. She remembered how other staffers on the Campaign had treated his improper behavior like a joke and a positive event. She felt disgusted and retraumatized. She knew then that she could not stay with the Campaign.

**Ms. Johnson Immediately Leaves the Campaign & Retains An Attorney**

80.     On October 10, 2016—the first working day after the *Access Hollywood* tape was released—Ms. Johnson called in sick. She still felt terrible, physically and emotionally, and could not sleep.

81.     She was deeply disturbed by the fact that Defendant Trump had not only kissed her, but had also openly bragged that he made a regular practice of kissing women without their consent.

82.     That day, Ms. Giorno asked Ms. Johnson to use her connections to Defendant Trump's supporters across the country to compile videos of women showing their support for Defendant Trump after the release of the Access Hollywood tape. Ms. Johnson felt like she had no choice, as she had not yet formulated a plan for how to officially leave the Campaign. Ms. Johnson expected that the volunteers she called would be as horrified as she was and would not agree to support

16

Defendant Trump. Instead, the women she contacted said they happily stood with Defendant Trump and believed the tape had been doctored. Their reactions caused Ms. Johnson to fear that no one would believe or support her if she publicly objected to what Defendant Trump had done to her.

83.     On or about October 12, 2016, Ms. Johnson traveled to West Palm Beach, where she was supposed to attend a rally the next day. There, she called an attorney at a firm that appeared to have experience representing sexual assault victims and arranged a meeting to discuss her legal options.

84.     On October 13, 2016, instead of attending the rally, Ms. Johnson met in person with the attorney.

85.     During that in-person meeting, Ms. Johnson's attorney advised her that he believed she had a strong case.

86.     Ms. Johnson's attorney told her to do three things as soon as possible: (1) quit her job; (2) change her phone number; and (3) move out of campaign housing. Accordingly, Ms. Johnson immediately took the following actions:

(a)     On October 13, 2016, the same day she met with her attorney, Ms. Johnson met with a therapist whom her attorney had arranged for her to meet to help her cope with her emotional distress stemming from the incident with Defendant Trump. Ms. Johnson's attorney arranged for the first therapy session to be provided on a complimentary basis, and she spoke with the therapist several times after that initial meeting. The therapist helped find new housing for Ms. Johnson;

(b)     On or about October 14, 2016, Ms. Johnson moved out of her Trump Campaign housing, at a time when she knew her housemate would not be at the house; and

(c)     Ms. Johnson changed her phone number.

87.     Ms. Johnson informed her attorney that she had taken all of the precautions he had recommended.

88.     Shortly thereafter, Ms. Johnson also quit the Trump Campaign. On or about October 16, 2016, Ms. Johnson emailed Lucia Castellano, the head of human resources for the Trump Campaign, to let her know that she was leaving the Campaign.

89.     Ten days later, on October 26, 2016, Ms. Castellano emailed Ms. Johnson a letter confirming that Ms. Johnson no longer worked for the Trump Campaign.

90.     Ms. Johnson then informed her attorney that she had quit and forwarded him the letter confirming termination.

91.     For the time period following Ms. Johnson's initial contact with her attorney, from approximately October 12, 2016 to October 28, 2016, Ms. Johnson communicated with him on a regular basis.

92.     During that time period, Ms. Johnson's attorney continued to discuss the details of her potential claims with her. He asked about her emotional status, inquired as to whether she was still seeing the therapist, and encouraged her to hang in there.

93.     Also during that time, Ms. Johnson continued to see the therapist that her attorney had connected her with. She continued to feel considerable emotional distress because of the forced kiss, and had nightmares about it.

94.     At the end of October, Ms. Johnson's attorney unexpectedly contacted her and told her that he would not be moving forward with any lawsuit on her behalf. He explained that he and his law partners did not wish to proceed with the representation, but that the decision had nothing to do with the merits of the case.

95.     The law firm's decision discouraged Ms. Johnson from filing any sort of claim or bringing any lawsuit against Defendant Trump at that time.

96.     After Defendant Trump was officially elected President, Ms. Johnson also feared getting caught up in a public conflict with him due to the public backlash she might face. This fear

18

was validated by the fact that Defendant Trump had been viciously attacking all of the many women who were now publicly attesting to his unlawful and predatory behavior.[9]

### Defendant Trump's Unwanted Kissing Was Intentional and Part of a Pattern of Predatory Behavior Towards Women.

97.     In the weeks after Ms. Johnson learned of the *Access Hollywood* tape, Defendant Trump's pattern and practice of forcing himself on women became public knowledge. Specifically, Ms. Johnson learned of the multitude of public accusations by other women who had been forcibly kissed by Defendant Trump.

98.     The realization that she was not the only person Defendant Trump had forcibly kissed added to Ms. Johnson's already considerable distress.

99.     In fact, Defendant Trump has a very long history of forcibly kissing women on the mouth without their consent, as well as otherwise sexually harassing and assaulting them. Indeed, in a 2006 interview on The Howard Stern show, Defendant Trump readily agreed that he was a sexual predator:[10]

> HOWARD STERN:  Donald, seriously. You know about sexual predators and things like that, I mean –
>
> ROBIN QUIVERS: You are one!

---

[9] DelReal, Jose A. and Sean Sullivan. "Trump belittles accusers as unattractive, as more come forward." *The Washington Post*, 14 Oct. 2016, https://www.washingtonpost.com/politics/trump-belittles-accusers-as-unattractive-as-more-come-forward/2016/10/14/694fd214-923b-11e6-9c52-0b10449e33c4_story.html?utm_term=.ebf0dbdea0cd (describing one accuser, Natasha Stoynoff, as a "liar" and another, Jessica Leeds, as "not . . . my first choice, that I can tell you."); Reiman, Eliza. "The 22 women who have accused Trump of sexual misconduct." *Business Insider*, 26 Sept. 2018, https://www.businessinsider.com/women-accused-trump-sexual-misconduct-list-2017-12#jessica-drake-17 (in response to Jessica Drake's accusation that Defendant Trump grabbed and kissed her without her consent, he suggested such conduct was acceptable because of her profession: "And she's a porn star. You know, this one that came out recently, 'he grabbed me and he grabbed me on the arm.' Oh, I'm sure she's never been grabbed before . . . .").

[10] Jenavieve Hatch. "Watch Trump Say 'True' When Called a Sexual Predator in 2006." *HuffPost*, 18 Oct. 2016, https://www.huffingtonpost.com/entry/watch-trump-say-true-when-called-a-sexual-predator-in-2006_us_5804d258e4b0162c043cd864.

HOWARD STERN:   Alright, look, I wasn't gonna say that –

DEFENDANT TRUMP: It's true.

HOWARD STERN: But, uh –

DEFENDANT TRUMP: It's true.

100.   Not only does Defendant Trump forcibly kiss women intentionally, he also has no qualms about doing so in the presence of other people. For instance, Defendant Trump attempted to kiss Jennifer Hawkins, a 2004 Miss Universe winner from Australia, on the mouth in front of an audience of thousands of people. A video of the incident shows Defendant Trump grabbing Ms. Hawkins around the waist and moving in for a kiss. In the video, Ms. Hawkins turns her head to the side and puts her arm between them, and the kiss lands on her cheek.[11]

101.   Among the many examples of Defendant Trump's predatory conduct are the following allegations that Defendant Trump forcibly kissed women, most of which were only made public as a consequence of the same *Access Hollywood* tape that triggered Ms. Johnson's decision to quit the campaign:

(a)   In 1993, Defendant Trump forcibly kissed his former business partner, Jill Harth, on the lips and groped her private parts. Ms. Harth has said that incident caused her a great deal of stress and anxiety and harmed her marriage.[12]

(b)   In 1997, Defendant Trump forcibly kissed Temple Taggart, who was representing Utah in the Miss USA beauty pageant. Later that year, at a meeting in Trump

---

[11] A video of the 2011 incident can be seen at https://www.vox.com/identities/2016/10/28/13459750/trump-video-miss-universe-grab-kiss-jennifer-hawkins.

[12] Nelson, Libby. "The sexual assault allegations against Donald Trump, explained." *Vox*, 12 Oct. 2016, https://www.vox.com/2016/10/12/13234224/donald-trump-jill-harth-sexual-assault.

Tower, he kissed her on the mouth a second time, again without her consent. The kiss caught Ms. Taggart off guard, and left her feeling shocked and embarrassed.[13]

(c)     Also in 1997, Defendant Trump grabbed Cathy Heller's hand and attempted to kiss her on the mouth when she was introduced to him at Mar-a-Lago. She later stated that she was "angry and shaken" after the incident, and that Defendant Trump, who seemed to feel "entitled" to kiss her, appeared "pissed" that she did not welcome his advances.[14]

(d)     In 2005, Defendant Trump kissed Rachel Crooks, then a 22-year-old receptionist at a real estate investment company in Trump Tower, outside an elevator in the building one day. When Ms. Crooks shook Defendant Trump's hand, he would not let go of it, and kissed her directly on the mouth—just as he did Ms. Johnson. "It was so inappropriate," Ms. Crooks told *The New York Times* in October 2016. "I was so upset that he thought I was so insignificant that he could do that."[15] The incident left Ms. Crooks feeling confused and ashamed, and caused her to experience feelings of anxiety and insecurity for nearly a decade afterward.

(e)     Also in 2005, Defendant Trump forcibly kissed Natasha Stoynoff, a photographer who was interviewing Defendant Trump and his wife, Melania Trump, for a feature story on their first wedding anniversary. Ms. Stoynoff felt intimidated and scared after the encounter. Defendant Trump later suggested at a Florida rally that Ms. Stoynoff is not

---

[13] "Jackson, Hallie, et al. "Miss USA Contestant Details Unwanted Encounters with Trump." *NBC News*, 13 Oct. 2016, https://www.nbcnews.com/politics/2016-election/miss-usa-contestant-details-encounters-trump-n665521.

[14] Molly Redden, "Donald Trump 'grabbed me and went for the lips', says new accuser." *The Guardian*, 16 Oct. 2016, https://www.theguardian.com/us-news/2016/oct/15/donald-trump-sexual-misconduct-allegations-cathy-heller.

[15] Haag, Matthew. "Rachel Crooks, Who Accused Trump of Sexual Assault, Wins Legislative Primary." *The New York Times*, 9 May 2018, www.nytimes.com/2018/05/09/us/politics/rachel-crooks-ohio.html.

attractive enough for him to have sexually assaulted her, saying "Look at her. Look at her words. Tell me what you think. I don't think so."[16]

(f)     Again in 2005, Defendant Trump forcibly kissed Jessica Drake and two female friends at a golf tournament in Lake Tahoe. After the release of the *Access Hollywood* tape, Ms. Drake felt the need to come forward publicly, stating that "I realize that in this situation I may be but a tiny grain of sand. But clearly, this is an enormous beach."[17]

(g)     On October 14, 2016, Summer Zervos publicly accused Defendant Trump of greeting her and saying goodbye to her at a 2007 meeting at Trump Tower with a kiss on the lips. He later tried to grope her and aggressively kiss her on the mouth. Ms. Zervos was "incredibly hurt" by Defendant Trump's conduct and felt as though he had treated her like a sexual object. Seeing Defendant Trump non-stop on the news while he was running for office, and being asked about her connection to him, caused her "a great deal of pain and anguish" because of what he had done to her.[18]

(h)     In 2015, Defendant Trump kissed journalist Katy Tur in an incident she described as making her feel "powerless. I just stood there frozen thinking, Oh my god, what is this man doing? He's not my friend. He's not my business partner. He's not my social acquaintance. He's not a family member of mine. This is somebody I am covering. This is a

---

[16] A video of Defendant Trump's comments can be seen at
https://www.independent.co.uk/news/world/americas/donald-trump-not-attractive-enough-natasha-stoynoff-sexual-assault-look-at-her-rally-kissed-a7360826.html.
[17] Kenny, Caroline. "Latest Trump Accuser Says He Hugged, Kissed Her without Permission." *CNN*, 23 Oct. 2016, www.cnn.com/2016/10/22/politics/donald-trump-jessica-drake/index.html.
[18] Conway, Madeline. "Former 'Apprentice' contestant accuses Trump of sexually harassing her in 2007." *Politico*, 14 Oct. 2016, https://www.politico.com/story/2016/10/trump-summer-zervos-accusations-allred-229806.

presidential candidate, I am the reporter assigned on this beat—it just crosses a huge line. It's so unprofessional and so inappropriate given the circumstances."[19]

102.    Unsurprisingly, given the large number of allegations against Defendant Trump involving forcible kissing, as well as his own admission that "I just start kissing them…I don't even wait," unwanted kissing has been repeatedly described as Defendant Trump's "modus operandi."[20]

103.    Defendant Trump does not only forcibly kiss women without their consent. He also gropes them without their consent and has done so on at least the following occasions:

(a)    In the 1980s, Defendant Trump grabbed Jessica Leeds's breasts in the first-class cabin of an airplane. He tried to put his hands up her skirt and grope her. "He was like an octopus," Ms. Leeds told The New York Times.[21] "His hands were everywhere." Ms. Leeds

---

[19] Zarya, Valentina. "Katy Tur Writes About Being Kissed By Trump in Her New Book. His Response: 'Fake News'." *Fortune*, Fortune, 12 Sept. 2017, www.fortune.com/2017/09/12/katy-tur-donald-trump/.

[20] *See, e.g.*, Crockett, Emily. "A Newly Surfaced Video Shows Donald Trump Grabbing and Kissing a Former Miss Universe Onstage." *Vox*, 28 Oct. 2016, www.vox.com/identities/2016/10/28/13459750/trump-video-miss-universe-grab-kiss-jennifer-hawkins ("Trump's modus operandi, according to his accusers, is to grab them and try to kiss them on the lips. Sometimes he lands the kiss, and sometimes he doesn't — but he's allegedly forceful enough that even if the women try to pull away, he'll usually land a kiss on the cheek."); Robinson, Nathan J. "Getting Away With It." *Current Affairs*, 26 Jan. 2017, www.currentaffairs.org/2017/01/getting-away-with-it ("Nearly a dozen women have accused Trump of sexual assault, many describing a similar modus operandi: Trump simply begins grabbing them or kissing them against their will, forcing his tongue down their throats as they attempt to resist"); Stoynoff, Natasha. "Physically Attacked by Donald Trump - a PEOPLE Writer's Own Harrowing Story." *PEOPLE.com*, Time Inc, 12 Oct. 2016, www.people.com/politics/donald-trump-attacked-people-writer/ ("We walked into that room alone, and Trump shut the door behind us. I turned around, and within seconds he was pushing me against the wall and forcing his tongue down my throat … As he explained to Billy Bush, it was his usual modus operandi with women."); Schlesinger, Robert. "Measuring the Trump Effect." *U.S. News & World Report*, 14 Oct. 2016, www.usnews.com/opinion/articles/2016-10-14/will-donald-trumps-scandals-cost-the-gop-the-senate-and-house ("[T]he parade of women who have come forward asserting that his bragging [on the Access Hollywood tape] was not 'just words,' as he tried to explain it away, but actually his modus operandi.").

[21] Twohey, Megan, et al. "Two Women Say Donald Trump Touched Them Inappropriately." *The New York Times*, 12 Oct. 2016, https://www.nytimes.com/2016/10/13/us/politics/donald-trump-women.html.

fled to the back of the plane as a result of the assault. Years later, when Defendant Trump declared during the second presidential debate that he had never actually grabbed a woman's genitals without her consent, Ms. Leeds felt he was lying to her face and "wanted to punch the screen."

(b)    In the early 1990s, Defendant Trump put his hand up the skirt of Kristin Anderson at a nightclub in New York City. She and her companions were "very grossed out and weirded out," and even years later, she felt disgusted when she thought about it. Ms. Anderson later said that a stranger "groping you on the side, on the sly, like you're some kind of stuffed animal on the couch. That's really not okay, and it opens the door for much worse behavior on [his] part and for the girl, allowing worse behavior to happen to them because they feel that it's inconsequential. . . . it sends an awful message to the women that they're nothing."[22]

(c)    In 1996, Lisa Boyne, now a health food entrepreneur, told the Huffington Post she witnessed Defendant Trump looking up women's skirts and commenting on their underwear and genitalia at a dinner. Then 25 and a think tank employee, Boyne said she was invited to dinner with Trump and a modeling agent. Seated at a semi-circular table with Trump on one end, the two men at the table refused to get up and allow the women to leave the table and instead made them walk across it. Defendant Trump "stuck his head right underneath their skirts."[23]

---

[22] Tumulty, Karen. "Woman says Trump reached under her skirt and groped her in early 1990s." *The Washington Post*, 14 Oct. 2016, https://www.washingtonpost.com/politics/woman-says-trump-reached-under-her-skirt-and-groped-her-in-early-1990s/2016/10/14/67e8ff5e-917d-11e6-a6a3-d50061aa9fae_story.html?utm_term=.4a3a609bc349.

[23] Reilly, Molly. "Trump Faces Another Accusation – This Time, He Looked UP Models' Skirt. *Huffington Post*, 13 Oct. 2016, https://www.huffingtonpost.com/entry/donald-trump-models-skirts-underwear_us_57ffd172e4b0162c043ac07f.

(d)     In 1997, Former 1997 Miss Teen USA contestants said Trump walked into the dressing room while contestants, some as young as 15, were changing and casually announced "Don't worry, ladies, I've seen it all before." Former Miss Vermont Teen USA Mariah Billado, who was among the girls who were undressed, confirmed to reporters that the incident took place and recalled saying "Oh my God, there's a man in here!"[24]

(e)     In 1998, Defendant Trump groped Karena Virginia's breast while she was waiting for a car to take her home from the 1998 U.S. Open tennis tournament. Ms. Virginia was in shock, and flinched. Later, the "shock turned to shame," and for years she felt that she was at fault for the incident.[25] When she saw Defendant Trump years later she felt shame and disgust.

(f)     In 2000, Bridget Sullivan who was competing in the Miss USA contest said that Defendant Trump came backstage where the contestants were changing, walking through the dressing rooms while they "were all naked."[26] In a 2005 appearance on Howard Stern's radio show unearthed by CNN, Trump bragged about walking into contestants' dressing rooms at pageants saying: "Well, I'll tell you the funniest is that before a show, I'll go backstage and everyone's getting dressed, and everything else, and you know, no men are anywhere, and I'm allowed to go in because I'm the owner of the pageant...You know, they're standing there

---

[24] Barbash, Fred. "Former Miss Arizona: Trump 'just came strolling right in' on naked contestants." *The Washington Post*, 12 Oct. 2016, https://www.washingtonpost.com/news/morning-mix/wp/2016/10/12/former-miss-arizona-trump-just-came-strolling-right-in-on-naked-contestants/?utm_term=.af55aa1368b4.

[25] Chuck, Elizabeth. "Karena Virginia Becomes 10th Woman to Accuse Trump of Sexual Misconduct." *NBC News*, 20 Oct. 2016, https://www.nbcnews.com/news/us-news/karena-virginia-becomes-tenth-woman-accuse-trump-sexual-misconduct-n670146.

[26] Garrison, Jessica, et al. "'We Were All Naked' When Donald Trump Walked Through Beauty Queen Dressing Room." *BuzzFeedNews*, 9 Oct. 2016, https://www.buzzfeednews.com/article/jessicagarrison/we-were-all-naked-when-donald-trump-walked-in.

with no clothes. 'Is everybody OK?' And you see these incredible looking women, and so, I sort of get away with things like that."[27]

(g)     In 2001, former Miss Arizona Tasha Dixon and another unnamed Miss USA contestant recounted to news sources that Trump walked through the Miss USA dressing room while contestants were naked and then just "stood there and stared at us."[28]

(h)     In 2003, Mindy McGillivray alleged that Trump groped her while she was assisting a photographer working at an even at Mar-a-Lago. The photographer Ken Davidoff remembered Ms. McGillivray telling him that Defendant Trump "just grabbed my ass!"[29]

(i)     In 2006, Defendant Trump groped Ninni Maaksonen, a former Miss Finland, during a photoshoot before an appearance on The Late Show with David Letterman. The experience left her feeling disgusted.[30]

(j)     In 2013, Defendant Trump repeatedly groped Cassandra Searles, a former Miss Washington contestant. In a Facebook post describing the incidents later, Ms. Searles called Defendant Trump a "misogynist" who would line up beauty pageant contestants and treat them "like cattle."[31] Paromita Mitra, a Miss Mississippi USA contestant posted a response

---

[27] Kaczynski, Andrew, et al. "Donald Trump to Howard Stern: It's okay to call my daughter a 'piece of ass.'" *CNN*, 9 Oct. 2016, https://www.cnn.com/2016/10/08/politics/trump-on-howard-stern/index.html.

[28] Redden, Molly. "Miss USA 2001 contestant: Trump barged into room when we were naked." *The Guardian*, 13 Oct. 2016, https://www.theguardian.com/us-news/2016/oct/12/donald-trump-miss-usa-dressing-room-2001-rehearsal.

[29] Capozzi, Joe. "Palm Beach Post Exclusive: Local woman says Trump groped her." *The Palm Beach Post*, 12 Oct. 2016, https://www.palmbeachpost.com/news/palm-beach-post-exclusive-local-woman-says-trump-groped-her/w5ii48gwdJY9htsLl88GcP/.

[30] Bixby, Scott. "Former Miss Finland is 12th woman to accuse Donald Trump of sexual assault." *The Guardian*, 28 Oct. 2016, https://www.theguardian.com/us-news/2016/oct/27/trump-twelfth-woman-sexual-assault-accusation-ninni-laaksonen.

[31] Tuck, Lauren. "Donald Trump Reportedly Treated Miss USA Contestants Like 'Property.'" *Yahoo! News*, 17 June 2016, https://www.yahoo.com/lifestyle/donald-trump-reportedly-treated-miss-000000927.html.

stating, "I literally have nightmares about the process," while another woman, Shanon McAnally, called Ms. Searles's account "so true and extremely scary."[32]

104.    Defendant Trump's public statements provide further insight into his motives, and demonstrate that he harbors deeply misogynistic attitudes towards women. Specifically, Defendant Trump has a long history (which continues to this day) of publicly demeaning, objectifying, and engaging in overtly gendered attacks against female reporters, politicians, media personalities, employees, and others.[33]

105.    In short, Defendant Trump's battery of Ms. Johnson is part of a pattern of predatory and harassing behavior towards women. He knows that his behavior is wrong, degrading, and harmful, both because common decency dictates as much and because several victims of his unwanted advances have publicly stated so. Yet he continues to repeatedly and unashamedly grope women, kiss them without their consent, and force them to endure unwanted touching. As demonstrated by his long history of similar behavior, he does so intentionally, maliciously, and with the knowledge that it will cause damage and injury.

106.    Indeed, Defendant Trump kisses and touches women without asking for consent or permission precisely because he knows that if he does, there is a high probability that his advances will be rebuffed.

107.    In kissing and touching women without their consent, Defendant Trump's behavior is so wanting in care that it constitutes a conscious disregard to the rights of the women involved.

---

[32] *Id.*

[33] The occasions on which Defendant Trump has publicly displayed sexist attitudes are too numerous to recount here, but are well documented and have been widely reported by the press. *See, e.g.*, Cohen, Claire. "Donald Trump Sexism Tracker: Every Offensive Comment in One Place." *The Telegraph*, 14 July 2017, https://www.telegraph.co.uk/women/politics/donald-trump-sexism-tracker-every-offensive-comment-in-one-place/.

108.    Defendant Trump intentionally kissed Ms. Johnson despite knowing that there was a high probability that his kiss was unwanted and would cause her distress and embarrassment, as demonstrated both by his failure to ask her for permission and his pattern of identical conduct.

109.    Defendant Trump's conduct in kissing Ms. Johnson evidenced a conscious disregard for or indifference to her rights.

### Ms. Johnson was Underpaid Compared to Her Colleagues

110.    In addition to the forcible kissing Ms. Johnson experienced during her time with the Campaign, Ms. Johnson was vastly underpaid compared to many of her Campaign counterparts who were white, despite her critical role at various stages of the Campaign.

111.    Ms. Johnson was also underpaid compared to similarly qualified and less qualified male staffers. She did not know this fact until very recently. Ms. Johnson's experience is not isolated— indeed, the Campaign engaged in systemic gender discrimination in pay against its female employees.

112.    Ms. Johnson was paid $3,000 per month between January and August 2016. She was paid a $1,000 bonus on August 31, 2016. From September 2016 until she left the campaign, she was paid $4,000 per month. But despite all her hard work and success, particularly at critical times in the campaign, Ms. Johnson was compensated at a lower level than virtually all her colleagues. Specifically, Ms. Johnson's compensation was substantially lower than that paid to other Campaign staff who had the same responsibilities as she did, and even other Campaign staff who had fewer responsibilities than she did:

(a)    Sidney Bowdidge, a white man, is a former massage therapist who was part of the National Strike Team with Ms. Johnson. He was responsible for volunteer recruitment and management, just like Ms. Johnson. He traveled with Ms. Johnson as part of the National Strike Team. For that work, he was paid $3,500 per month from March through August 2016

(except for April 2016, when he was paid $6,000) and $7,000 per month for the remainder of the campaign.

(b)     Matt Ciepielowski, a white man, was part of the National Strike Team with Ms. Johnson, and they traveled to all of the same states. Mr. Ciepielowski was paid $8,000 per month from January through June 2016 (except for April 2016, when he was paid $10,500), and $10,000 per month for the rest of the campaign.

(c)     Austin Browning, a white male teenager, was a high school senior when he was hired during the general election. He was paid $5,618.58 in August 2016, $7,817.78 in September 2016, $8,592.30 in October 2016, and $6,421.07 in November 2016.

(d)     David Chiokadze, a white man, assisted the Communications Director for the Florida team in preparing talking points and written statements for the Campaign. Mr. Chiokadze and Ms. Johnson worked closely together during the general election in Florida, and Ms. Johnson frequently helped Mr. Chiokadze with his work. Yet Mr. Chiokadze was paid $8,000 in May 2016, $9,003.25 in June 2016, $8,000 in July 2016, $13,148 in August 2016, $8,363.56 in September 2016, and $5,907.90 in October 2016.

(e)     Tony Ledbetter, a white man, was responsible for representing the Campaign in the northern part of Florida during the general election, just as Ms. Johnson had been responsible for representing the campaign in the northern part of Alabama during the primaries. Mr. Ledbetter had fewer responsibilities than Ms. Johnson did during the general election, because while Ms. Johnson was in charge of operating the RV program throughout the entire state, Mr. Ledbetter was only responsible for a few counties. Yet Mr. Ledbetter was paid $3,500 per month from January through March 2016 and $5,500 per month between August and October 2016.

113.    The Campaign knew that it was underpaying Ms. Johnson relative to her white counterparts. It knew this because campaigns are required to track disbursements and report them to the FEC.

114.    The Campaign also knew that it is illegal to pay white people more than African American people for the same work. Yet the Campaign paid Ms. Johnson less than her white counterparts, both men and women.

115.    The Campaign also knew that it was underpaying Ms. Johnson, and the rest of its female staff, relative to male employees. In addition to the Campaign's obligations to report pay information to the FEC, while the 2016 campaigns were ongoing it was reported that men employed by the Campaign made "about 35% more" than women.[34] Accusations of gender-based pay discrimination by the Campaign were widely reported.[35]

116.    And, the Campaign knew that it is illegal to pay women less than men for the same work. Yet the Campaign willfully paid its female employees less than its male employees.

117.    There is no reasonable basis for Ms. Johnson's lower pay. Ms. Johnson successfully helped organize rallies, including one in Alabama touted by Defendant Trump himself as the "biggest crowd of the political season by far," and was chosen as one of the select few to be a part of the elite National Strike Team that traveled to critical primary states. And Ms. Johnson was ultimately selected to work in the important battleground state of Florida for the general election campaign as the Operations Administrative Director. Indeed, given the Campaign's reliance and trust in her, and her

---

[34] Matt Viser. "Donald Trump's Campaign Pays Women Less Than Men." *The Boston Globe*, 4 June 2016, https://www.bostonglobe.com/news/politics/2016/06/04/donald-trump-campaign-pays-women-less-than-men/VIu0v2MUJiHqhvc5C0W5dO/story.html.

[35] *E.g.*, Trip Gabriel. "Donald Trump Field Organizer Accuses Campaign of Sex Discrimination." *The New York Times*, 31 Jan. 2016, https://www.nytimes.com/2016/02/01/us/politics/trump-field-organizer-accuses-campaign-of-sex-discrimination.html?_r=1.

wide range of responsibilities, the fact that a high school age student was making roughly twice what Ms. Johnson made throws the unequal pay into sharp relief.

118.     The Campaign's discriminatory pay was part of a larger culture of racist and sexist behavior that pervaded the Campaign. Defendant Trump set the tone in his campaign rallies by highlighting and playing on racist tropes about Latin American immigrants, Muslims, and African Americans.

119.     Additionally, Ms. Johnson endured and observed repeated instances of racist and sexist remarks throughout the Campaign. In Florida, Ms. Johnson's direct supervisor, Jennifer Locetta, repeatedly made racist and sexist remarks to Ms. Johnson, including referring to Ms. Giorno's hair as "nappy," and calling an Indian American volunteer a "dot-head." Campaign staff casually referred to black men as "thugs" and discussed the view that Michelle Obama is secretly a man.

## COLLECTIVE ACTION ALLEGATIONS

120.     The Campaign engaged in systemic gender-based pay discrimination against its female employees. It knowingly and willfully paid its female employees less than its male employees for the same work.

121.     Ms. Johnson seeks to be appointed as a representative of the collective.

122.     Ms. Johnson brings these collective claims pursuant to 29 U.S.C. § 216(b), seeking damages, equitable relief, and any other make-whole relief on behalf of all female Campaign employees who were paid less than male employees doing the same or similar work for claims under the Equal Pay Act ("EPA").

123.     Ms. Johnson and the collective are similarly situated in that they were female Campaign staff who were affected by policies and practices with the purpose and effect of denying them equal compensation for the same or similar work because of their gender.

124.    There are many similarly situated collective members who would benefit from the issuance of a court-supervised notice of the present lawsuit and the opportunity to join the present lawsuit. Notice should be sent to the collective pursuant to 29 U.S.C. § 216(b).

125.    Questions of law and fact common to Ms. Johnson and the collective include, but are not limited to, the following:

(a)    Whether members of the collective were subjected to an unlawful common policy that resulted in unequal pay for equal work;

(b)    Whether the Campaign unlawfully failed and continues to fail to compensate members of the collective at a level commensurate with similarly situated male employees;

(c)    Whether the Campaign's policy, practice, or procedure of failing to compensate members of the collective at levels commensurate with male employees violates applicable provisions of the EPA;

(d)    Whether the Campaign's failure to compensate members of the collective at a level commensurate with comparable male employees was willful within the meaning of the EPA.

126.    Ms. Johnson's claims for violation of the EPA may be brought and maintained as an opt-in collective action pursuant to 29 U.S.C. § 216(b) because her claims are similar to the claims of the collective she seeks to represent.

127.    Ms. Johnson and the collective that she seeks to represent (a) are similarly situated and (b) are or were subjected to the Campaign's common compensation policies, practices, and procedures and centralized decision-making resulting in unequal pay based on sex by failing to compensate members of the collective at a level commensurate with male employees who perform substantially equal work and/or hold equivalent levels, job titles, and positions.

## COUNT I
## BATTERY AGAINST DEFENDANT TRUMP
### (On Behalf of Plaintiff Individually)

128.     Plaintiff incorporates paragraphs 1 through 119 above as if fully written herein.

129.     On August 24, 2016, Defendant Donald J. Trump did in fact intentionally touch Plaintiff, Alva T. Johnson, on her person against her will and without her legal consent. Prior to a Campaign rally in Tampa, Florida, Plaintiff attended a meet-and-greet where Defendant Trump met volunteers and supporters inside a Campaign RV. During that meet-and-greet event, Defendant Trump forcibly kissed Ms. Johnson in the presence of several of her colleagues and others. The forced and unwanted kiss was deeply offensive to Ms. Johnson.

130.     As a direct and proximate result of Defendant's battery on Plaintiff, Plaintiff has in the past suffered, and continues to suffer emotional distress, psychological trauma, humiliation, embarrassment, loss of dignity, invasion of privacy and other damages. Plaintiff also suffered damages in the form of medical expenses.

131.     As a direct and proximate result of Defendant's battery on Plaintiff, Plaintiff has also suffered a loss of income and a loss of the capacity to enjoy life.

132.     Defendant performed the acts herein alleged with malice, moral turpitude, wantonness, willfulness, and reckless indifference to the rights of others. Defendant had actual knowledge of the wrongfulness of his conduct and the high probability that injury or damage to Plaintiff would result and, despite that knowledge, intentionally touched Plaintiff, which did in fact result in injury and damage to Plaintiff.

133.     WHEREFORE, Plaintiff prays this Court will enter an order prohibiting Donald J. Trump from grabbing, kissing or otherwise assaulting or harassing women without prior express consent. Plaintiff further demands judgment against Defendant for compensatory damages, including economic damages and non-economic damages for emotional pain, suffering, mental anguish,

embarrassment, humiliation, and loss of enjoyment of life; punitive damages; prejudgment interest;

costs; and such other and further relief as this Court deems just and proper.

## COUNT II
## UNEQUAL PAY BASED ON GENDER AGAINST DEFENDANT DONALD J. TRUMP
## FOR PRESIDENT, INC.
### (Equal Pay Act)
### (On Behalf of Plaintiff and the Collective)

134.    Plaintiff incorporates paragraphs 1 through 127 above as if fully written herein.

135.    Defendant Donald J. Trump for President, Inc. has discriminated against Plaintiff in

violation of the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 206, et seq., as amended by the Equal

Pay Act of 1963 ("EPA"). The Campaign paid Plaintiff and the collective less than similarly-situated

male colleagues while performing equal work on jobs the performance of which requires skill, effort,

and responsibility, and which are performed under similar working conditions.

136.    For example, Plaintiff was paid $3,000 per month between January and August 2016,

a $1,000 bonus on August 31, 2016, and $4,000 per month from September 2016 until her departure

from the campaign. As described more fully herein, these sums were substantially less than those paid

to similarly-situated male Campaign staff performing equal and sometimes lesser work on jobs the

performance of which requires equal skill, effort, and responsibility, and which were performed under

similar working conditions.

137.    The differential in pay between Plaintiff and the Campaign's male employees was not

due to seniority, merit, quantity, or quality of production, but was due to gender.

138.    Defendant did not act in good faith, and caused, attempted to cause, contributed to,

or caused the continuation of, the wage rate discrimination based on sex in violation of the EPA.

Moreover, the foregoing conduct constitutes a willful violation of the EPA within the meaning of 29

U.S.C. § 255(a). Because Defendant has willfully violated the EPA, a three-year statute of limitations

applies to such violations, pursuant to 29 U.S.C. § 255(a).

139.     As a direct result of Defendant's discriminatory policies and/or practices described above, Plaintiff has suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

140.     Defendant's actions have caused Plaintiff substantial losses in employment opportunities, earnings, and other employment benefits. In addition, Plaintiff suffered and continues to suffer emotional distress, humiliation, embarrassment, and anguish.

141.     WHEREFORE, Plaintiff demands judgment against Defendant Donald J. Trump for President, Inc. for compensatory damages, including economic damages and non-economic damages for emotional pain, suffering, mental anguish, embarrassment, humiliation, and loss of enjoyment of life; back pay; front pay; punitive damages; prejudgment interest; costs; and such other and further relief as this Court deems just and proper.

## COUNT III
## UNEQUAL PAY BASED ON RACE AGAINST DEFENDANT DONALD J. TRUMP FOR PRESIDENT, INC.
### (42 U.S.C. § 1981)
### (On Behalf of Plaintiff Individually)

142.     Plaintiff incorporates paragraphs 1 through 119 above as if fully written herein.

143.     Defendant Donald J. Trump has discriminated against Plaintiff in violation of 42 U.S.C.A. § 1981. Plaintiff was paid $3,000 per month between January and August 2016. She was paid a $1,000 bonus on August 31, 2016. From September 2016 until she left the campaign, she was paid $4,000 per month. As described more fully herein, these sums were substantially less than those paid to similarly-situated white Campaign staff performing equal and sometimes lesser work on jobs the performance of which requires equal skill, effort, and responsibility, and which were performed under similar working conditions.

144.     The differential in pay between Plaintiff and white employees was not due to seniority, merit, quantity, or quality of production, but was due to race.

145.    Defendant did not act in good faith, and caused, attempted to cause, contributed to, or caused the continuation of, the wage rate discrimination based on race in violation of § 1981.

146.    As a direct result of Defendant's discriminatory policies and/or practices described above, Plaintiff has suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

147.    Defendant's actions have caused Plaintiff substantial losses in employment opportunities, earnings, and other employment benefits. In addition, Plaintiff suffered and continues to suffer emotional distress, humiliation, embarrassment, and anguish.

148.    WHEREFORE, Plaintiff demands judgment against Defendant Donald J. Trump for President, Inc. for compensatory damages, including economic damages and non-economic damages for emotional pain, suffering, mental anguish, embarrassment, humiliation, and loss of enjoyment of life; back pay; front pay; punitive damages; prejudgment interest; costs; and such other and further relief as this Court deems just and proper.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for judgment as follows:

## AS TO COUNT I

1.    For an injunction prohibiting Donald J. Trump from grabbing, kissing or otherwise assaulting or harassing women without prior express consent;

2.    All damages, including compensatory, punitive, and special damages;

3.    Equitable and declaratory relief;

4.    Attorney's fees and costs of suit, to the extent provided by law;

5.    Pre-and post-judgment interest to the extent provided by law; and

6.    Such other and further relief as the Court deems just.

## AS TO COUNT II

7.     That the Court certify this action as a collective action under the EPA on behalf of Plaintiff and the collective; designate Plaintiff as the representative of the collective; promptly issue notice pursuant to 29 U.S.C. § 216(b) to all similarly situated members of the collective, which (1) apprises them of the pendency of this action and (2) permits them to assert timely EPA claims in this action by filing Individual Consent to Join forms pursuant to 29 U.S.C. § 216(b); and toll the statute of limitations for the claims of all members of the collective from the date the original complaint was filed until collective members are provided with reasonable notice of the pendency of this action and a fair opportunity to exercise their right to opt in as Collective Action Plaintiffs;

8.     A declaratory judgment that the practices complained of herein are unlawful and violate 29 U.S.C. § 216(b).

9.     A preliminary and permanent injunction against the Campaign from engaging in policies, patterns, or practices that discriminate against Plaintiff and other collective members because of their gender;

10.     An order that the Campaign institute and carry out policies, practices, and programs that provide equal employment opportunities for all employees regardless of gender and that it eradicate the effects of their past and present unlawful employment practices;

11.     An order retaining jurisdiction over this action to ensure that the Campaign complies with the decree;

12.     An order for front pay and back pay (including interest and benefits) for Plaintiff and collective members;

13.     All damages sustained as a result of the Campaign's conduct, including damages for emotional distress, humiliation, embarrassment, and anguish, according to proof;

14.     Liquidated damages;

15.     Exemplary and punitive damages in an amount commensurate with the Campaign's ability to pay and to deter future conduct;

16.     Costs included here, including reasonable attorney's fees to the extent allowable by law;

17.     Pre-judgment and post-judgment interest as provided by law; and

18.     Such other and further legal and equitable relief as this Court deems necessary, just, and proper.

## AS TO COUNT III

19.     That the Court award all damages, including compensatory, punitive, and special damages;

20.     Equitable and declaratory relief;

21.     Attorney's fees and costs of suit, to the extent provided by law;

22.     Pre-judgment and post-judgment interest to the extent provided by law; and

23.     Such other and further relief as the Court deems just.

## JURY DEMAND

Plaintiff demands a trial by jury in this action of all issues so triable.


Dated February 25, 2019                    Respectfully Submitted,


  */s/ Hassan A. Zavareei*
Hassan A. Zavareei (*pro hac vice* forthcoming)
**Trial Counsel**
Katherine M. Aizpuru (*pro hac vice* forthcoming)
**TYCKO & ZAVAREEI LLP**
1828 L Street NW, Suite 1000
Washington, D.C. 20036
P: (202) 417-3667
F: (202) 973-0950
hzavareei@tzlegal.com
kaizpuru@tzlegal.com

  */s/ Janet R. Varnell*
Janet Varnell (Fla. Bar No. 71072)
Brian W. Warwick, (Fla. Bar No. 0605573)
**VARNELL & WARWICK, PA**
P.O. Box 1870
Lady Lake, FL 32158-1870
P: 352-753-8600
F: 352-503-3301
jvarnell@varnellandwarwick.com
bwarwick@varnellandwarwick.com

Tanya S. Koshy (*pro hac vice* forthcoming)
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, CA 94612
P: (510) 250-3298
F: (202) 973-0950
tkoshy@tzlegal.com

____/s/ F. Paul Bland_____
F. Paul Bland (*pro hac vice* forthcoming)
Karla Gilbride (*pro hac vice* forthcoming)
**PUBLIC JUSTICE, P.C.**
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600

Jennifer Bennett (*pro hac vice* forthcoming)
**PUBLIC JUSTICE, P.C.**
475 14th Street, Suite 610
Oakland, CA 94612
(510) 622-8150