UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ALVA JOHNSON,
**Individually and On Behalf of All Others**
**Similarly Situated,**

      **Plaintiff,**                         **Case No. 8:19-cv-00475-WFJ-SPF**

**v.**

**DONALD J. TRUMP,**
**In his Individual Capacity and**
**DONALD J. TRUMP FOR**
**PRESIDENT, INC.**

      **Defendants.**

_____/

## DEFENDANTS' MOTION TO STRIKE PORTIONS OF PLAINTIFF'S COMPLAINT AND MEMORANDUM OF LAW IN SUPPORT THEREOF

### ORAL ARGUMENT REQUESTED PURSUANT TO LOCAL RULE 3.01(j)

Pursuant to Rule 12(f) of the Federal Rules of Civil Procedure, defendants Donald J. Trump ("Mr. Trump") and Donald J. Trump for President, Inc. (the "Campaign") (collectively, "Defendants"), by their undersigned counsel, move the Court for entry of an Order striking portions of plaintiff Alva Johnson's ("Plaintiff") Complaint [Dkt. No. 1], and in support thereof state as follows:

## I. MOTION

1.      Mr. Trump and the Campaign move to strike the following paragraphs in Plaintiff's Complaint, in whole or in part, on the grounds they contain scandalous, immaterial, impertinent and highly prejudicial allegations: 1, 2, 3, 5, 14, 15, 28, 76, 79, 81, 96, 97, 98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108.  The specific passages in these paragraphs that Mr.

Trump and the Campaign seek to strike are highlighted in the copy of Plaintiff's Complaint attached hereto as Exhibit 1 (collectively, the "Trump Allegations").

2.      Mr. Trump and the Campaign further move to strike Plaintiff's prayer for entry of an order "prohibiting Donald J. Trump from grabbing, kissing or otherwise assaulting or harassing women without prior express consent" in connection with her claim for battery against Mr. Trump (the "Injunction Prayer"), on the grounds that this relief is unavailable as a matter of law.  [Complaint, ¶ 133, Prayer for Relief, ¶ 1.]  These portions of the Complaint are also highlighted in the copy of the Complaint attached hereto as Exhibit 1.  Following the parties' meet and confer regarding this Motion pursuant to Local Rule 3.01(g), Plaintiff's counsel consented, verbally and writing, to strike the Injunction Prayer from the Complaint. Accordingly, Defendants have provided Plaintiff's counsel with a proposed stipulated motion to strike the Injunction Prayer from the Complaint, but as of the time of this filing, Plaintiff's counsel has not consented to the filing of the stipulated motion.  Following Plaintiff's anticipated consent to the stipulated motion and the Court's grant of the same, Defendants will provide notice to the Court of their withdrawal of the arguments herein with respect to the Injunction Prayer.  The remaining arguments in this instant Motion remain in dispute.

WHEREFORE, based upon the below legal argument with supporting authority, Mr. Trump and the Campaign respectfully request that the Court strike the Trump Allegations and the Injunction Prayer from Plaintiff's Complaint.

Pursuant to Local Rule 3.01(j), Defendants respectfully request that the Court schedule an oral argument on this Motion.  Defendants estimate that a total of thirty (30) minutes will be required for such oral argument.

## II. MEMORANDUM OF LAW

### A. Introduction

Plaintiff's Complaint reads more like a supermarket tabloid than a request for legal relief. Despite the narrow scope of Plaintiff's battery claim arising out of alleged conduct by Mr. Trump on August 24, 2016, and her statutory pay claims against the Campaign, Plaintiff devotes a substantial portion of her Complaint on gratuitous and inflammatory allegations that have nothing to do with Plaintiff or her battery and claims, and serve no purpose but to disparage Mr. Trump, cloud the relevant issues and prejudice Mr. Trump and the Campaign.   These inappropriate allegations (the Trump Allegations) accuse Mr. Trump of engaging in improper conduct with respect to at least nineteen (19) women who are not parties to this action (most of which alleged conduct is alleged to have occurred 12-30 years ago), making lewd comments wholly unrelated to Plaintiff or her claims (each of which are at least a decade prior to the date of the alleged battery), engaging in a "long history" or "pattern" of "sexually predatory conduct," and "harbor[ing] deeply misogynistic attitudes towards women."   These allegations have no place in Plaintiff's Complaint and should be stricken.

"[S]uperflous descriptions and not substantive elements of the cause of action….have no place in pleadings before the court."  *Alvarado-Morales v. Digital Equip. Corp.*, 843 F.2d 613, 618 (1st Cir. 1988).  The Trump Allegations are the very definition of superfluous: they are unnecessary to properly plead Plaintiff's claims, and have no bearing on her claims. Additionally, Plaintiff's back-door attempt to use the Trump Allegations to establish an alleged "pattern and practice" in her pleading with respect to Mr. Trump's alleged "treatment of women" is a blatant attempt to use past alleged conduct or character evidence to support her claims, which is expressly prohibited by Federal Rule of Evidence 404.

The Trump Allegations also are highly prejudicial to both Mr. Trump and his presidential re-election Campaign.  These improper allegations are calculated to inflame a jury, blur the relevant issues, and cause the jury to rely on unwarranted inferences, thereby concluding that Mr. Trump "must have" engaged in the alleged battery, not because of any actual evidence of battery against Plaintiff, but because of the existence of nineteen wholly unrelated allegations and alleged prior statements made by Mr. Trump that have nothing to do with Plaintiff.

Plaintiff also will surely seek discovery on each of the nineteen other allegations, including depositions of each of the nineteen other accusers, all other alleged witnesses relevant to those allegations, and all documents related to same—thereby turning discovery of one case into discovery of twenty cases, all within this one case, notwithstanding the fact that nineteen of those cases have nothing to do with the legitimate claims and defenses in this action.  Plaintiff's lawsuit already seeks to turn this case into a media circus, and this Court into an unwitting participant.  By trying to assert claims and seek discovery of nineteen irrelevant allegations, Plaintiff seeks to multiply the improper aspects of this case twentyfold.  Accordingly, reference to these nineteen other allegations, Mr. Trump's alleged prior statements and Plaintiff's attempt to brand Mr. Trump as a "sexual predator" and "misogynist" based thereon is scandalous, immaterial, impertinent and highly prejudicial, and should be stricken.

Mr. Trump and the Campaign also move to strike Plaintiff's Injunction Prayer, which seeks an order "prohibiting Donald J. Trump from grabbing, kissing or otherwise assaulting or harassing women without prior express consent" in connection with her claim for battery against Mr. Trump.  This relief is unavailable as a matter of law because an injunction to obey the law, which is what Plaintiff is seeking, is not enforceable.  Also, there is no legal right to seek an injunction in connection with a battery cause of action.  Moreover, monetary damages are

available to adequately compensate Plaintiff for any alleged battery (as evidenced by her prayer for monetary damages).

Accordingly, Mr. Trump and the Campaign respectfully request that the Court strike the Trump Allegations and Injunction Prayer.

**B.** <u>**Legal Standard On Motion To Strike**</u>

A court may strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Courts have "broad discretion in making this determination." *DeJesus v. Cigna Corp.*, 2018 WL 375579, at *2 (M.D. Fla. Jan. 11, 2018). "The purpose of a motion to strike is 'to clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters.'" *Slone v. Judd*, 2009 WL 5214984, at *1 (M.D. Fla. Dec. 29, 2009), quoting *McInerney v. Moyer Lumber & Hardware, Inc.*, 244 F.Supp.2d 393, 402 (E.D. Pa. 2002); *see also Sidney-Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1983) ("[T]he function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial"). A motion to strike is properly granted where "'the matter sought to be omitted has no possible relationship to the controversy, may confuse the issues, or otherwise prejudice a party.'" *Schmidt v. Life Ins. Co. of N. Am.*, 289 F.R.D. 357, 358 (M.D. Fla. 2012), quoting *Reyher v. Trans World Airlines, Inc.*, 881 F. Supp. 574, 576 (M.D. Fla. 1995). "[S]uch motions are not disfavored where they remove 'unnecessary clutter' from the litigation." *Sun Life Assurance Co. of Canada v. Great Lakes Bus. Credit LLC*, 968 F. Supp. 2d 898, 902 (N.D. Ill. 2013), citing *Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1294 (7th Cir. 1989).

"Scandalous" matter is any allegation that "unnecessarily reflects on the moral character of an individual," "states anything in repulsive language that detracts from the dignity of the

court" or casts "a cruelly derogatory light on a party or other person." *S.D. v. St. Johns Cty. Sch. Dist.*, 2009 WL 1941482, at *4 (M.D. Fla. July 7, 2009); *S.E.C. v. Lauer*, 2007 WL 1393917, at *2 (S.D. Fla. Apr. 30, 2007) (striking as scandalous a letter that accused attorneys of immoral and unethical conduct without any legitimate basis) (internal quotations and citations omitted); *see also* Phillips & Stevenson, *Rutter Group Prac. Guide Fed. Civ. Proc. Before Trial (Nat Ed.)*, Ch. 9-G, § 9:388 (2019).

"Immaterial matter" is one that has no important relationship to the claim or defense." *S.D. v. St. Johns Cty. Sch. Dist.*, 2009 WL 1941482, at *1 (M.D. Fla. July 7, 2009).  An "impertinent" matter is one "that do[es] not pertain, and [is] not necessary, to the issues in question, or "that could not be admitted as evidence in the action." *126th Ave. Landfill, Inc. v. Pinellas Cty.*, *Fla.*, 2009 WL 1544030, at *3 (M.D. Fla. June 3, 2009); Phillips & Stevenson, *Rutter Group Prac. Guide Fed. Civ. Proc. Before Trial (Nat Ed.)*, Ch. 9-G, § 9:387 (2019). Even "a statement of unnecessary particulars in connection with and descriptive of that which is material" may be stricken as immaterial. *Fodor v. E. Shipbuilding Grp.*, 2014 WL 50783, at *5 (N.D. Fla. Jan. 7, 2014).

### C.  **The Trump Allegations Should Be Stricken**

#### i.   The Trump Allegations Are Scandalous, Immaterial And Impertinent

The Trump Allegations fall squarely within the definition of scandalous, immaterial and impertinent matter.  These allegations, which accuse Mr. Trump of improper conduct with respect to nineteen other women who are not parties to this action, making lewd comments wholly unrelated to Plaintiff or her claims, engaging in "long history" of "sexually predatory conduct," and "harbor[ing] deeply misogynistic attitudes towards women," are gratuitously inflammatory and serve no purpose but to disparage Mr. Trump, cloud the relevant issues, and

prejudice the trier of fact against Mr. Trump and the Campaign.

The Trump Allegations have no legitimate bearing on any of Plaintiffs' claims and have no place in her Complaint.  "[S]uperfluous descriptions and not substantive elements of the cause of action….have no place in pleadings before the court." *Alvarado-Morales v. Digital Equip. Corp.*, 843 F.2d 613, 618 (1st Cir. 1988); *see also Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), rev'd on other grounds, 510 U.S. 517 (1994) ("Superfluous historical allegations are a proper subject of a motion to strike.").  Here, the Trump Allegations are superfluous and have no relationship to the substantive elements of any of her claims, and are completely unnecessary for Plaintiff to plead her claims.

Under Florida law, "battery consists of the infliction of a harmful or offensive contact upon another with the intent to cause such contact or the apprehension that such contact is imminent." *Paul v. Holbrook*, 696 So. 2d 1311, 1312 (Fla. Dist. Ct. App. 1997).  Here, Plaintiff need only allege facts related to the specific conduct underlying the alleged battery that occurred on August 24, 2016, *i.e.*, Plaintiff's alleged interactions with Mr. Trump on that date, to satisfy the "short and plain" pleading requirement under FRCP 8.  Thus, Plaintiff's foray into Mr. Trump's alleged conduct decades before the date of the alleged battery, and her effort to brand him a serial "sexual predator" and "misogynist" is the very definition of scandalous, immaterial and impertinent, and should be stricken.

Courts routinely strike similar inflammatory allegations in pleadings pursuant to FRCP 12(f).  In *Smith v. City of Lake City, Fla.*, 2012 WL 4772286 (M.D. Fla. Oct. 8, 2012) the defendant moved to strike allegations from plaintiff's race discrimination complaint regarding defendant's pattern or practice of discriminating against other similar individuals based on race. Granting this motion, the court held that "[p]laintiff brings this action as a single individual

alleging personal harm" and the inclusion of allegations in the complaint of similar conduct with respect to others was improper. *Id.* at 2. In reaching this holding, the court observed that while it may be possible that plaintiff would be able to submit evidence of other employees who suffered similar types of discrimination in the course of the case, such allegations were not proper in a complaint because "[t]here is a significant distinction between admissible evidence and well pled allegations in a complaint." *Id.*

In *Vita Nuova Foods, Inc. v. Vita Nuova Prod., Inc.*, 2008 WL 11331718, at *1 (S.D. Fla. Oct. 24, 2008), the plaintiff moved to strike allegations in defendant's answer and counterclaim related to a third-party defendant ("Gamez"), which labeled him as a "Convicted Felon," detailed the crimes for which he was convicted, and included a printout of his criminal records. *Id.* at 1-2. In response, the defendant argued these allegations were necessary to support its counterclaims for abandonment and fraudulent application of the trademark at issue. *Id.* at *2. The Court rejected this argument and struck all allegations and documents related to Gamez's criminal record, finding they were immaterial, scandalous, had no bearing on the subject matter, were intended to solely embarrass plaintiff and Gamez, and were not necessary to properly plead any of defendant's affirmative defenses or counterclaim. *Id.* The Court further held that future issues regarding the potential relevancy of Gamez's criminal record could be adequately resolved via a motion at a later date. *Id.* Additionally, the court informed the parties that defendant's inclusion of the aforementioned criminal information "treads closely" to violating the Florida Rules of Professional Conduct, Rules Regulating the Florida Bar 4-3.1 and 4-3.4(g), and advised that the court would be monitoring defendant's counsel to ensure no further misconduct

occurred. *Id.* at 3.[1]

In *Dukes v. Miami-Dade Cty.*, 2007 WL 2696775 (S.D. Fla. Sept. 11, 2007), defendants moved to strike from plaintiffs' excessive force and assault and battery complaint allegations regarding the defendants' efforts to cover up their conduct. *Id.* at *3. Opposing this motion, plaintiffs argued these allegations "contain[ed] facts that are 'part and parcel of the facts that will be revealed in the trial of this case.'" *Id.* Citing the FRCP 8 pleading standard, the Court rejected defendants' argument and held: [p]laintiffs' factual allegations about events that took place after the alleged beatings and arrests are unnecessary and thus improperly pled because they are not relevant to an assessment of liability on any of the [p]laintiffs' remaining claims…the factual allegations of post-arrest cover-up are immaterial to [p]laintiffs['] claims and therefore have no place in the [operative] Complaint." *Id.*

In *Breckenridge Pharm., Inc. v. Metabolite Labs., Inc.*, 2007 WL 201261 (S.D. Fla. Jan. 24, 2007) the plaintiff moved to strike a litany of misconduct allegations in the defendant's answer and counterclaim for infringement, which alleged an unclean hands defense based upon plaintiff's purported "'misrepresentations to this and other courts, its sale of adulterated pharmaceuticals, its sale of diluted cancer drugs, and its pattern of willfully disregarding the intellectual property rights of others," and also contained allegations of unsubstantiated newspaper reports of various persons not related to plaintiff, civil claims of false representation

---

[1] Rule 4-3.1 of the Rules Regulating the Florida Bar provides, in pertinent part: "A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification, or reversal of existing law."

Rule 4-3.4(g) of the Rules Regulating the Florida Bar provides that a lawyer must not: "present, participate in presenting, or threaten to present criminal charges solely to obtain an advantage in a civil matter."

of products and misconduct by attorneys not related to the instant case. *Id.* at *2. In striking all of these allegations, the court held the aforementioned allegations were scandalous, likely irrelevant, intended to harm the reputation of plaintiff and its principal, and were not necessary to properly plead defendant's unclean hands defense or affirmative claims under the notice pleading standard. *Id.* at 3.[2]

Here, Plaintiff's battery claim is based solely on the alleged harm she personally suffered as a result of her alleged interactions with Mr. Trump on August 24, 2016. Accordingly, Plaintiff's scandalous and inflammatory allegations regarding Mr. Trump's alleged conduct, unrelated to her or the alleged battery incident, has no place in a pleading. Moreover, Plaintiff's

---

[2] *See also Cowell v. Utopia Home Care, Inc.,* 144 F. Supp. 3d 398, 406 (E.D.N.Y. 2015) (striking references in FLSA complaint to other actions brought against defendant and deposition excerpts of defendant's executive for the purpose of showing willfulness because such references were "'immaterial, impertinent or scandalous' and inappropriate in a complaint, and are not necessary to allege wil[l]fulness."); *Morse v. Weingarten,* 777 F. Supp. 312, 319 (S.D.N.Y. 1991) (striking references to defendant's prior criminal conviction and income level in complaint for Securities Exchange Act violation, common law fraud and negligent misrepresentations because references "are immaterial and impertinent to this case, and may be 'scandalous,' do not bear[] remotely on the merits of this case, and [r]eference to those matters serves no purpose except to inflame the reader."); *Fodor v. E. Shipbuilding Grp.,* 2014 WL 50783, at *5 (N.D. Fla. Jan. 7, 2014) (striking allegations that defendant forged documents and request for criminal penalties because they "are derogatory, vexatious and only obscure the issues before the court…[and] not within the scope of" the causes of action brought by plaintiff); *Glob. View Ltd. Venture Capital v. Great Cent. Basin Expl., L.L.C.,* 288 F. Supp. 2d 473, 481 (S.D.N.Y. 2003) (striking allegations that defendants engaged in "fraudulent, self-dealing, malicious and otherwise outrageous misconduct" and were "unscrupulous, unprincipled con artists" because allegations "amount[] to nothing more than name calling, and do[] not contribute to [plaintiff's] substantive claims."); *Wilkerson v. Butler,* 229 F.R.D. 166, 170 (E.D. Cal. 2005) (striking allegations of plaintiff's unprofessional manner of delivering diagnosis as immaterial to malpractice claim); *Oram v. SoulCycle LLC,* 979 F. Supp. 2d 498, 512 (S.D.N.Y. 2013) (striking allegations in wage claim complaint that defendants mistreated their customers as "unnecessary and inappropriate statements prejudicial to [d]efendants in that as a pleading, the [complaint] may be reviewed by the jury at the trial of this matter."); *Bureerong v. Uvawas,* 922 F. Supp. 1450, 1479 (C.D. Cal. 1996) (striking term "slave sweatshop" from complaint even though some defendants pled guilty to slavery charges because term "adds nothing material" to complaint, not necessary to show defendants subjected plaintiffs to involuntary servitude, it was highly prejudicial to defendants and appeared only for inflammatory effect).

attempt to use the Trump Allegations to establish an alleged "pattern and practice" through her pleading with respect to Mr. Trump's alleged treatment of women, is a blatant attempt to rely on past alleged conduct or character evidence as probative of a propensity to act in accordance with that trait, which is expressly prohibited by the Federal Rules of Evidence. Federal Rule of Evidence 404 provides, in pertinent part, that "[e]vidence of a person's character or character trait **is not admissible** to prove that on a particular occasion the person acted in accordance with the character or trait" and "[e]vidence of a crime, wrong, or other act **is not admissible** to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." *Fed. R. Evid.* 404(a)(1), (b)(1) (emphasis added). Through the Trump Allegations, Plaintiff is attempting to make an end run around these rules.

Pursuant to Federal Rule of Evidence 404, the court in *United States v. Med-Care Diabetic & Med. Supplies, Inc.*, 2014 WL 12279511 (S.D. Fla. June 17, 2014) granted a motion to strike references to a defendants' prior criminal conviction from the plaintiff's pleading. There, the plaintiff brought a claim under the False Claims Act ("FCA") against multiple defendants, and her Second Amended Complaint contained allegations and documents about one of the defendant's conviction for securities fraud, conspiracy to commit securities fraud, money laundering and to defraud the United States, and perjury. *Id.* at *1. In granting defendants' motion to strike these references and documents, the court held that "[s]tatements regarding [defendants] past criminal conduct and judgments are matters intended to cast [defendants] and his alleged associates in a derogatory light and lead the jury to draw unwarranted inferences about their participation in the purported FCA scheme at issue here," and the documents submitted by defendants "have no bearing on whether any Defendant submitted false or fraudulent claims to Medicare or that Medicare paid any such claims." *Id.* (emphasis added).

Citing Federal Rule of Evidence 404, the court further held that "[t]he objectionable allegations in the Second Amended Complaint **create the possibility of an end run around the rules of evidence**, which prohibit citation to past wrongdoing or character evidence as probative of a propensity to act in accordance with that character trait…It is the province of the Court to rule on the admissibility of such information in accordance with the rules of evidence. The presence of these allegations in the Second Amended Complaint prejudices Defendants' right to any later *in limine* motions to preclude such evidence." *Id.* at *2 (emphasis added).

Here, Plaintiff inserted the Trump Allegations for the purpose of casting Mr. Trump and the Campaign in a derogatory light, attempting to damage Mr. Trump politically and his re-election Campaign, and leading the jury to draw unwarranted inferences in an improper attempt to cause them to believe Plaintiff's claims based on prior alleged statements and irrelevant allegations from unrelated people, decades before the alleged battery at issue. These allegations are not only scandalous immaterial and impertinent, but also impermissible character evidence that does not properly belong in a pleading.

 ii. <u>The Trump Allegations Are Highly Prejudicial</u>

"The possibility that superfluous pleadings will cause the trier of fact to draw 'unwarranted' inferences at trial is the type of prejudice that will support the granting of a motion to strike." *Neilson v. Union Bank of California*, N.A., 290 F. Supp. 2d 1101, 1152 (C.D. Cal. 2003). Unnecessary and inappropriate statements in a Complaint are prejudicial because "they may be reviewed by the jury at the trial of this matter." *Oram v. SoulCycle* LLC, 979 F. Supp. 2d 498, 512 (S.D.N.Y. 2013).

The Ninth Circuit Court of Appeals decision in *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524 (9th Cir. 1993), rev'd on other grounds,  510 U.S. 517 (1994), is instructive with respect to the

reasons why unrelated inflammatory allegations are prejudicial and properly stricken pursuant to FRCP 12(f).   There, the defendant's counterclaim contained multiple pages of allegations regarding an unrelated fraudulent tax shelter plan involving shareholders of the plaintiff, which defendant argued should not have been stricken by the district court because the allegations were made "to present 'relevant background and foundational facts' establishing a pattern of abuse" to support defendant's claim.   *Id.* at 1528.   Rejecting this argument and recognizing that "[s]uperficial historical allegations are a proper subject of a motion to strike", the Court of Appeals held:

> [T]he district court correctly noted that the [third-party shareholder] allegations created **serious risks of prejudice to [plaintiff], delay, and confusion of the issues**.   The allegations did not involve the parties to the [plaintiff's] copyright infringement action, but rather consisted of stale and barred charges that had already been extensively litigated and would have been **burdensome for [plaintiff] to answer**.   There was a strong likelihood that evidence of the disputes between [defendant] and [third-party shareholders] would **lead to unwarranted and prejudicial inferences against [plaintiff]**.   Finally, the stricken allegations would have **unnecessarily complicated the trial** of the copyright claim by requiring the introduction of extensive evidence of the tax plan agreements and a mass of related documents, potentially adding weeks to the trial.   The district court could properly grant the motion to strike for the purpose of **streamlining the ultimate resolution of the action and focusing the jury's attention on the real issues in the case.**   *Id.* at 1527-28 (emphasis added).

For similar reasons, the presence of the Trump Allegations in Plaintiff's Complaint is highly prejudicial to both Mr. Trump and the Campaign.   These allegations have been made for the improper purpose of disparaging Mr. Trump, and creating a false inference that Mr. Trump has engaged in similar conduct in past, for which he should therefore be liable to Plaintiff in this case by extension.   It is all but certain that these irrelevant and scandalous allegations will inflame a jury, and cause them to rely on unwarranted inferences at trial, impermissibility substituting such inferences for actual proof of Plaintiff's claims.   There is also a substantial risk that these allegations will blur the relevant issues, *i.e.*, the events of August 24, 2016 and the pay

Plaintiff received from the Campaign.  Plaintiffs surely will seek discovery into the 19 other accusations, dating back 10-30 years, as a fishing expedition far outside the bounds of the relevant matters.  Such discovery would multiply the discovery in this case twentyfold, massively over-complicate the resolution of this action, and make it impossible for the jury to distinguish the few relevant events and facts at issue from the nineteen other sets of irrelevant events and facts associated with the nineteen other unrelated accusations.  Simply put, the Trump Allegations have no place in Plaintiff's Complaint and should be stricken.

### D.  **The Injunction Prayer Should be Stricken**

A motion to strike under FRCP 12(f) is "the appropriate mechanism" to remove a prayer for relief that is not legally recoverable.  *Hutchings v. Fed. Ins. Co.*, 2008 WL 4186994, at *2 (M.D. Fla. Sept. 8, 2008) (construing motion to dismiss prayer for consequential damages as motion to strike because "whereas an entire claim or count may be *dismissed*, portions of a claim or count may be *stricken*."); *see also Wilkerson v. Butler*, 229 F.R.D. 166, 172 (E.D. Cal. 2005) ("A motion to strike is appropriate to address requested relief…which is not recoverable as a matter of law."), citing 2 Schwarzer, Tashima & Wagstaffe, *Cal. Practice Guide: Fed. Civil Procedure Before Trial* (2005) Attacking the Pleadings, para. 9–389 and 9–390, p. 9–97; *A.L. v. Fla.*, 2010 WL 1946940, at *1 (M.D. Fla. May 13, 2010) (striking plaintiff's impermissible request for prejudgment interest for tort claim as impertinent); *Rosas v. Geovera Specialty Ins. Co.*, 2019 WL 885368, at *2 (M.D. Fla. Feb. 6, 2019) (striking legally unavailable request for attorneys' fees as immaterial); *Angelo v. Jackson Mem'l Hosp.*, 2007 WL 9706665, at *2 (S.D. Fla. July 26, 2007) (striking legally unavailable request for punitive damages).

Here, Plaintiff's request for an injunction in connection with her battery claim to "prohibit[] [Mr. Trump] from grabbing kissing, or otherwise assaulting or harassing women

without prior express consent" is unavailable as a matter of law.  "Under Florida law, a party seeking a permanent injunction must plead and prove a clear legal right, the inadequacy of a remedy at law, and that an irreparable injury will occur if such relief is not granted." *Dear v. Q Club Hotel, LLC*, 2015 WL 4273054, at *3 (S.D. Fla. July 14, 2015) (internal quotations omitted); *see also E. Fed. Corp. v. State Office Supply Co.*, 646 So. 2d 737, 741 (Fla. Dist. Ct. App. 1994).  "Notably, where money damages will adequately compensate a plaintiff for his alleged harms, the plaintiff **cannot establish the inadequacy of a remedy at law or that irreparable injury will occur absent an injunction**." *Dear*, 2015 WL 4273054, at *3 (emphasis added), citing *B.G.H. Ins. Syndicate, Inc. v. Presidential Fire & Cas. Co.*, 549 So. 2d 197, 198 (Fla. Dist. Ct. App. 1989); *Supreme Serv. Station Corp. v. Telecredit Serv. Ctr., Inc.*, 424 So. 2d 844, 844 (Fla. Dist. Ct. App. 1982).

Plaintiff has not pled, and cannot plead, the requirements for injunctive relief because monetary damages will adequately compensate Plaintiff for the alleged battery (as evidenced by her prayer for monetary damages) and there is no legal right to seek an injunction in connection with a battery cause of action.  [Complaint, ¶ 133, Prayer for Relief, ¶ 2.]

Moreover, the injunction sought by Plaintiff, which essentially seeks to prevent Mr. Trump from violating the law, is not enforceable.  FRCP 65(d) provides that "[e]very order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; [and] shall describe in reasonable detail—and not by reference to the complaint or other document—the act or acts sought to be restrained."  It is well-settled that injunctions that do nothing more than instruct a defendant to "obey the law" are unenforceable because they are impermissibly vague and do not satisfy these requirements. *Burton v. City of Belle Glade*, 178 F.3d 1175, 1200-01 (11th Cir. 1999); *S.E.C. v. Sky Way Glob., LLC*, 710 F.

Supp. 2d 1274, 1277-79 (M.D. Fla. 2010); *see also Polk v. Polk,* 41 So. 2d 150, 153 (Fla. 1949) ("We have reference to the prayer for an injunction the purpose of which is to enjoin the crime of simple assault and battery.   We have repeatedly held that equity will not enjoin a crime."); *Steinfink v. Kadish*, 638 So. 2d 79, 79 (Fla. Dist. Ct. App. 1993) ("Since equity has no non-statutory jurisdiction to enjoin the commission of crime, nor will equity act to prevent an illegal act merely because it is illegal…, there is no alternative basis to support the [injunction] order under review.").

Accordingly, Plaintiff's Injunction Prayer should be stricken because such relief is unavailable as a matter of law for her battery claim and it impermissibly seeks to have Mr. Trump obey the law.

### E.  <u>Conclusion</u>

For the foregoing reasons, Mr. Trump and the Campaign respectfully request that the Trump Allegations and Injunction Prayer be stricken pursuant to FRCP 12(f).

## <u>LOCAL RULE 3.01(g) CERTIFICATION</u>

Pursuant to Local Rule 3.01(g), counsel for the Campaign has conferred with counsel for Plaintiff.   Counsel for Plaintiff has consented to strike the Injunction Prayer, but opposes all other relief requested herein.

Dated this 10th day of May, 2019                    Respectfully Submitted,

<u>/s/ Charles J. Harder</u>
Charles J. Harder
Trial Counsel
CHarder@HarderLLP.com
Admitted *Pro Hac Vice*
HARDER LLP
132 S. Rodeo Drive, Fourth Floor
Beverly Hills, California  90212
Telephone:  (424) 203-1600
Facsimile:   (424) 203-1601

Dawn Siler-Nixon
Florida Bar No. 993360
DSiler-Nixon@FordHarrison.com
Tracey K. Jaensch
Florida Bar No. 907057
TJaensch@FordHarrison.com
FORD**HARRISON** LLP
101 E. Kennedy Blvd., Suite 900
Tampa, Florida 33602
Telephone: (813) 261-7800
Facsimile:  (813) 261-7899

Attorneys for Defendants
Donald J. Trump and
Donald J. Trump for President, Inc.

17

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on May 10, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will electronically send a notice of electronic filing upon the following:

Brian W. Warwick
bwarwick@varnellandwarwick.com
jvarnell@varnellandwarwick.com
Janet Varnell
Varnell & Warwick, PA
P.O. Box 1870
Lady Lakes, FL  32158-1870

Hassan A. Zavareei
hzavareei@tzlegal.com
Katherine M. Aizpuru
kaizpuru@tzlegal.com
Tycko & Zavareei LLP
1828 L Street NW, Suite 1000
Washington, D.C.  20036

Tanya S. Koshy
tkoshy@tzlegal.com
Tycko & Zavareei LLP
1970 Broadway, Suite 1070
Oakland, CA  94612

F. Paul Bland
pbland@publicjustice.net
Karla Gilbride
kgilbride@publicjustice.net
Public Justice, P.C.
1620 L Street NW, Suite 630
Washington, DC  20036

Jennifer Bennett
jbennett@publicjustice.net
Public Justice, P.C.
475 14th Street, Suite 610
Oakland, CA  94612

<u>*/s/ Charles J. Harder*</u>
Attorney

# Exhibit 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### (TAMPA DIVISION)

| | |
|---|---|
| **ALVA JOHNSON,**<br>*Individually and On Behalf of All Others Similarly Situated*, | CASE NO. _____ |
| Plaintiff, | **JURY TRIAL DEMANDED**<br>**INJUNCTIVE RELIEF SOUGHT**<br>**COLLECTIVE ACTION COMPLAINT** |
| vs. | |
| **DONALD J. TRUMP,**<br>*In his Individual Capacity* and<br>**DONALD J. TRUMP FOR PRESIDENT, INC.,** | |
| Defendants. | |

## INTRODUCTION

1.      Plaintiff Alva Johnson brings this lawsuit to hold the President of the United States, Defendant Donald J. Trump, accountable for his sexually predatory conduct.

2.      On October 7, 2016, *The Washington Post* published an article about an "extremely lewd conversation about women" between Defendant Trump and television host Billy Bush during a 2005 episode of *Access Hollywood*.[1] In a recording of that conversation, Defendant Trump describes his habit of forcibly kissing and groping women without their consent:

> Yeah, that's her. With the gold. I better use some Tic Tacs just in case I start kissing her. You know I'm automatically attracted to beautiful – *I just start kissing them. It's like a magnet. Just kiss. I don't even wait.* And when you're a star, they let you do it. You can do anything.

3.      This is exactly what Defendant Trump did to Ms. Johnson, a highly accomplished African American woman who served as a senior staffer for his presidential campaign (the

---

[1] Fahrenthold, David, "Trump recorded having extremely lewd conversation about women in 2005." *The Washington Post*, 7 July 2016, https://www.washingtonpost.com/politics/trump-recorded-having-extremely-lewd-conversation-about-women-in-2005/2016/10/07/3b9ce776-8cb4-11e6-bf8a-3d26847eeed4_story.html?noredirect=on&utm_term=.c47a7453221b.

"Campaign"). Ms. Johnson was an integral part of the Campaign's success and was repeatedly recognized for her contributions. She was the Campaign's Director of Outreach and Coalitions for the state of Alabama, and because of her success, was chosen to serve as a member of the exclusive National Strike Team and as Operations Administrative Director for the battleground state of Florida during the general election.[2] To Defendant Trump, however, Ms. Johnson was nothing more than a sexual object he felt entitled to dominate and humiliate. Like he has done with so many other women, Defendant Trump violated norms of decency and privacy by kissing Ms. Johnson on the lips without her consent in the middle of a Florida work event and in front of numerous other Campaign officials.

4.      While forcible kissing is a serious violation of bodily autonomy that can cause victims to experience feelings of physical alarm, fear, shame, guilt, and helplessness.[3] These feelings can be exacerbated when the predator is a boss or other authority figure. And when the predator happens to be one of the most powerful men in the world, the experience can be downright terrifying.

5.      In the moment that Defendant Trump forcibly kissed her, Ms. Johnson, a highly successful and widely respected Campaign staffer, felt reduced to just another object of Defendant Trump's unwanted sexual attention. Ms. Johnson brings this lawsuit against Defendant Trump for that humiliating violation, which amounts to common law battery, and seeks assistance from the Court to put a stop to his predatory conduct.

6.      Not only did Ms. Johnson endure forcible kissing by her boss, she experienced race and gender discrimination as one of the few females and one of only a handful of African American people on the Campaign payroll. Ms. Johnson was paid less than white employees, including both staff

---

[2]      Trump 2016 General Election Campaign Organization, Florida, http://www.p2016.org/trump/trumpgenfl.html (last visited Feb. 21, 2019).

[3]      *See* Margolin, L., Miller, M., & Moran, P. B. (1989). "When a kiss is not just a kiss: Relating violations of consent in kissing to rape myth acceptance." *Sex Roles: A Journal of Research, 20* (5-6), 231-243. http://dx.doi.org/10.1007/BF00287721; Clark-Flory, Tracy. "A Forced Kiss is Never 'Just a Kiss.'" *Vocativ*, 13 Oct. 2016, https://www.vocativ.com/367496/donald-trump-forced-kiss/index.html.

with similar duties and lower-ranked staff. She was also paid less than similarly situated male employees. Indeed, the Campaign's pattern of underpaying female staffers is well documented.[4] For this reason, Ms. Johnson seeks to bring this case as a collective action on behalf of female Campaign employees who suffered unlawful pay discrimination at the hands of Defendant Donald J. Trump for President, Inc.

## PARTIES

7.      Ms. Johnson is a citizen and resident of the state of Alabama.

8.      Defendant Trump is a resident of the state of New York.

9.      The Campaign is a corporation organized under the laws of Virginia with a principal place of business in New York.

## JURISDICTION AND VENUE

10.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Plaintiff and the Defendants are citizens of different states and the amount in controversy exceeds $75,000.

11.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Ms. Johnson's claims occurred in this District.

12.      This Court has personal jurisdiction over Defendant Trump because he committed a tortious act within the state of Florida, owns property within the state of Florida, and conducts business within the state of Florida.

13.      This Court has personal jurisdiction over the Campaign because it maintained an office or agency within the state of Florida.

---

[4] Viser, Matt. "Donald Trump's Campaign Pays Women Less Than Men." *The Boston Globe*, 4 June 2016, https://www.bostonglobe.com/news/politics/2016/06/04/donald-trump-campaign-pays-women-less-than-men/VIu0v2MUJiHqhvc5C0W5dO/story.html.

**FACTS**

14.     <mark>Defendant Trump has a long history of harassing and assaulting women, including forcibly kissing them on the mouth without their consent. He does so intentionally—just as he admitted on the *Access Hollywood* tape. Since the *Access Hollywood* tape became public, dozens of women have come forward with complaints that Defendant Trump forcibly kissed, groped, and/or harassed them—disturbing allegations that span nearly four decades.</mark>

15.     Ms. Johnson <mark>was not aware of Defendant Trump's long history of predatory conduct towards women when she</mark> first connected with the Campaign in late 2015. She joined the Campaign early in the primary season, worked hard, and became a valued Director who was integral to the Campaign's success. But instead of being rewarded for her hard work and accomplishments, Ms. Johnson was subjected to unwanted kissing by her boss and discrimination based on her race and her gender.

16.     Ms. Johnson signed up to help a long-shot nominee run a successful campaign. She did not sign up to be paid less than her colleagues because of her race and gender. And she certainly did not sign up to be forcibly kissed in public, then subjected to humiliating comments from her colleagues that caused her to relive the experience. But she experienced all of these things as a senior member of Defendant Trump's Campaign staff.

**Ms. Johnson Joins the Trump Presidential Campaign**

17.     Ms. Johnson initially became interested in joining the Campaign after her stepfather, who has decades of experience in Republican politics, asked her to help prepare a proposal to assist a Republican candidate, Donald J. Trump, with outreach to African Americans.

18.     Ms. Johnson, whose background is in event planning and human resources, had never considered working in politics. However, she was intrigued by the possibility of working on the campaign of a relatively unknown political outsider like Defendant Trump.

4

19.     Ms. Johnson voted for Barack Obama in 2008 and 2012. But during President Obama's two terms in office, she saw the African American community in Alabama continue to experience severe economic hardship, and felt that perhaps Defendant Trump, with his background in business, could help invigorate the economy and provide jobs for her community.

20.     Ms. Johnson agreed to help with the proposal, and joined her stepfather for a meeting with Chess Bedsole, a family friend and recent addition to the Trump Campaign.

21.     At the meeting, Mr. Bedsole remarked that he was impressed with Ms. Johnson's background, and that the Campaign could benefit from her expertise in successfully executing large-scale events.

22.     Mr. Bedsole informed Ms. Johnson that, before she could be hired, Defendant Trump needed to meet her in person.

23.     On November 21, 2015, at Mr. Bedsole's invitation, Ms. Johnson attended a rally in Birmingham, where she met Defendant Trump for the first time. Because she was a guest of Mr. Bedsole and was considering joining the Campaign as staff, Ms. Johnson was allowed to enter a VIP meet-and-greet area (typically reserved for significant donors), where Defendant Trump was greeting people and shaking hands.

24.     Approximately ten other people were in the meet-and-greet area, including Terry Lathan, Chairman of the Alabama Republican Party, and Ed Henry, an Alabama state representative.

25.     Ms. Johnson waited until the others had an opportunity to shake hands with Defendant Trump, then walked towards him so that she could introduce herself.

26.     As Ms. Johnson approached, Defendant Trump looked her up and down and said, "Oh, beautiful, beautiful, fantastic."

27.     Ms. Johnson tried to redirect Defendant Trump's attention by telling him that she was a political outsider, like him, and was coming from the private sector.

28.     Despite this uncomfortable interaction, Ms. Johnson believed that if she went to work for the Campaign, she could establish appropriate boundaries with Defendant Trump. ==At the time, she did not know of the many other allegations of his predatory behavior.== So when the Campaign offered her a position, Ms. Johnson decided to take the opportunity. She was excited about the chance to showcase her skills in event planning and large-scale organizing, and was hopeful that she would be able to use a position in the Campaign to advocate on behalf of African Americans and other marginalized groups.

29.     Ms. Johnson officially joined the Campaign staff in January 2016—making her one of the earliest paid Campaign staffers.

### Ms. Johnson Shines in the Alabama Primary

30.     Between January and March 2016, leading up to the Alabama primary election, Ms. Johnson served as Director of Outreach and Coalitions for the Campaign. She quickly made an impression on Campaign staff and proved herself to be a highly competent leader and a valuable asset to the Campaign. Her responsibilities included speaking to organizations, coordinating rallies, and engaging with diverse communities.



*Ms. Johnson's official business card for the Alabama Primary.*

31.     As one of just a few paid African American Campaign staffers, Ms. Johnson was also responsible for minority outreach throughout Alabama. She visited the so-called "Black Belt" of

6

Alabama, a historic region of the state populated by low-income African American farmers, seeking the African American vote.

32.    She also spoke on behalf of the Campaign at Republican political gatherings, including young Republican and college Republican events, as well as GOP Executive Committee meetings, and was in charge of building volunteer capacity in North Alabama.

33.    Ms. Johnson's skills shined most brightly when she helped organize Campaign rallies, which were a critical part of the Campaign's success in the primary and general elections.[5]

34.    One such rally held in Madison County, Ms. Johnson's home county, in February 2016, earned her praise from Campaign staff.

35.    Just three days before the February 2016 rally, the Campaign confirmed that Defendant Trump would attend. With just a few days to find space to hold the rally, Ms. Johnson coordinated with the Deputy State Campaign Director to find a venue, making numerous phone calls to find a space large enough to accommodate the crowd. She also worked to ensure that the flow of attendees would be efficient and manageable.

36.    The event was notable both for its large turnout and the surprise endorsement of Defendant Trump by then-Senator Jeff Sessions, the first senator to endorse Defendant Trump.

37.    Defendant Trump himself touted the size of the crowd, describing the rally as "the biggest crowd of the political season by far. We have 30,000 people. 30,000! Amazing!"[6] Later, in a tweet, Defendant Trump once again highlighted the size of the crowd:

[5] Rivero, Cristina. "How marketing helped Donald Trump win the 2016 election." *The Washington Post*, 17 Nov. 2016, https://www.washingtonpost.com/graphics/politics/2016-election/trump-campaign-marketing/ (describing how Defendant "Trump also used his numerous rallies to generate and perpetuate media attention").
[6] CSPANJUNKIEd0tORG, *Donald Trump 'This is the Biggest Crowd of the Political Season by Far! We Have 30,000 People!*, YouTube (Feb. 28, 2016), https://www.youtube.com/watch?v=JkWizCel968.



38.     Two days later, on March 1, 2016, Defendant Trump won the Alabama primary with 43.42% of the vote—including a resounding win in Madison County. The successful rally solidified Ms. Johnson's reputation in the Campaign as a talented strategist and essential member of the team.

### Ms. Johnson Joins the National Strike Team
### Because of her Success in Alabama

39.     As a direct result of her successful contributions to the Alabama primary win, Ms. Johnson was assigned to the National Strike Team, an elite group of Campaign staffers who traveled to the most critical states during the primary season.

40.     Over the next four months, Ms. Johnson traveled to Missouri, Utah, Wisconsin, Indiana, and California, helping organize and manage local volunteer offices.

41.     Opening volunteer offices was a core responsibility of the National Strike Team because the Campaign ordinarily did not operate wide-scale local volunteer offices until a few weeks before a state primary, at which point Ms. Johnson and the rest of the National Strike Team would arrive to set up an office, build a volunteer base, and generate voter engagement and excitement in advance of the election.

8

42.     As part of the National Strike Team, Ms. Johnson was responsible for recruiting and managing the many volunteers who conducted phone banking and canvassing for the Campaign. To keep volunteer morale high, Ms. Johnson planned outings for volunteers and organized a volunteer appreciation event called Super Saturday.

43.     In addition to her responsibilities overseeing Campaign volunteers, Ms. Johnson also helped local state staff coordinate successful rallies in Wisconsin, Missouri, Utah, and Indiana, serving as the point of contact for campaign accessories, like signs and stickers, that came in from out of state.

44.     In each state to which she traveled, Ms. Johnson also transformed the local office into a home base for volunteers and supporters, where they could pick up yard signs and bumper stickers and take photos.

45.     Ms. Johnson also continued to conduct outreach to minorities, as she did in Alabama. Ms. Johnson sought out African American communities and other communities of color wherever she traveled so that she could make sure that the Campaign placed signs, recruited volunteers, and conducted door-knocking in those neighborhoods in the weeks leading up to a primary.

46.     Thanks in part to Ms. Johnson's hard work, energy, and skills, Defendant Trump won the Republican primaries in California, Illinois, Missouri, and Indiana.

### Because of Ms. Johnson's Success on the National Strike Team, She is Assigned to the Florida Campaign

47.     At the end of July, after Defendant Trump secured the Republican nomination for president, the Campaign assembled top staff from across the country to go to Florida, an important battleground state, for the general election campaign. Because of her successes in Alabama and on the National Strike Team, Ms. Johnson was chosen to join the Campaign's team in Florida, where she ultimately attained the position of Operations Administrative Director.



*Ms. Johnson with the Florida team.*

48.    In Florida, Ms. Johnson worked closely with—among others—State Director Karen Giorno, Deputy State Director Jennifer Locetta, Director of Outreach and Coalitions Bibi Ramos, and Chess Bedsole, who was continuing to serve in a legal capacity.

49.    Initially, Ms. Johnson was tasked with helping then-Deputy State Director Jennifer Locetta and then-State Director Karen Giorno with onboarding new staff. Ms. Johnson's experience in human resources made her well suited for this position.

50.    Throughout her time in Florida, Ms. Johnson also worked closely with members of the communications team on various projects, including writing statements on behalf of Karen Giorno to be used by the Campaign.

51.    Ms. Johnson's most important responsibility, though, was managing the famous Trump RVs that navigated the state of Florida in advance of the general election. The RVs were

essentially mobile offices for the Campaign and were critical to the Campaign's success at registering and engaging voters.[7]



*One of the Florida Trump Campaign RVs.*

52.     Ms. Johnson selected the vendor who provided the RVs, hired the teams to drive and operate the RVs, and identified events at which the RVs would appear, including football games, rallies, and concerts.

53.     Ms. Johnson specifically arranged for the RVs to visit more remote areas of Florida that may have otherwise been neglected. In fact, the RVs visited 57 out of Florida's 61 counties.

54.     Additionally, after Hurricane Hermine, instead of campaigning, Ms. Johnson instructed the North Florida RV to purchase hundreds of dollars of supplies to deliver to community members who had been impacted by the hurricane.

---

[7] Atwood, Kylie. "How an RV organizes and energizes Trump voters in Florida" *CBS News*, 29 Sept. 2016, https://www.cbsnews.com/news/how-a-rv-organizes-and-energizes-trump-voters-in-florida/.

55.     Because of these and many other actions Ms. Johnson took to ensure the RVs were a positive presence in communities across Florida, they became one of the most successful facets of the Campaign's voter engagement efforts.

**Defendant Trump Kisses Ms. Johnson Without Her Consent**

56.     On August 24, 2016, Ms. Johnson helped organize a rally in Tampa, Florida. Prior to the rally, Defendant Trump met with volunteers and staff inside one of the famous RVs. During that meeting, Defendant Trump forcibly kissed Ms. Johnson without her consent.

57.     When Defendant Trump arrived for the rally, it was raining. Campaign staff ushered him inside the RV to get him out of the rain. Ms. Johnson and other members of the Florida Campaign staff followed him inside.



*Ms. Johnson and Defendant Trump at the RV.*

58.     Other supporters present in the RV included then-Florida Attorney General Pamela Jo Bondi, Ms. Giorno, and Regional Directors Earl "Tony" Ledbetter, Mitch Tyner, and Nick Corvino.

59.     Ms. Giorno instructed Ms. Johnson to bring some volunteers into the RV to meet Defendant Trump, and Ms. Johnson did so.

60.     Inside the RV, Defendant Trump chatted with staff and volunteers, took pictures, and shook hands. After posing for pictures, Defendant Trump sat at a desk in the RV and autographed campaign signs.



*Ms. Johnson took this picture of Defendant Trump signing autographs in the RV.*

61.     Ms. Johnson noticed that Defendant Trump was watching her and appeared to be trying to make eye contact with her.

13

62.     After fifteen minutes or so, Secret Service officers told Defendant Trump that he should leave so that he could get to the rally. As Defendant Trump approached the door, he passed Ms. Johnson. She told him she had been on the road since March, away from her family. So, she urged him to go in there and "kick ass."

63.     Defendant Trump grasped her hand and did not let go. He told her he knew she had been on the road for a long time and that she had been doing a great job. He also told Ms. Johnson that he would not forget about her, and that he was going to take care of her.

64.     As Defendant Trump spoke, he tightened his grip on Ms. Johnson's hand and leaned towards her. He moved close enough that she could feel his breath on her skin.

65.     Ms. Johnson suddenly realized that Defendant Trump was trying to kiss her on the mouth, and attempted to avoid this by turning her head to the right. Defendant Trump kissed her anyway, and the kiss landed on the corner of her mouth.

66.     Defendant Trump's kiss on Ms. Johnson's mouth was intentional. Indeed, Ms. Johnson was wearing a baseball cap with the bill facing forward. Given her baseball cap, Defendant Trump's kiss on Ms. Johnson's mouth was deliberate and required intention.

67.     Immediately afterwards, the Secret Service ushered Defendant Trump away, off the RV.

68.     Ms. Johnson stayed in the RV, in shock about what had just transpired. She felt confused and humiliated.

69.     As Ms. Bondi walked off the RV, she glanced at Ms. Johnson and smiled. Ms. Giorno, walking behind Ms. Bondi, grabbed Ms. Johnson's elbow and gave it an approving tug.

70.     Ms. Johnson was upset that Ms. Giorno and Ms. Bondi reacted this way, since she had not wanted Defendant Trump to kiss her and felt that it was completely inappropriate. She feared that this would impact how they viewed her as a colleague and cause them to take her less seriously.

14

71.     Driving back to Sarasota later that day, Ms. Johnson called her partner, and then her parents, to tell them about what had happened, crying as she recalled the incident.

72.     When Ms. Johnson arrived at Campaign headquarters in Sarasota, the story of Defendant Trump's kiss had beaten her back. Ms. Giorno had arrived earlier and was already sharing the details with other Campaign staff.

73.     As Ms. Johnson walked into the staff room, one staffer said, laughing, that he heard that she got a kiss from the boss. Though Ms. Johnson was deeply disappointed by this reaction, the fact that people seemed to be treating it as some kind of joke made her feel pressured to play it off.

74.     That staffer was not the only person to call attention to the fact that Defendant Trump had kissed Ms. Johnson. Florida Chief of Staff Darren Morris told her that she had become the Florida team's secret weapon because Defendant Trump had kissed her. These comments made Ms. Johnson feel extremely uncomfortable.

## The Access Hollywood Tape

75.     On October 7, 2016, a mere month and a half after the forcible kiss, *The Washington Post* published an article regarding an "extremely lewd conversation about women" between Defendant Trump and television host Billy Bush during a 2005 episode of *Access Hollywood*.[8]

76.     That same day, the *Post* released a recording of the "lewd conversation," now commonly known as the *Access Hollywood* tape. In the recording, Defendant Trump described his practice of committing sexual battery on women, including forcibly kissing them without their consent, and grabbing their genitals:

> DEFENDANT TRUMP:     Yeah, that's her. With the gold. I better use some Tic Tacs just in case I start kissing her. You know I'm automatically attracted to beautiful – *I just start kissing them. It's like a magnet. Just kiss. I don't even wait.* And when you're a star, they let you do it. You can do anything.

---

[8] *See* Fahrenthold, *supra* note 1.

BUSH:            Whatever you want.

DEFENDANT TRUMP:       Grab 'em by the pussy. You can do anything.

77.    When Ms. Johnson first learned of the *Access Hollywood* tape, she was instantly transported back to the moment in which Defendant Trump singled her out of all of the people on his staff and forcibly kissed her.

78.    She first listened to a recording of the tape while sitting in her car with her partner. As they listened, she felt horrified and sick to her stomach. She told her partner that the conduct Defendant Trump described in the tape was exactly what he had done to her. Her partner agreed.

79.    Ms. Johnson began to feel panicked, like she couldn't breathe, as she realized that what Defendant Trump had done to her was not an isolated incident, but part of a pattern of predatory behavior towards women. She remembered how other staffers on the Campaign had treated his improper behavior like a joke and a positive event. She felt disgusted and retraumatized. She knew then that she could not stay with the Campaign.

**Ms. Johnson Immediately Leaves the Campaign & Retains An Attorney**

80.    On October 10, 2016—the first working day after the *Access Hollywood* tape was released—Ms. Johnson called in sick. She still felt terrible, physically and emotionally, and could not sleep.

81.    She was deeply disturbed by the fact that Defendant Trump had not only kissed her, but had also openly bragged that he made a regular practice of kissing women without their consent.

82.    That day, Ms. Giorno asked Ms. Johnson to use her connections to Defendant Trump's supporters across the country to compile videos of women showing their support for Defendant Trump after the release of the Access Hollywood tape. Ms. Johnson felt like she had no choice, as she had not yet formulated a plan for how to officially leave the Campaign. Ms. Johnson expected that the volunteers she called would be as horrified as she was and would not agree to support

16

Defendant Trump. Instead, the women she contacted said they happily stood with Defendant Trump and believed the tape had been doctored. Their reactions caused Ms. Johnson to fear that no one would believe or support her if she publicly objected to what Defendant Trump had done to her.

83.     On or about October 12, 2016, Ms. Johnson traveled to West Palm Beach, where she was supposed to attend a rally the next day. There, she called an attorney at a firm that appeared to have experience representing sexual assault victims and arranged a meeting to discuss her legal options.

84.     On October 13, 2016, instead of attending the rally, Ms. Johnson met in person with the attorney.

85.     During that in-person meeting, Ms. Johnson's attorney advised her that he believed she had a strong case.

86.     Ms. Johnson's attorney told her to do three things as soon as possible: (1) quit her job; (2) change her phone number; and (3) move out of campaign housing. Accordingly, Ms. Johnson immediately took the following actions:

        (a)     On October 13, 2016, the same day she met with her attorney, Ms. Johnson met with a therapist whom her attorney had arranged for her to meet to help her cope with her emotional distress stemming from the incident with Defendant Trump. Ms. Johnson's attorney arranged for the first therapy session to be provided on a complimentary basis, and she spoke with the therapist several times after that initial meeting. The therapist helped find new housing for Ms. Johnson;

        (b)     On or about October 14, 2016, Ms. Johnson moved out of her Trump Campaign housing, at a time when she knew her housemate would not be at the house; and

        (c)     Ms. Johnson changed her phone number.

87.     Ms. Johnson informed her attorney that she had taken all of the precautions he had recommended.

17

88.     Shortly thereafter, Ms. Johnson also quit the Trump Campaign. On or about October 16, 2016, Ms. Johnson emailed Lucia Castellano, the head of human resources for the Trump Campaign, to let her know that she was leaving the Campaign.

89.     Ten days later, on October 26, 2016, Ms. Castellano emailed Ms. Johnson a letter confirming that Ms. Johnson no longer worked for the Trump Campaign.

90.     Ms. Johnson then informed her attorney that she had quit and forwarded him the letter confirming termination.

91.     For the time period following Ms. Johnson's initial contact with her attorney, from approximately October 12, 2016 to October 28, 2016, Ms. Johnson communicated with him on a regular basis.

92.     During that time period, Ms. Johnson's attorney continued to discuss the details of her potential claims with her. He asked about her emotional status, inquired as to whether she was still seeing the therapist, and encouraged her to hang in there.

93.     Also during that time, Ms. Johnson continued to see the therapist that her attorney had connected her with. She continued to feel considerable emotional distress because of the forced kiss, and had nightmares about it.

94.     At the end of October, Ms. Johnson's attorney unexpectedly contacted her and told her that he would not be moving forward with any lawsuit on her behalf. He explained that he and his law partners did not wish to proceed with the representation, but that the decision had nothing to do with the merits of the case.

95.     The law firm's decision discouraged Ms. Johnson from filing any sort of claim or bringing any lawsuit against Defendant Trump at that time.

96.     After Defendant Trump was officially elected President, Ms. Johnson also feared getting caught up in a public conflict with him due to the public backlash she might face. This fear

was validated by the fact that Defendant Trump had been viciously attacking all of the many women who were now publicly attesting to his unlawful and predatory behavior.[9]

### Defendant Trump's Unwanted Kissing Was Intentional and Part of a Pattern of Predatory Behavior Towards Women.

97.    In the weeks after Ms. Johnson learned of the *Access Hollywood* tape, Defendant Trump's pattern and practice of forcing himself on women became public knowledge. Specifically, Ms. Johnson learned of the multitude of public accusations by other women who had been forcibly kissed by Defendant Trump.

98.    The realization that she was not the only person Defendant Trump had forcibly kissed added to Ms. Johnson's already considerable distress.

99.    In fact, Defendant Trump has a very long history of forcibly kissing women on the mouth without their consent, as well as otherwise sexually harassing and assaulting them. Indeed, in a 2006 interview on The Howard Stern show, Defendant Trump readily agreed that he was a sexual predator:[10]

> HOWARD STERN:  Donald, seriously.  You know about sexual predators and things like that, I mean –
>
> ROBIN QUIVERS: You are one!

---

[9] DelReal, Jose A. and Sean Sullivan. "Trump belittles accusers as unattractive, as more come forward." *The Washington Post*, 14 Oct. 2016, https://www.washingtonpost.com/politics/trump-belittles-accusers-as-unattractive-as-more-come-forward/2016/10/14/694fd214-923b-11e6-9c52-0b10449e33c4_story.html?utm_term=.ebf0dbdea0cd (describing one accuser, Natasha Stoynoff, as a "liar" and another, Jessica Leeds, as "not . . . my first choice, that I can tell you."); Reiman, Eliza. "The 22 women who have accused Trump of sexual misconduct." *Business Insider*, 26 Sept. 2018, https://www.businessinsider.com/women-accused-trump-sexual-misconduct-list-2017-12#jessica-drake-17 (in response to Jessica Drake's accusation that Defendant Trump grabbed and kissed her without her consent, he suggested such conduct was acceptable because of her profession: "And she's a porn star. You know, this one that came out recently, 'he grabbed me and he grabbed me on the arm.' Oh, I'm sure she's never been grabbed before . . . .").

[10] Jenavieve Hatch. "Watch Trump Say 'True' When Called a Sexual Predator in 2006." *HuffPost*, 18 Oct. 2016, https://www.huffingtonpost.com/entry/watch-trump-say-true-when-called-a-sexual-predator-in-2006_us_5804d258e4b0162c043cd864.

HOWARD STERN: Alright, look, I wasn't gonna say that –

DEFENDANT TRUMP: It's true.

HOWARD STERN: But, uh –

DEFENDANT TRUMP: It's true.

100. Not only does Defendant Trump forcibly kiss women intentionally, he also has no qualms about doing so in the presence of other people. For instance, Defendant Trump attempted to kiss Jennifer Hawkins, a 2004 Miss Universe winner from Australia, on the mouth in front of an audience of thousands of people. A video of the incident shows Defendant Trump grabbing Ms. Hawkins around the waist and moving in for a kiss. In the video, Ms. Hawkins turns her head to the side and puts her arm between them, and the kiss lands on her cheek.[11]

101. Among the many examples of Defendant Trump's predatory conduct are the following allegations that Defendant Trump forcibly kissed women, most of which were only made public as a consequence of the same *Access Hollywood* tape that triggered Ms. Johnson's decision to quit the campaign:

(a)     In 1993, Defendant Trump forcibly kissed his former business partner, Jill Harth, on the lips and groped her private parts. Ms. Harth has said that incident caused her a great deal of stress and anxiety and harmed her marriage.[12]

(b)     In 1997, Defendant Trump forcibly kissed Temple Taggart, who was representing Utah in the Miss USA beauty pageant. Later that year, at a meeting in Trump

---

[11] A video of the 2011 incident can be seen at https://www.vox.com/identities/2016/10/28/13459750/trump-video-miss-universe-grab-kiss-jennifer-hawkins.

[12] Nelson, Libby. "The sexual assault allegations against Donald Trump, explained." *Vox*, 12 Oct. 2016, https://www.vox.com/2016/10/12/13234224/donald-trump-jill-harth-sexual-assault.

Tower, he kissed her on the mouth a second time, again without her consent. The kiss caught Ms. Taggart off guard, and left her feeling shocked and embarrassed.[13]

(c)     Also in 1997, Defendant Trump grabbed Cathy Heller's hand and attempted to kiss her on the mouth when she was introduced to him at Mar-a-Lago. She later stated that she was "angry and shaken" after the incident, and that Defendant Trump, who seemed to feel "entitled" to kiss her, appeared "pissed" that she did not welcome his advances.[14]

(d)     In 2005, Defendant Trump kissed Rachel Crooks, then a 22-year-old receptionist at a real estate investment company in Trump Tower, outside an elevator in the building one day. When Ms. Crooks shook Defendant Trump's hand, he would not let go of it, and kissed her directly on the mouth—just as he did Ms. Johnson. "It was so inappropriate," Ms. Crooks told *The New York Times* in October 2016. "I was so upset that he thought I was so insignificant that he could do that."[15] The incident left Ms. Crooks feeling confused and ashamed, and caused her to experience feelings of anxiety and insecurity for nearly a decade afterward.

(e)     Also in 2005, Defendant Trump forcibly kissed Natasha Stoynoff, a photographer who was interviewing Defendant Trump and his wife, Melania Trump, for a feature story on their first wedding anniversary. Ms. Stoynoff felt intimidated and scared after the encounter. Defendant Trump later suggested at a Florida rally that Ms. Stoynoff is not

---

[13] "Jackson, Hallie, et al. "Miss USA Contestant Details Unwanted Encounters with Trump." *NBC News*, 13 Oct. 2016, https://www.nbcnews.com/politics/2016-election/miss-usa-contestant-details-encounters-trump-n665521.

[14] Molly Redden, "Donald Trump 'grabbed me and went for the lips', says new accuser." *The Guardian*, 16 Oct. 2016, https://www.theguardian.com/us-news/2016/oct/15/donald-trump-sexual-misconduct-allegations-cathy-heller.

[15] Haag, Matthew. "Rachel Crooks, Who Accused Trump of Sexual Assault, Wins Legislative Primary." *The New York Times*, 9 May 2018, www.nytimes.com/2018/05/09/us/politics/rachel-crooks-ohio.html.

attractive enough for him to have sexually assaulted her, saying "Look at her. Look at her words. Tell me what you think. I don't think so."[16]

(f)     Again in 2005, Defendant Trump forcibly kissed Jessica Drake and two female friends at a golf tournament in Lake Tahoe. After the release of the *Access Hollywood* tape, Ms. Drake felt the need to come forward publicly, stating that "I realize that in this situation I may be but a tiny grain of sand. But clearly, this is an enormous beach."[17]

(g)     On October 14, 2016, Summer Zervos publicly accused Defendant Trump of greeting her and saying goodbye to her at a 2007 meeting at Trump Tower with a kiss on the lips. He later tried to grope her and aggressively kiss her on the mouth. Ms. Zervos was "incredibly hurt" by Defendant Trump's conduct and felt as though he had treated her like a sexual object. Seeing Defendant Trump non-stop on the news while he was running for office, and being asked about her connection to him, caused her "a great deal of pain and anguish" because of what he had done to her.[18]

(h)     In 2015, Defendant Trump kissed journalist Katy Tur in an incident she described as making her feel "powerless. I just stood there frozen thinking, Oh my god, what is this man doing? He's not my friend. He's not my business partner. He's not my social acquaintance. He's not a family member of mine. This is somebody I am covering. This is a

---

[16] A video of Defendant Trump's comments can be seen at https://www.independent.co.uk/news/world/americas/donald-trump-not-attractive-enough-natasha-stoynoff-sexual-assault-look-at-her-rally-kissed-a7360826.html.

[17] Kenny, Caroline. "Latest Trump Accuser Says He Hugged, Kissed Her without Permission." *CNN*, 23 Oct. 2016, www.cnn.com/2016/10/22/politics/donald-trump-jessica-drake/index.html.

[18] Conway, Madeline. "Former 'Apprentice' contestant accuses Trump of sexually harassing her in 2007." *Politico*, 14 Oct. 2016, https://www.politico.com/story/2016/10/trump-summer-zervos-accusations-allred-229806.

presidential candidate, I am the reporter assigned on this beat—it just crosses a huge line. It's so unprofessional and so inappropriate given the circumstances."[19]

102.     Unsurprisingly, given the large number of allegations against Defendant Trump involving forcible kissing, as well as his own admission that "I just start kissing them…I don't even wait," unwanted kissing has been repeatedly described as Defendant Trump's "modus operandi."[20]

103.     Defendant Trump does not only forcibly kiss women without their consent. He also gropes them without their consent and has done so on at least the following occasions:

(a)     In the 1980s, Defendant Trump grabbed Jessica Leeds's breasts in the first-class cabin of an airplane. He tried to put his hands up her skirt and grope her. "He was like an octopus," Ms. Leeds told The New York Times.[21] "His hands were everywhere." Ms. Leeds

[19] Zarya, Valentina. "Katy Tur Writes About Being Kissed By Trump in Her New Book. His Response: 'Fake News'." *Fortune*, Fortune, 12 Sept. 2017, www.fortune.com/2017/09/12/katy-tur-donald-trump/.
[20] *See, e.g.*, Crockett, Emily. "A Newly Surfaced Video Shows Donald Trump Grabbing and Kissing a Former Miss Universe Onstage." *Vox*, 28 Oct. 2016, www.vox.com/identities/2016/10/28/13459750/trump-video-miss-universe-grab-kiss-jennifer-hawkins ("Trump's modus operandi, according to his accusers, is to grab them and try to kiss them on the lips. Sometimes he lands the kiss, and sometimes he doesn't — but he's allegedly forceful enough that even if the women try to pull away, he'll usually land a kiss on the cheek."); Robinson, Nathan J. "Getting Away With It." *Current Affairs*, 26 Jan. 2017, www.currentaffairs.org/2017/01/getting-away-with-it ("Nearly a dozen women have accused Trump of sexual assault, many describing a similar modus operandi: Trump simply begins grabbing them or kissing them against their will, forcing his tongue down their throats as they attempt to resist"); Stoynoff, Natasha. "Physically Attacked by Donald Trump - a PEOPLE Writer's Own Harrowing Story." *PEOPLE.com*, Time Inc, 12 Oct. 2016, www.people.com/politics/donald-trump-attacked-people-writer/ ("We walked into that room alone, and Trump shut the door behind us. I turned around, and within seconds he was pushing me against the wall and forcing his tongue down my throat … As he explained to Billy Bush, it was his usual modus operandi with women."); Schlesinger, Robert. "Measuring the Trump Effect." *U.S. News & World Report*, 14 Oct. 2016, www.usnews.com/opinion/articles/2016-10-14/will-donald-trumps-scandals-cost-the-gop-the-senate-and-house ("[T]he parade of women who have come forward asserting that his bragging [on the Access Hollywood tape] was not 'just words,' as he tried to explain it away, but actually his modus operandi.").
[21] Twohey, Megan, et al. "Two Women Say Donald Trump Touched Them Inappropriately." *The New York Times*, 12 Oct. 2016, https://www.nytimes.com/2016/10/13/us/politics/donald-trump-women.html.

fled to the back of the plane as a result of the assault. Years later, when Defendant Trump declared during the second presidential debate that he had never actually grabbed a woman's genitals without her consent, Ms. Leeds felt he was lying to her face and "wanted to punch the screen."

(b)    In the early 1990s, Defendant Trump put his hand up the skirt of Kristin Anderson at a nightclub in New York City. She and her companions were "very grossed out and weirded out," and even years later, she felt disgusted when she thought about it. Ms. Anderson later said that a stranger "groping you on the side, on the sly, like you're some kind of stuffed animal on the couch. That's really not okay, and it opens the door for much worse behavior on [his] part and for the girl, allowing worse behavior to happen to them because they feel that it's inconsequential. . . . it sends an awful message to the women that they're nothing."[22]

(c)    In 1996, Lisa Boyne, now a health food entrepreneur, told the Huffington Post she witnessed Defendant Trump looking up women's skirts and commenting on their underwear and genitalia at a dinner. Then 25 and a think tank employee, Boyne said she was invited to dinner with Trump and a modeling agent. Seated at a semi-circular table with Trump on one end, the two men at the table refused to get up and allow the women to leave the table and instead made them walk across it. Defendant Trump "stuck his head right underneath their skirts."[23]

[22] Tumulty, Karen. "Woman says Trump reached under her skirt and groped her in early 1990s." *The Washington Post*, 14 Oct. 2016, https://www.washingtonpost.com/politics/woman-says-trump-reached-under-her-skirt-and-groped-her-in-early-1990s/2016/10/14/67e8ff5e-917d-11e6-a6a3-d50061aa9fae_story.html?utm_term=.4a3a609bc349.
[23] Reilly, Molly. "Trump Faces Another Accusation – This Time, He Looked UP Models' Skirt. *Huffington Post*, 13 Oct. 2016, https://www.huffingtonpost.com/entry/donald-trump-models-skirts-underwear_us_57ffd172e4b0162c043ac07f.

(d)     In 1997, Former 1997 Miss Teen USA contestants said Trump walked into the dressing room while contestants, some as young as 15, were changing and casually announced "Don't worry, ladies, I've seen it all before." Former Miss Vermont Teen USA Mariah Billado, who was among the girls who were undressed, confirmed to reporters that the incident took place and recalled saying "Oh my God, there's a man in here!"[24]

(e)     In 1998, Defendant Trump groped Karena Virginia's breast while she was waiting for a car to take her home from the 1998 U.S. Open tennis tournament. Ms. Virginia was in shock, and flinched. Later, the "shock turned to shame," and for years she felt that she was at fault for the incident.[25] When she saw Defendant Trump years later she felt shame and disgust.

(f)     In 2000, Bridget Sullivan who was competing in the Miss USA contest said that Defendant Trump came backstage where the contestants were changing, walking through the dressing rooms while they "were all naked."[26] In a 2005 appearance on Howard Stern's radio show unearthed by CNN, Trump bragged about walking into contestants' dressing rooms at pageants saying: "Well, I'll tell you the funniest is that before a show, I'll go backstage and everyone's getting dressed, and everything else, and you know, no men are anywhere, and I'm allowed to go in because I'm the owner of the pageant…You know, they're standing there

---

[24] Barbash, Fred. "Former Miss Arizona: Trump 'just came strolling right in' on naked contestants." *The Washington Post*, 12 Oct. 2016, https://www.washingtonpost.com/news/morning-mix/wp/2016/10/12/former-miss-arizona-trump-just-came-strolling-right-in-on-naked-contestants/?utm_term=.af55aa1368b4.

[25] Chuck, Elizabeth. "Karena Virginia Becomes 10th Woman to Accuse Trump of Sexual Misconduct." *NBC News*, 20 Oct. 2016, https://www.nbcnews.com/news/us-news/karena-virginia-becomes-tenth-woman-accuse-trump-sexual-misconduct-n670146.

[26] Garrison, Jessica, et al. "'We Were All Naked' When Donald Trump Walked Through Beauty Queen Dressing Room." *BuzzFeedNews*, 9 Oct. 2016, https://www.buzzfeednews.com/article/jessicagarrison/we-were-all-naked-when-donald-trump-walked-in.

with no clothes. 'Is everybody OK?' And you see these incredible looking women, and so, I sort of get away with things like that."[27]

(g)     In 2001, former Miss Arizona Tasha Dixon and another unnamed Miss USA contestant recounted to news sources that Trump walked through the Miss USA dressing room while contestants were naked and then just "stood there and stared at us."[28]

(h)     In 2003, Mindy McGillivray alleged that Trump groped her while she was assisting a photographer working at an even at Mar-a-Lago. The photographer Ken Davidoff remembered Ms. McGillivray telling him that Defendant Trump "just grabbed my ass!"[29]

(i)     In 2006, Defendant Trump groped Ninni Maaksonen, a former Miss Finland, during a photoshoot before an appearance on The Late Show with David Letterman. The experience left her feeling disgusted.[30]

(j)     In 2013, Defendant Trump repeatedly groped Cassandra Searles, a former Miss Washington contestant. In a Facebook post describing the incidents later, Ms. Searles called Defendant Trump a "misogynist" who would line up beauty pageant contestants and treat them "like cattle."[31] Paromita Mitra, a Miss Mississippi USA contestant posted a response

---

[27] Kaczynski, Andrew, et al. "Donald Trump to Howard Stern: It's okay to call my daughter a 'piece of ass.'" *CNN*, 9 Oct. 2016, https://www.cnn.com/2016/10/08/politics/trump-on-howard-stern/index.html.

[28] Redden, Molly. "Miss USA 2001 contestant: Trump barged into room when we were naked." *The Guardian*, 13 Oct. 2016, https://www.theguardian.com/us-news/2016/oct/12/donald-trump-miss-usa-dressing-room-2001-rehearsal.

[29] Capozzi, Joe. "Palm Beach Post Exclusive: Local woman says Trump groped her." *The Palm Beach Post*, 12 Oct. 2016, https://www.palmbeachpost.com/news/palm-beach-post-exclusive-local-woman-says-trump-groped-her/w5ii48gwdJY9htsLl88GcP/.

[30] Bixby, Scott. "Former Miss Finland is 12th woman to accuse Donald Trump of sexual assault." *The Guardian*, 28 Oct. 2016, https://www.theguardian.com/us-news/2016/oct/27/trump-twelfth-woman-sexual-assault-accusation-ninni-laaksonen.

[31] Tuck, Lauren. "Donald Trump Reportedly Treated Miss USA Contestants Like 'Property.'" *Yahoo! News*, 17 June 2016, https://www.yahoo.com/lifestyle/donald-trump-reportedly-treated-miss-000000927.html.

stating, "I literally have nightmares about the process," while another woman, Shanon McAnally, called Ms. Searles's account "so true and extremely scary."[32]

104.     Defendant Trump's public statements provide further insight into his motives, and demonstrate that he harbors deeply misogynistic attitudes towards women. Specifically, Defendant Trump has a long history (which continues to this day) of publicly demeaning, objectifying, and engaging in overtly gendered attacks against female reporters, politicians, media personalities, employees, and others.[33]

105.     In short, Defendant Trump's battery of Ms. Johnson is part of a pattern of predatory and harassing behavior towards women. He knows that his behavior is wrong, degrading, and harmful, both because common decency dictates as much and because several victims of his unwanted advances have publicly stated so. Yet he continues to repeatedly and unashamedly grope women, kiss them without their consent, and force them to endure unwanted touching. As demonstrated by his long history of similar behavior, he does so intentionally, maliciously, and with the knowledge that it will cause damage and injury.

106.     Indeed, Defendant Trump kisses and touches women without asking for consent or permission precisely because he knows that if he does, there is a high probability that his advances will be rebuffed.

107.     In kissing and touching women without their consent, Defendant Trump's behavior is so wanting in care that it constitutes a conscious disregard to the rights of the women involved.

---

[32] *Id.*

[33] The occasions on which Defendant Trump has publicly displayed sexist attitudes are too numerous to recount here, but are well documented and have been widely reported by the press. *See, e.g.*, Cohen, Claire. "Donald Trump Sexism Tracker: Every Offensive Comment in One Place." *The Telegraph*, 14 July 2017, https://www.telegraph.co.uk/women/politics/donald-trump-sexism-tracker-every-offensive-comment-in-one-place/.

108.     Defendant Trump intentionally kissed Ms. Johnson despite knowing that there was a high probability that his kiss was unwanted and would cause her distress and embarrassment, as demonstrated both by his failure to ask her for permission and his pattern of identical conduct.

109.     Defendant Trump's conduct in kissing Ms. Johnson evidenced a conscious disregard for or indifference to her rights.

### Ms. Johnson was Underpaid Compared to Her Colleagues

110.     In addition to the forcible kissing Ms. Johnson experienced during her time with the Campaign, Ms. Johnson was vastly underpaid compared to many of her Campaign counterparts who were white, despite her critical role at various stages of the Campaign.

111.     Ms. Johnson was also underpaid compared to similarly qualified and less qualified male staffers. She did not know this fact until very recently. Ms. Johnson's experience is not isolated—indeed, the Campaign engaged in systemic gender discrimination in pay against its female employees.

112.     Ms. Johnson was paid $3,000 per month between January and August 2016. She was paid a $1,000 bonus on August 31, 2016. From September 2016 until she left the campaign, she was paid $4,000 per month. But despite all her hard work and success, particularly at critical times in the campaign, Ms. Johnson was compensated at a lower level than virtually all her colleagues. Specifically, Ms. Johnson's compensation was substantially lower than that paid to other Campaign staff who had the same responsibilities as she did, and even other Campaign staff who had fewer responsibilities than she did:

(a)     Sidney Bowdidge, a white man, is a former massage therapist who was part of the National Strike Team with Ms. Johnson. He was responsible for volunteer recruitment and management, just like Ms. Johnson. He traveled with Ms. Johnson as part of the National Strike Team. For that work, he was paid $3,500 per month from March through August 2016

28

(except for April 2016, when he was paid $6,000) and $7,000 per month for the remainder of the campaign.

(b)     Matt Ciepielowski, a white man, was part of the National Strike Team with Ms. Johnson, and they traveled to all of the same states. Mr. Ciepielowski was paid $8,000 per month from January through June 2016 (except for April 2016, when he was paid $10,500), and $10,000 per month for the rest of the campaign.

(c)     Austin Browning, a white male teenager, was a high school senior when he was hired during the general election. He was paid $5,618.58 in August 2016, $7,817.78 in September 2016, $8,592.30 in October 2016, and $6,421.07 in November 2016.

(d)     David Chiokadze, a white man, assisted the Communications Director for the Florida team in preparing talking points and written statements for the Campaign. Mr. Chiokadze and Ms. Johnson worked closely together during the general election in Florida, and Ms. Johnson frequently helped Mr. Chiokadze with his work. Yet Mr. Chiokadze was paid $8,000 in May 2016, $9,003.25 in June 2016, $8,000 in July 2016, $13,148 in August 2016, $8,363.56 in September 2016, and $5,907.90 in October 2016.

(e)     Tony Ledbetter, a white man, was responsible for representing the Campaign in the northern part of Florida during the general election, just as Ms. Johnson had been responsible for representing the campaign in the northern part of Alabama during the primaries. Mr. Ledbetter had fewer responsibilities than Ms. Johnson did during the general election, because while Ms. Johnson was in charge of operating the RV program throughout the entire state, Mr. Ledbetter was only responsible for a few counties. Yet Mr. Ledbetter was paid $3,500 per month from January through March 2016 and $5,500 per month between August and October 2016.

113.     The Campaign knew that it was underpaying Ms. Johnson relative to her white counterparts. It knew this because campaigns are required to track disbursements and report them to the FEC.

114.     The Campaign also knew that it is illegal to pay white people more than African American people for the same work. Yet the Campaign paid Ms. Johnson less than her white counterparts, both men and women.

115.     The Campaign also knew that it was underpaying Ms. Johnson, and the rest of its female staff, relative to male employees. In addition to the Campaign's obligations to report pay information to the FEC, while the 2016 campaigns were ongoing it was reported that men employed by the Campaign made "about 35% more" than women.[34] Accusations of gender-based pay discrimination by the Campaign were widely reported.[35]

116.     And, the Campaign knew that it is illegal to pay women less than men for the same work. Yet the Campaign willfully paid its female employees less than its male employees.

117.     There is no reasonable basis for Ms. Johnson's lower pay. Ms. Johnson successfully helped organize rallies, including one in Alabama touted by Defendant Trump himself as the "biggest crowd of the political season by far," and was chosen as one of the select few to be a part of the elite National Strike Team that traveled to critical primary states. And Ms. Johnson was ultimately selected to work in the important battleground state of Florida for the general election campaign as the Operations Administrative Director. Indeed, given the Campaign's reliance and trust in her, and her

---

[34] Matt Viser. "Donald Trump's Campaign Pays Women Less Than Men." *The Boston Globe*, 4 June 2016, https://www.bostonglobe.com/news/politics/2016/06/04/donald-trump-campaign-pays-women-less-than-men/VIu0v2MUJiHqhvc5C0W5dO/story.html.
[35] *E.g.*, Trip Gabriel. "Donald Trump Field Organizer Accuses Campaign of Sex Discrimination." *The New York Times*, 31 Jan. 2016, https://www.nytimes.com/2016/02/01/us/politics/trump-field-organizer-accuses-campaign-of-sex-discrimination.html?_r=1.

wide range of responsibilities, the fact that a high school age student was making roughly twice what Ms. Johnson made throws the unequal pay into sharp relief.

118.     The Campaign's discriminatory pay was part of a larger culture of racist and sexist behavior that pervaded the Campaign. Defendant Trump set the tone in his campaign rallies by highlighting and playing on racist tropes about Latin American immigrants, Muslims, and African Americans.

119.     Additionally, Ms. Johnson endured and observed repeated instances of racist and sexist remarks throughout the Campaign. In Florida, Ms. Johnson's direct supervisor, Jennifer Locetta, repeatedly made racist and sexist remarks to Ms. Johnson, including referring to Ms. Giorno's hair as "nappy," and calling an Indian American volunteer a "dot-head." Campaign staff casually referred to black men as "thugs" and discussed the view that Michelle Obama is secretly a man.

## COLLECTIVE ACTION ALLEGATIONS

120.     The Campaign engaged in systemic gender-based pay discrimination against its female employees. It knowingly and willfully paid its female employees less than its male employees for the same work.

121.     Ms. Johnson seeks to be appointed as a representative of the collective.

122.     Ms. Johnson brings these collective claims pursuant to 29 U.S.C. § 216(b), seeking damages, equitable relief, and any other make-whole relief on behalf of all female Campaign employees who were paid less than male employees doing the same or similar work for claims under the Equal Pay Act ("EPA").

123.     Ms. Johnson and the collective are similarly situated in that they were female Campaign staff who were affected by policies and practices with the purpose and effect of denying them equal compensation for the same or similar work because of their gender.

124.     There are many similarly situated collective members who would benefit from the issuance of a court-supervised notice of the present lawsuit and the opportunity to join the present lawsuit. Notice should be sent to the collective pursuant to 29 U.S.C. § 216(b).

125.     Questions of law and fact common to Ms. Johnson and the collective include, but are not limited to, the following:

(a)     Whether members of the collective were subjected to an unlawful common policy that resulted in unequal pay for equal work;

(b)     Whether the Campaign unlawfully failed and continues to fail to compensate members of the collective at a level commensurate with similarly situated male employees;

(c)     Whether the Campaign's policy, practice, or procedure of failing to compensate members of the collective at levels commensurate with male employees violates applicable provisions of the EPA;

(d)     Whether the Campaign's failure to compensate members of the collective at a level commensurate with comparable male employees was willful within the meaning of the EPA.

126.     Ms. Johnson's claims for violation of the EPA may be brought and maintained as an opt-in collective action pursuant to 29 U.S.C. § 216(b) because her claims are similar to the claims of the collective she seeks to represent.

127.     Ms. Johnson and the collective that she seeks to represent (a) are similarly situated and (b) are or were subjected to the Campaign's common compensation policies, practices, and procedures and centralized decision-making resulting in unequal pay based on sex by failing to compensate members of the collective at a level commensurate with male employees who perform substantially equal work and/or hold equivalent levels, job titles, and positions.

## COUNT I
## BATTERY AGAINST DEFENDANT TRUMP
### (On Behalf of Plaintiff Individually)

128.    Plaintiff incorporates paragraphs 1 through 119 above as if fully written herein.

129.    On August 24, 2016, Defendant Donald J. Trump did in fact intentionally touch Plaintiff, Alva T. Johnson, on her person against her will and without her legal consent. Prior to a Campaign rally in Tampa, Florida, Plaintiff attended a meet-and-greet where Defendant Trump met volunteers and supporters inside a Campaign RV. During that meet-and-greet event, Defendant Trump forcibly kissed Ms. Johnson in the presence of several of her colleagues and others. The forced and unwanted kiss was deeply offensive to Ms. Johnson.

130.    As a direct and proximate result of Defendant's battery on Plaintiff, Plaintiff has in the past suffered, and continues to suffer emotional distress, psychological trauma, humiliation, embarrassment, loss of dignity, invasion of privacy and other damages. Plaintiff also suffered damages in the form of medical expenses.

131.    As a direct and proximate result of Defendant's battery on Plaintiff, Plaintiff has also suffered a loss of income and a loss of the capacity to enjoy life.

132.    Defendant performed the acts herein alleged with malice, moral turpitude, wantonness, willfulness, and reckless indifference to the rights of others. Defendant had actual knowledge of the wrongfulness of his conduct and the high probability that injury or damage to Plaintiff would result and, despite that knowledge, intentionally touched Plaintiff, which did in fact result in injury and damage to Plaintiff.

133.    WHEREFORE, Plaintiff prays this Court will enter an order prohibiting Donald J. Trump from grabbing, kissing or otherwise assaulting or harassing women without prior express consent. Plaintiff further demands judgment against Defendant for compensatory damages, including economic damages and non-economic damages for emotional pain, suffering, mental anguish,

33

embarrassment, humiliation, and loss of enjoyment of life; punitive damages; prejudgment interest; costs; and such other and further relief as this Court deems just and proper.

## COUNT II
## UNEQUAL PAY BASED ON GENDER AGAINST DEFENDANT DONALD J. TRUMP
## FOR PRESIDENT, INC.
### (Equal Pay Act)
### (On Behalf of Plaintiff and the Collective)

134.    Plaintiff incorporates paragraphs 1 through 127 above as if fully written herein.

135.    Defendant Donald J. Trump for President, Inc. has discriminated against Plaintiff in violation of the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 206, et seq., as amended by the Equal Pay Act of 1963 ("EPA"). The Campaign paid Plaintiff and the collective less than similarly-situated male colleagues while performing equal work on jobs the performance of which requires skill, effort, and responsibility, and which are performed under similar working conditions.

136.    For example, Plaintiff was paid $3,000 per month between January and August 2016, a $1,000 bonus on August 31, 2016, and $4,000 per month from September 2016 until her departure from the campaign. As described more fully herein, these sums were substantially less than those paid to similarly-situated male Campaign staff performing equal and sometimes lesser work on jobs the performance of which requires equal skill, effort, and responsibility, and which were performed under similar working conditions.

137.    The differential in pay between Plaintiff and the Campaign's male employees was not due to seniority, merit, quantity, or quality of production, but was due to gender.

138.    Defendant did not act in good faith, and caused, attempted to cause, contributed to, or caused the continuation of, the wage rate discrimination based on sex in violation of the EPA. Moreover, the foregoing conduct constitutes a willful violation of the EPA within the meaning of 29 U.S.C. § 255(a). Because Defendant has willfully violated the EPA, a three-year statute of limitations applies to such violations, pursuant to 29 U.S.C. § 255(a).

139.     As a direct result of Defendant's discriminatory policies and/or practices described above, Plaintiff has suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

140.     Defendant's actions have caused Plaintiff substantial losses in employment opportunities, earnings, and other employment benefits. In addition, Plaintiff suffered and continues to suffer emotional distress, humiliation, embarrassment, and anguish.

141.     WHEREFORE, Plaintiff demands judgment against Defendant Donald J. Trump for President, Inc. for compensatory damages, including economic damages and non-economic damages for emotional pain, suffering, mental anguish, embarrassment, humiliation, and loss of enjoyment of life; back pay; front pay; punitive damages; prejudgment interest; costs; and such other and further relief as this Court deems just and proper.

## COUNT III
## UNEQUAL PAY BASED ON RACE AGAINST DEFENDANT DONALD J. TRUMP FOR PRESIDENT, INC.
### (42 U.S.C. § 1981)
### (On Behalf of Plaintiff Individually)

142.     Plaintiff incorporates paragraphs 1 through 119 above as if fully written herein.

143.     Defendant Donald J. Trump has discriminated against Plaintiff in violation of 42 U.S.C.A. § 1981. Plaintiff was paid $3,000 per month between January and August 2016. She was paid a $1,000 bonus on August 31, 2016. From September 2016 until she left the campaign, she was paid $4,000 per month. As described more fully herein, these sums were substantially less than those paid to similarly-situated white Campaign staff performing equal and sometimes lesser work on jobs the performance of which requires equal skill, effort, and responsibility, and which were performed under similar working conditions.

144.     The differential in pay between Plaintiff and white employees was not due to seniority, merit, quantity, or quality of production, but was due to race.

35

145.    Defendant did not act in good faith, and caused, attempted to cause, contributed to, or caused the continuation of, the wage rate discrimination based on race in violation of § 1981.

146.    As a direct result of Defendant's discriminatory policies and/or practices described above, Plaintiff has suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

147.    Defendant's actions have caused Plaintiff substantial losses in employment opportunities, earnings, and other employment benefits. In addition, Plaintiff suffered and continues to suffer emotional distress, humiliation, embarrassment, and anguish.

148.    WHEREFORE, Plaintiff demands judgment against Defendant Donald J. Trump for President, Inc. for compensatory damages, including economic damages and non-economic damages for emotional pain, suffering, mental anguish, embarrassment, humiliation, and loss of enjoyment of life; back pay; front pay; punitive damages; prejudgment interest; costs; and such other and further relief as this Court deems just and proper.

### PRAYER FOR RELIEF

Wherefore, Plaintiff prays for judgment as follows:

### AS TO COUNT I

1.    For an injunction prohibiting Donald J. Trump from grabbing, kissing or otherwise assaulting or harassing women without prior express consent;

2.    All damages, including compensatory, punitive, and special damages;

3.    Equitable and declaratory relief;

4.    Attorney's fees and costs of suit, to the extent provided by law;

5.    Pre-and post-judgment interest to the extent provided by law; and

6.    Such other and further relief as the Court deems just.

## AS TO COUNT II

7.      That the Court certify this action as a collective action under the EPA on behalf of Plaintiff and the collective; designate Plaintiff as the representative of the collective; promptly issue notice pursuant to 29 U.S.C. § 216(b) to all similarly situated members of the collective, which (1) apprises them of the pendency of this action and (2) permits them to assert timely EPA claims in this action by filing Individual Consent to Join forms pursuant to 29 U.S.C. § 216(b); and toll the statute of limitations for the claims of all members of the collective from the date the original complaint was filed until collective members are provided with reasonable notice of the pendency of this action and a fair opportunity to exercise their right to opt in as Collective Action Plaintiffs;

8.      A declaratory judgment that the practices complained of herein are unlawful and violate 29 U.S.C. § 216(b).

9.      A preliminary and permanent injunction against the Campaign from engaging in policies, patterns, or practices that discriminate against Plaintiff and other collective members because of their gender;

10.     An order that the Campaign institute and carry out policies, practices, and programs that provide equal employment opportunities for all employees regardless of gender and that it eradicate the effects of their past and present unlawful employment practices;

11.     An order retaining jurisdiction over this action to ensure that the Campaign complies with the decree;

12.     An order for front pay and back pay (including interest and benefits) for Plaintiff and collective members;

13.     All damages sustained as a result of the Campaign's conduct, including damages for emotional distress, humiliation, embarrassment, and anguish, according to proof;

14.     Liquidated damages;

15. Exemplary and punitive damages in an amount commensurate with the Campaign's ability to pay and to deter future conduct;

16. Costs included here, including reasonable attorney's fees to the extent allowable by law;

17. Pre-judgment and post-judgment interest as provided by law; and

18. Such other and further legal and equitable relief as this Court deems necessary, just, and proper.

## AS TO COUNT III

19. That the Court award all damages, including compensatory, punitive, and special damages;

20. Equitable and declaratory relief;

21. Attorney's fees and costs of suit, to the extent provided by law;

22. Pre-judgment and post-judgment interest to the extent provided by law; and

23. Such other and further relief as the Court deems just.

## JURY DEMAND

Plaintiff demands a trial by jury in this action of all issues so triable.

Dated February 25, 2019                                 Respectfully Submitted,

_/s/ Hassan A. Zavareei_                                _/s/ Janet R. Varnell_
Hassan A. Zavareei (*pro hac vice* forthcoming)         Janet Varnell (Fla. Bar No. 71072)
**Trial Counsel**                                       Brian W. Warwick, (Fla. Bar No. 0605573)
Katherine M. Aizpuru (*pro hac vice* forthcoming)       **VARNELL & WARWICK, PA**
**TYCKO & ZAVAREEI LLP**                                P.O. Box 1870
1828 L Street NW, Suite 1000                            Lady Lake, FL 32158-1870
Washington, D.C. 20036                                  P: 352-753-8600
P: (202) 417-3667                                       F: 352-503-3301
F: (202) 973-0950                                       jvarnell@varnellandwarwick.com
hzavareei@tzlegal.com                                   bwarwick@varnellandwarwick.com
kaizpuru@tzlegal.com

Tanya S. Koshy (*pro hac vice* forthcoming)
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, CA 94612
P: (510) 250-3298
F: (202) 973-0950
tkoshy@tzlegal.com

   /s/ F. Paul Bland
F. Paul Bland (*pro hac vice* forthcoming)
Karla Gilbride (*pro hac vice* forthcoming)
**PUBLIC JUSTICE, P.C.**
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600

Jennifer Bennett (*pro hac vice* forthcoming)
**PUBLIC JUSTICE, P.C.**
475 14th Street, Suite 610
Oakland, CA 94612
(510) 622-8150