## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## (TAMPA DIVISION)

**ALVA JOHNSON,**
*Individually and On Behalf of All Others Similarly Situated,*

        Plaintiff,

        vs.

**DONALD J. TRUMP,**
*In his Individual Capacity* and
**DONALD J. TRUMP FOR PRESIDENT, INC.,**

        Defendants.

**CASE NO. 8:19-cv-00475-WFJ-SPF**

---

**PLAINTIFF'S MOTION TO CONDITIONALLY CERTIFY COLLECTIVE ACTION
AND FACILITATE NOTICE TO POTENTIAL COLLECTIVE MEMBERS AND
INCORPORATED MEMORANDUM OF LAW**

Pursuant to the Federal and Local Rules of Civil Procedure and 29 U.S.C. § 216(b), Plaintiff Alva Johnson ("Plaintiff"), on behalf of herself and all those similarly situated, respectfully requests that the Court enter an Order conditionally certifying a collective action against Defendant Donald J. Trump for President, Inc. ("DJTFP" or "Campaign") for violations of the Equal Pay Act ("EPA"), 29 U.S.C. §§206(d), 216(b), and permitting, under court supervision, notice to:

> All women employed by Defendant Donald J. Trump for President, Inc. from May 13, 2016 to the present.

Plaintiff also respectfully requests that this Court:

a. Require Defendant DJTFP to identify all putative members of the proposed collective by providing a list of their names, last known addresses, dates of employment, cell phone numbers, and email addresses in electronic and importable format, *e.g.*, a Microsoft Excel spreadsheet, within 14 days of the entry of an order;[1]

---

[1] *See Hoffman-La Roche, Inc. v. Sperling*, 493 U.S. 165, 169-170 (1989) (determining that courts have authority to compel defendant-employers to provide names and addresses of potential plaintiffs through the pretrial discovery process).

b.  Permit Plaintiff's counsel to send Court-approved notice of this action to the putative collective members via U.S. Mail, e-mail, phone call, and text message. Plaintiff's proposed Notice to the putative collective and proposed Consent to Become an Opt-In Plaintiff form are attached hereto as EXHIBITS A and B, respectively;

c.  Permit Plaintiff's counsel to send a reminder notice to putative collective members via email and text message at the halfway point of the notice period;

d.  Approve a 60-day opt-in period from the date the Court-approved notice is sent, during which the putative collective members may join this case by returning their written consents; and

e.  Allow putative collective members to electronically sign and return Consent to Become an Opt-In Plaintiff forms.

As set forth more fully herein, Plaintiff has provided substantial evidence demonstrating that, at all relevant times, Defendant DJTFP maintained a common policy, uniformly applicable to all members of the putative collective, of paying female employees less than their male counterparts for the same or similar work. Thus, Plaintiff has met the lenient standard applicable to her claims at this early stage of the litigation, and her requested relief should be granted. *See Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208 (11th Cir. 2001).

## I.    INTRODUCTION

Plaintiff Alva Johnson was employed by Defendant DJTFP from January 2016 through October 2016. During this time, she carried out a wide variety of job duties and travelled to multiple states, as is typical of employees of presidential campaigns—particularly campaigns that are leanly staffed, as the Trump Campaign was. Plaintiff's duties included, at various times, recruiting, organizing, and managing local volunteers, coordinating rallies and Campaign Recreational Vehicle ("RV") operations, drafting and delivering public remarks, onboarding new staff, distributing campaign "collateral," and conducting minority outreach.

Plaintiff alleges that, throughout the campaign, she and similarly situated female employees nationwide were paid less than their male counterparts for performing substantially similar work,

and that this pay disparity was the result of a common scheme carried out by DJTFP's male-dominated management and upheld via DJTFP's centralized decision-making and policies.  In support of her allegations, Plaintiff presents anecdotal and documentary evidence of widespread gender-based pay discrimination, which demonstrates that DJTFP's discriminatory compensation policies applied to all members of the proposed collective, regardless of their geographical locations or official job titles. This evidence includes, among other things, a preliminary analysis of the Campaign's publicly available disbursement data for May through December of 2016, which demonstrates that, excluding a small handful of employees in senior leadership roles, on average, females were paid $3,865 monthly and males were paid $4,568—a stunning gap of 18.2 percent.

Based on this preliminary evidence, Plaintiff seeks the Court's authorization to notify members of the proposed collective of this litigation so that they may decide whether to opt in and thereby preserve their claims while discovery moves forward. *See* 29 U.S.C. §§ 216(b), 256.

## II.      LEGAL STANDARD

Because Plaintiff brings this collective action under the Equal Pay Act, which is part of the federal Fair Labor Standards Act ("FLSA") and incorporates its collective action provisions, 29 U.S.C. § 216(b), rather than Federal Rule of Civil Procedure 23, governs her claims.  § 216(b) provides that employees may bring actions on behalf of "themselves and other employees similarly situated" and that "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." *Id.* Unlike in Rule 23 class actions, no finding of numerosity is required for certification. *Id.*

Courts in this Circuit have adopted a two-stage collective certification process. *See Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1219 (11th Cir. 2001). At the first stage, also referred to as the "notice" or "conditional certification" stage, courts consider whether proposed collective

members should receive notice of the action and be provided with the opportunity to opt in. *Id.* At the second stage, which typically occurs at the close of discovery and is known as the "decertification" stage, courts determine whether the case should proceed to trial as a collective action. *See Morgan v. Family Dollar*, 551 F.3d 1233, 1260 (11th Cir. 2008).

The benefits of collective actions, which include promoting judicial economy and reducing "individual costs to vindicate rights by the pooling of resources," are dependent on "employees receiving accurate and timely notice concerning the pendency of the collective action so they can make informed decisions about whether to participate." *See Hoffmann-LaRoche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989). For this reason, courts generally apply a lenient standard at the notice stage, requiring only that plaintiffs demonstrate that collective members are "similarly situated." Though the FLSA itself does not define the phrase "similarly situated," the Eleventh Circuit has observed that courts should consider whether the employees are similar "with respect to their job requirements and in regards to their pay provisions." *Dybach v. State of Fla. Dep't of Corrections*, 942 F.2d 1562, 1567 (11th Cir. 1991). The Eleventh Circuit has further clarified that "plaintiffs need show only 'that their positions are similar, not identical,' to be the positions held by the putative class members" (*Grayson v. K Mart*, 79 F.3d 1086 n. 12 (11th Cir. 1996) (citations omitted)), and that "[a] unified policy, plan, or scheme . . . may not be required to satisfy the more liberal 'similarly situated' requirement of § 216(b)" (*Id.* at 1095).

Notably, in *Grayson*, the Court held that the allegations, affidavits, and depositions offered by the plaintiff were "*more* than sufficient" to meet the "similarly situated standard found in § 216(b)," indicating that conditional certification would have been proper even on a less developed record. *See id.* at 1095-96 (emphasis added). Indeed, at the conditional certification stage, courts typically make a determination based only on the pleadings and any affidavits which have been submitted. *See Vondriska v. Premier Mortg. Funding, Inc.*, 564 F.Supp.2d 1330, 1334 (M.D. Fla. 2007).

Relatedly, courts do not make credibility determinations or resolve contradictory evidence presented by the parties at the notice stage. *See, e.g., Henderson v. Holiday CVS, LLC*, 2010 WL 1854111, at *3 (S.D. Fla. May 11, 2010) (declining to "indulge in a fact finding determination on the merits, which is improper" at the notice stage of the litigation). *See also Kreher v. City of Atlanta, Georgia*, 2006 WL 739572, at *4 (N.D. Ga. March 20, 2006) (citation omitted) ("The focus of [the conditional certification] inquiry is not whether there has been an actual violation of law, but rather on whether the proposed plaintiffs are 'similarly situated' under 29 U.S.C. § 216(b) with respect to their allegations that the law has been violated"); *Bernal v. Vankar Enterprises, Inc.*, 2008 WL 791963, at *3 (W.D. Tex. March 24, 2008) (allegations that bartender tip pool was illegal were sufficient for conditional certification, notwithstanding employer's contentions otherwise); *Shajan v. Barolo, Ltd.*, 2010 WL 2218095, at *1 (S.D.N.Y. June 2, 2010) (at the conditional certification stage, "[w]eighing of the merits is absolutely inappropriate.").

Because of the lenient standard applicable to plaintiffs' claims at the notice stage, conditional certification of a representative class is typically approved. *See, e.g., Arvilla v. Fresh Mkt., Inc.*, 2019 WL 1382842, at *1–2 (M.D. Fla. Mar. 27, 2019). Here too, Plaintiff's Motion should be granted, as she has provided ample factual support for her allegations that the pay discrimination she experienced was the result of a common discriminatory scheme which affected all female Campaign staffers.

### III.    FACTS

**A.    Plaintiff is Similarly Situated to Members of the Proposed Collective and Their Male Comparators With Respect to Job Requirements and Expectations.**

Though some of the Campaign's payroll data is accessible via publicly available Federal Election Commission filings, information regarding individual Campaign workers' job duties is largely within the exclusive knowledge and control of Defendant, and cannot be obtained by Plaintiff without formal discovery. However, press reports reveal that, throughout the 2016

campaign cycle, the Trump Campaign's paid staff was a small and exclusive group. *See, e.g.*, Matt

Viser, "Donald Trump's Campaign Pays Women Less Than Men," *The Boston Globe*, 4 June 2016,

*available at* https://www.bostonglobe.com/news/politics/2016/06/04/donald-trump-campaign-

pays-women-less-than-men/VIu0v2MUJiHqhvc5C0W5dO/story.html (noting that the Trump

Campaign employed only 113 paid staffers, defined as staff making at least $1,000 per month, in

April 2016); Reid Wilson, "Trump lags behind Clinton in campaign staff, pollsters," *The Hill*, 22 July

2016, *available at* https://thehill.com/blogs/ballot-box/presidential-races/288867-trump-lags-

behind-clinton-in-campaign-staff-pollsters (reporting that "Trump's campaign was paying salaries to

just 68 staffers as of June 30, 2016."). To put these numbers into perspective, the Trump Campaign

has said that it hopes to recruit and train two million volunteers for the 2020 election.  *See* Michael

Wilner, "'No centrist lane' in Democratic primary, Trump campaign says," *McClatchy*, 25 April 2019,

available at https://www.mcclatchydc.com/news/politics-government/white-

house/article229459319.html. Thus, *all* of DJTFP's paid staffers were members of a select group of

"senior" staffers, expected to demonstrate similar high levels of skill and dedication, report up in the

same hierarchies, and follow the same Campaign-wide policies and procedures.  For instance, on

information and belief, every paid DJTFP staffer was required to sign an identical nondisclosure

agreement as a condition of employment. *See, e.g.*,

https://www.washingtonpost.com/politics/2019/02/21/trump-campaign-loved-ndas-an-ex-staffer-

wants-nullify-them-with-class-action/?utm_term=.12315e43664a (noting that, in 2016, then-

candidate Trump "expressed his affinity for NDAs and his confidence in the ones he's doled out to

his campaign staffers"). Further, almost all of DJTFP's paid staffers were tasked generally with

coordinating the Campaign's voter outreach via campaign field offices and/or the media.

One paid Campaign staffer, Omarosa Manigault Newman, has already stepped forward to

voice her willingness to opt in to this collective action.  *See* Declaration of Omarosa Manigault

Newman, attached hereto as EXHIBIT C. Like Plaintiff Alva Johnson, a major facet of Ms. Manigault Newman's job was outreach to African American and other minority groups.  Also like Ms. Johnson, Ms. Manigault Newman was responsible for speaking at Republican events and crafting Campaign communications. As set forth in further detail in her Declaration, Ms. Manigault Newman believes that Defendant DJTFP paid her less than male employees who performed the same or similar job duties under similar working conditions.

In sum, the limited information available to Plaintiff at this early stage, before discovery has been exchanged, reveals that all paid staff of DJTFP performed work that required substantially similar skill, effort and responsibility. This is borne out by Plaintiff's own experiences as a DJTFP staffer. *See, e.g., infra*, describing the duties and credentials of several male DJTFP employees. Accordingly, Plaintiff has amply demonstrated that she is similarly situated to both members of the putative collective and their male counterparts with respect to job duties and expectations.

**B.     Plaintiff is Similarly Situated to the Members of the Proposed Collective in that They Were All Subject to the Same Discriminatory Compensation Scheme.**

*1.   DJTFP paid Plaintiff less than comparable male employees for substantially equivalent work.*

Throughout the 2016 election cycle, Plaintiff was significantly underpaid compared to many of her male Campaign counterparts. Specifically, Plaintiff was paid $3,000 per month between January and August 2016. She was paid a $1,000 bonus on August 31, 2016. From September 2016 until she left the campaign, she was paid $4,000 per month. This compensation was considerably lower than that paid to male Campaign staff who had the same responsibilities as she did, and lower even than male Campaign staff who had fewer responsibilities than she did.  The following are just a few examples of male DJTFP employees who were paid more than Plaintiff for substantially similar work:

     i.   Sidney Bowdidge, a former massage therapist, was part of the National Strike Team with Plaintiff. He was responsible for volunteer recruitment and management, just like

7

Plaintiff. He traveled with Plaintiff as part of the National Strike Team. For that work, he was paid $3,500 per month from March through August 2016 (except for April 2016, when he was paid $6,000) and $7,000 per month for the remainder of the campaign.

ii.  Matt Ciepielowski was part of the National Strike Team with Plaintiff, and they traveled to all of the same states. Mr. Ciepielowski was paid $8,000 per month from January through June 2016 (except for April 2016, when he was paid $10,500), and $10,000 per month for the rest of the campaign.

iii.  Austin Browning was a high school senior when he was hired during the general election. He was paid $5,618.58 in August 2016, $7,817.78 in September 2016, $8,592.30 in October 2016, and $6,421.07 in November 2016.

iv.  David Chiokadze assisted the Communications Director for the Florida team in preparing talking points and written statements for the Campaign. Mr. Chiokadze and Plaintiff worked closely together during the general election in Florida, and Plaintiff frequently helped Mr. Chiokadze with his work. Yet Mr. Chiokadze was paid $8,000 in May 2016, $9,003.25 in June 2016, $8,000 in July 2016, $13,148 in August 2016, $8,363.56 in September 2016, and $5,907.90 in October 2016.

v.  Tony Ledbetter was responsible for representing the Campaign in the northern part of Florida during the general election, just as Plaintiff had been responsible for representing the campaign in the northern part of Alabama during the primaries. Mr. Ledbetter had fewer responsibilities than Plaintiff did during the general election, because while Plaintiff was in charge of operating the RV program throughout the entire state, Mr. Ledbetter was only responsible for a few counties. Yet Mr. Ledbetter was paid $3,500 per month from January through March 2016 and $5,500 per month between August and October 2016.

2.    *Plaintiff's preliminary analysis of the available data reveals gender-based pay disparities across the proposed collective.*

Attached hereto as EXHIBIT D is the declaration of Dr. Phillip M. Johnson, economist and managing director at Econ One Research, Inc. Dr. Johnson holds a doctoral degree in economics from the University of California at Los Angeles and a bachelor's degree in economics from California State University at Northridge. Dr. Johnson's preliminary analysis of the Campaign's payroll-related disbursement data reveals that women were consistently paid less than men on average. The chart below reflects a summary of some of Dr. Johnson's findings, which are explained in further detail in his Declaration:

**Trump Campaign**
**Employee Compensation by Gender**

| Year -Month | Female | Male | Female - Male | Percent Diff |
|---|---|---|---|---|
| | | Mean Compensation | | |
| | | (Dollars) | | |
| | | | (2) - (3) | (4) / (2) |
| (1) | (2) | (3) | (4) | (5) |
| Staff Excluding Key Staff and Advisors | | | | |
| 1. May 2016 | $ 3,609 | $ 4,624 | $    -1,015 | -28.1% |
| 2. June 2016 | 3,917 | 4,801 | -884 | -22.6 |
| 3. July 2016 | 3,792 | 5,019 | -1,227 | -32.4 |
| 4. August 2016 | 3,555 | 4,530 | -975 | -27.4 |
| 5. September 2016 | 4,582 | 4,810 | -228 | -5.0 |
| 6. October 2016 | 4,592 | 5,016 | -423 | -9.2 |
| 7. November 2016 | 2,573 | 3,060 | -488 | -19.0 |
| 8. December 2016 | 8,807 | 8,902 | -95 | -1.1 |
| 9. **May-Dec 2016** | **$ 3,865** | **$ 4,568** | **$    -703** | **-18.2%** |
| Key Staff and Advisors | | | | |
| 10. May 2016 | $ 6,675 | $ 10,123 | $    -3,448 | -51.7% |
| 11. June 2016 | 5,367 | 9,915 | -4,549 | -84.8 |
| 12. July 2016 | 5,367 | 9,915 | -4,549 | -84.8 |
| 13. August 2016 | 7,680 | 9,052 | -1,372 | -17.9 |
| 14. September 2016 | 7,680 | 9,960 | -2,280 | -29.7 |
| 15. October 2016 | 9,146 | 10,140 | -995 | -10.9 |
| 16. November 2016 | 3,401 | 6,926 | -3,525 | -103.7 |
| 17. December 2016 | 0 | 20,000 | -20,000 | |
| 18. **May-Dec 2016** | **$ 6,474** | **$ 9,703** | **$    -3,230** | **-49.9%** |

Notes: (1) Key Staff and Advisors include "State Director", "Communications Director", "Director of New Media", "Deputy Campaign Manager", and "Senior Advisor".

Sources: FEC Disbursements Data; Ballotpedia.

9

This chart shows that, excluding a small handful of very high-level advisors and other staff, on average, females received $3,865 per month while males received $4,568.  The average monthly compensation paid to females was less than that paid to males in every month, and was 18.2 percent less than males' compensation for the May-December 2016 period as a whole.  As part of his analysis, Dr. Johnson also conducted a statistical test of whether this observed disparity in pay is likely to have occurred by chance, using a standard T-test for this purpose. The results of this test indicated that the disparity is unlikely to have occurred by chance.

Several other studies of the Campaign's publicly available compensation data have confirmed the substance of Dr. Johnson's preliminary findings. For instance, the Boston Globe conducted an in-depth analysis of the Campaign's April 2016 Federal Election Commission disclosures, and discovered that the women who worked for the Campaign that month made an average of about $4,500, while the men made nearly $6,100—an astonishing thirty-five percent disparity.  *See* Matt Viser. "Donald Trump's Campaign Pays Women Less Than Men," *The Boston Globe*, 4 June 2016, *available at* https://www.bostonglobe.com/news/politics/2016/06/04/donald-trump-campaign-payswomen-less-than-men/VIu0v2MUJiHqhvc5C0W5dO/story.html.

This pay disparity was evident even when researchers took into account only the Campaign's highest-paid senior staff. For instance, the Boston Globe study cited above found that, of the 15 highest-paid employees, only two were women. *Id.*  Likewise, an analysis of the Campaign's May 2016 financial disclosures revealed that "[n]early all of Trump's highest-paid senior staffers are men: Campaign manager Corey Lewandowski, deputy campaign manager Michael Glassner, chief policy adviser Sam Clovis, and director of social media Dan Scavino were each paid between $12,500 and $20,000 for April and May. The two female senior staffers — communications director Hope Hicks and national spokeswoman Katrina Pierson — were paid $7,700 and $10,486, respectively." *See*

Laura Basset, "Donald Trump's Campaign Staff Is 75 Percent Men," *The Huffington Post*, 25 May 2016, *available at* https://www.huffpost.com/entry/donald-trump-male-staff-75_n_5745b564e4b055bb1170c0de. Notably, the gender pay gap observed in these studies continued well into President Trump's tenure in the White House. *See* Josh Delk and Megan R. Wilson, "White House releases salaries of top Trump staffers," *The Hill*, 30 June 2017, *available at* https://thehill.com/homenews/administration/340302-white-house-releases-salaries-of-top-trump-staffers (showing that of the twenty-two highest-paid White House employees, only six were women).

The widespread nature of the EPA violations at issue is further demonstrated by the fact that similar cases have been filed against DJTFP in the past. For instance, in January 2016, an Iowa field organizer named Elizabeth Mae Davidson accused the Trump Campaign of sex discrimination, claiming that men were paid more than women for doing the same work. In an interview, Ms. Davidson said she was paid $2,000 a month and was classified as part-time because she also had a job as a paralegal. However, another district representative, Marc Elcock, was paid more, even though he, too, had a day job. *See* Trip Gabriel, "Donald Trump Field Organizer Accuses Campaign of Sex Discrimination," *The New York Times*, 31 Jan. 2016, *available at* https://www.nytimes.com/2016/02/01/us/politics/trump-field-organizer-accuses-campaign-of-sex-discrimination.html. According to public filings, several men who held the same title as her, including Mr. Elcock, were paid $3,500 to $4,000 a month. *Id.* Though Ms. Davidson received a right-to-sue letter from the Equal Employment Opportunity Commission, she ultimately opted not to pursue her case against the campaign for undisclosed reasons. *See* Ryan J. Foley, "Iowa woman drops gender bias case against Trump campaign, lawyer says," *The Des Moines Register*, 3 Jan. 2018, *available at* https://www.desmoinesregister.com/story/news/crime-and-courts/2018/01/03/iowa-woman-drops-gender-bias-case-against-trump-campaign-lawyer-says/1000565001/. Given the fact

that, as described *supra*, all DJTFP employees were required to sign restrictive nondisclosure agreements as a condition of employment, it is likely that other women wished to challenge the Campaign's discriminatory pay policies but were prevented from doing so due to fear of professional or legal retaliation.

DJTFP's knowledge of the pervasive gender pay disparity among its employees is indisputable, given that campaigns are required to track disbursements and report them to the FEC. Indeed, throughout the campaign, the discriminatory pay policies described above were established, enforced, and encouraged by DJTFP's top leadership, including then-candidate Trump himself. Defendant Trump has repeatedly made light of the issue of equal pay and has expressed particular disdain for working mothers. For instance, he justified lower pay for women in an interview with Mika Brzezinski for her 2011 book, *Knowing Your Value*, saying "an employer could say 'she's not giving me 100 percent. She's giving me 84 percent, and 16 percent is going towards taking care of children.'" *See* Christina Cauterucci, "The Trump Campaign Pays its Few Female Employees Much Less than its Male Ones," *Slate*, 26 May 2016, *available at* https://slate.com/human-interest/2016/05/trump-s-campaign-pays-its-few-female-employees-much-less-than-its-male-ones.html. Defendant Trump has also remarked that pumping breast milk in the office is "disgusting" (*see id.*); that pregnancy is "an inconvenience" for an employer (*see* Basset); and that he opposes the idea of a law requiring employees to pay women and men the same (*id.*).

## IV.   ARGUMENT

### A.   The Evidence Presented by Plaintiff is More than Sufficient to Meet the Lenient Standard for Conditional Certification of and Issuance of Notice to the Proposed Collective.

As set forth *supra*, because the prevailing issue at this stage is whether the proposed class members should be afforded an opportunity to preserve their claims and because certification is provisional, courts follow a lenient standard that typically results in certification. In support of her

claims, Plaintiff has attached hereto as EXHIBITS C, D, and E, respectively, the declaration of a

similarly situated DJTFP staffer, Omarosa Manigault Newman; the expert declaration of Dr. Phillip

Johnson; and her own declaration. These declarations, along with the other evidence provided by

Plaintiff, meet or exceed what courts in this Circuit and throughout the country have deemed

sufficient for conditional certification. *See Torres v. Nature Coast Home Care LLC*, 2016 WL 5870217,

at *2 (M.D. Fla. Oct. 7, 2016) ("even one opt-in notice can be sufficient to meet the first

requirement for conditional certification"); *Sniffen v. Spectrum Indus. Servs.*, 2007 WL 1341772, at *2

(S.D. Ohio Feb. 13, 2007) (even under the more restrictive standard of a "modest factual showing,"

the "affidavits of the two named plaintiffs [show] that potential class members are similarly

situated"); *Vondriska v. Premier Mortg. Funding, Inc.*, 564 F.Supp.2d 1330, 1334 (M.D. Fla. 2007)

("Evidence of other employees who desire to opt in may be based on affidavits, consents to join the

lawsuit, or expert evidence on the existence of other similarly-situated employees"); *Bernal v. Vankar

Enterprises, Inc.*, 2008 WL 791963, at *3 (W.D. Tex. March 24, 2008) (class of tipped bartenders

conditionally certified based on plaintiff's complaint alleging an illegal tip pool and plaintiff's

affidavit alone); *Barreda v. Prospect Airport Services, Inc.*, 2008 WL 7431307 (N.D. Ill. 2008) (certifying

companywide collective action based on affidavits from only one location); *Kutzback v. LMS

Intellibound, LLC*, 2014 WL 7187006 (W.D. Tenn. Dec. 16, 2014) (granting nationwide conditional

certification for approximately 28,000 putative members based on declarations and evidence of prior

litigation and Department of Labor investigation).

The evidence submitted by Plaintiff should be given special weight considering the unique

circumstances present here. Specifically, as described *supra*, all paid Campaign staffers were required

to sign restrictive nondisclosure agreements. Notably, the Campaign's standard NDA is indefinite in

duration and geographic scope, contains an exceedingly broad non-disparagement clause, applies to

third-party individuals and commercial entities not directly connected with the Campaign, and

threatens violators with significant legal consequences. These NDAs serve as a serious deterrent to women wishing to come forward with allegations of pay discrimination, especially at this early stage before a collective has been conditionally certified and official notice issued.  It is likely that, after such notice is issued and potential collective members are informed that other, similarly situated employees are pursuing their legal rights under the EPA, more women will feel empowered to opt in.

**B.    DJTFP's Offices Across the U.S. Constitute One Establishment for Purposes of the EPA**

Plaintiff has also provided evidence that all of DJTFP's offices constitute a single "establishment" under the EPA. The EPA prohibits discrimination "within any establishment in which such employees are employed," but does not define "establishment" based on geographical offices. *See* 29 U.S.C. 206(d)(1); *Mulhall v. Advance Sec. Inc.*, 19 F.3d 586, 591-92 (11th Cir. 1994) ("A reasonable trier of fact could infer that because of centralized control and the functional interrelationship between plaintiff and the comparators . . . a single establishment exists for purposes of the EPA."); *Brennan v. Goose Creek Consol. Ind. Sch. Dist.*, 519 F.2d 53, 57-58 (5th Cir. 1975) (schools in same district were one establishment due to centralized personnel administration); *American Federation v. Nassau*, 609 F. Supp. 695, 706 (E.D.N.Y. 1985) ("physically separate work places can constitute a single establishment under the EPA if there is a significant functional interrelationship between the work of the employees in the various locations."). Here, as described *supra*, Plaintiff and members of the proposed collective were subject to a common practice or scheme on the part of DJTFP's leadership to pay female employees significantly less than their male peers, a scheme which DJTFP effectuated through centralized Campaign policies and decision-making. Policies and decision-making emanated from Trump Tower, which served as the campaign's headquarters. Additionally, Plaintiff and members of the proposed collective were all primarily involved in voter engagement efforts on behalf of the Campaign, meaning that there was "significant

functional interrelationship between the work of the employees in the various locations." *American Federation*, 609 F. Supp. at 706. Accordingly, Plaintiff has shown that all of DJTFP's offices across the U.S. are part of the same establishment under the EPA.

**C.      Plaintiff and the Members of the Proposed Collective are Protected by the FLSA Under Both "Enterprise" and "Individual" Coverage**

Though the question of whether and under which specific provisions Plaintiff and the proposed collective members are covered by the FLSA (of which the EPA is a part) is more appropriate for resolution on Defendant's pending Motion to Dismiss, Plaintiff will briefly address it here. Workers are covered under the FLSA in one of two instances: individual coverage or enterprise coverage. Individual coverage lies where the worker is engaged in commerce or the production of goods for commerce. 29 U.S.C. § 207(a)(1). Enterprise coverage lies where the employee works for an enterprise engaged in commerce or in the production of goods for commerce. *Id.* Here, Plaintiffs and the proposed collective members are protected by the FLSA under both enterprise and individual coverage.

For a business to be covered by enterprise coverage by and thus required to meet the obligations of the FLSA, it must constitute an "enterprise" as defined by 29 U.S.C. § 203(r)(1), and meet the requirements under 29 U.S.C. § 203(s)(1). To constitute an "enterprise," a business must be "engaged in commerce or in the production of goods for commerce." 29 C.F.R. § 779.234; 29 U.S.C. § 203(s)(1). An enterprise is so engaged if it has employees engaged in commerce or in the production of goods for commerce, or has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person, and has an annual gross volume of sales made or business done of at least $500,000.  29 U.S.C. § 203(s)(1)(A). In *Polycarpe v. E & S Landscaping Service, Inc.*, 616 F.3d 1217 (11th Cir. 2010), the Eleventh Circuit examined the language in 29 U.S.C. § 203(s)(1)(A), "or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by

15

any person," referred to as "the handling clause." *Id.* The Court stated that the handling clause allows the FLSA "potentially to reach retail and service businesses that were otherwise locally focused." *Id.* at *7. The Court further noted that, under the handling clause, the focus is on whether an employer has two or more employees (*not necessarily the plaintiffs*) handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person. *Id.*  In its analysis, the Court explicitly rejected the "coming to rest" doctrine, which holds that goods or materials can lose their interstate quality if the items have already come to rest within a state before intrastate purchase by a business. The court held that the coming to rest doctrine is inapplicable in the enterprise coverage context because the FLSA "was designed to regulate enterprises dealing in articles acquired intrastate after travel in interstate commerce." *Id.* at *8-9 (citations omitted, emphasis in original).

Under this analysis, Defendant DJTFP is clearly an "enterprise" as defined by the FLSA, and its paid staffers, including Plaintiff and members of the proposed collective, are thus protected under the statute's enterprise coverage. Though formal discovery will likely reveal further information regarding the extent of Defendant's commercial activities, DJTFP's very own re-election campaign Manager has said: "We're closing in on selling our one millionth red MAGA [Make America Great Again] hat. You know those are 45 bucks a piece. You do the math there really quick, it's $45 million. So those kind of things—this president has changed the game in the way **merchandise**, rallies, the entire experience of being part of the political movement. He's changed it."  *See* David Brennan, "Donald Trump Campaign Manager Says Nearly 1 Million MAGA Hats Sold, and $45 Million Made," Newsweek, 29 April 2019, *available at* https://www.newsweek.com/donald-trump-campaign-maga-hats-donations-brad-parscale-2020-1408087 (emphasis added).

For a worker to be "engaged in commerce" and thus qualify for individual coverage under the FLSA, he or she must be directly participating in the actual movement of persons or things in interstate commerce by (i) working for an instrumentality of interstate commerce, *e.g.,* transportation or communication industry employees, or (ii) by regularly using the instrumentalities of interstate commerce in his work, *e.g.,* regular and recurrent use of interstate telephone, telegraph, mails, or travel. *See Thorne v. All Restoration Servs., Inc.*, 448 F.3d 1264, 1266 (11th Cir. 2006). Whether a worker travels between states to fulfill his or her job duties is relevant to the analysis of whether he or she qualifies for individual coverage under the FLSA. *See Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1316 (11th Cir. 2011) (finding that an employee was not entitled to individual coverage in part because he "never traveled outside of Florida for purposes of his employment.").

Plaintiff Johnson and members of the proposed collective all qualify for individual coverage under the FLSA because their voter engagement efforts involved both regularly using the instrumentalities of interstate commerce and, in many cases, interstate travel. These efforts included, among other things, crafting Campaign communications to be disseminated nationwide via TV, radio, and social media; phone-banking and overseeing phone-banking, which consisted of making phone calls to voters nationwide; travelling to, setting up, and managing Campaign "field" offices in multiple states; emailing Campaign workers and voters nationwide; and distributing and overseeing the distribution of Campaign "collateral" such as yard signs and bumper stickers, which were shipped from state to state throughout the election.

**D.     Plaintiff's Proposed Notice is Timely, Accurate, and Informative, and Plaintiff Should be Permitted to Email, Mail, and Text it to Putative Collective Members.**

Plaintiff's proposed judicial notice, attached hereto as EXHIBIT A, is "timely, accurate, and informative" and should be adopted. *See Hoffmann-La Roche,* 493 U.S. at 172. Plaintiff's proposed notice is timely because this litigation began less than three months ago, and the parties have yet to exchange discovery responses. Submitting the proposed notice for the Court's approval as early as

possible will give potential collective members the best possible chance of preserving as many of their EPA claims as possible. The accuracy of Plaintiff's proposed notice is similarly indisputable. The notice sets forth, in straightforward and concise terms, what this litigation is about, who qualifies as a member of the proposed collective, and what has and has not been decided by the Court at this stage. *See* Proposed Notice, EXHIBIT A ("the Court has not ruled on the merits of the lawsuit. The Court has only ruled that it is important that you be notified of the existence of the lawsuit so that you can protect your rights from expiring by joining the lawsuit."). For similar reasons, Plaintiff's proposed notice is informative. Specifically, it describes, in language understandable to the average worker, the main allegations in the Complaint, how qualified individuals' rights may be effected by opting in (or declining to opt in), and how qualified individuals can join the collective (including the date by which a Consent form must be received and how to transmit it to Plaintiff's counsel).

Plaintiff requests that she be permitted to notify all putative collective members of the pendency of this action via phone call and text message, and to email the Class Notice and Consent to Join forms in addition to mailing them via first-class mail. Email notice has been widely embraced by courts throughout the country. *See Alequin v. Darden Rests., Inc.,* No. 12–61742–CIV, 2013 WL 3945919 (S.D. Fla. July 31, 2013) (noting that the Southern District of Florida commonly approves e-mail notice to potential opt-in class members in FLSA cases); *Williams v. Coventry Health Care of Florida, Inc.,* 2016 WL 7013530 at * 1 (M.D. Fla. Oct. 4, 2016); *Collado v. J. & G. Transp., Inc.,* 2014 WL 5390569 at * 6 (S.D. Fla. Oct. 23, 2014); *Lewis v. Huntington Nat. Bank,* 2011 WL 8960489, at *2 (S.D. Ohio June 20, 2011) ("The addresses on file for [former employees] may or may not continue to be accurate, and using a second mode of communication will help ensure that all of these potential plaintiffs will receive at least one copy of the Notice Package."); *see also Butler v. Direct SAT USA, LLC,* 876 F. Supp.2d 560, 575 (D. Md. 2012) (allowing e-mail notice to putative class

members because communication through e-mail is now the "norm.") Likewise, many courts have approved notice via text message in FLSA cases, given the statute's remedial purpose and the goal of transmitting the notice to as many potential collective members as possible. *See, e.g., Landry v. Swire Oilfield Servs., L.L.C.*, 252 F. Supp. 3d 1079, 1129 (D.N.M. 2017) ("The Court finds persuasive the [p]laintiffs' argument that communication via email and text message will 'increase the chance of the class members receiving and reading the notice'"); *Bhumithanarn v. 22 Noodle Mkt. Corp.*, 2015 WL 4240985, at *5 (S.D.N.Y. July 13, 2015) (finding that "notice via text message is likely to be a viable and efficient means of communicating with many prospective members of [the] collective action" where it was shown text messaging was defendants' preferred method of employee communication).

## V.    CONCLUSION

Plaintiff has introduced ample evidence that the she performed substantially equivalent work to members of the proposed collective for purposes of the EPA, and that she and all of the members of the proposed collective are "similarly situated" with regard to their EPA claims. Thus, Plaintiff respectfully requests that the Court grant conditional certification and approve timely notice to the proposed collective as set forth above.

## **CERTIFICATE OF CONFERRAL**

Pursuant to Local Rule 3.01(g), undersigned counsel contacted counsel for Defendants regarding the relief requested in this Motion, and is authorized to represent that Defendants object to the relief requested in this Motion.

DATED: May 13, 2019.                    Respectfully submitted,

                                        /s/ Hassan A. Zavareei
                                        Hassan A. Zavareei (*pro hac vice*)
                                        Trial Counsel
                                        Katherine M. Aizpuru (*pro hac vice*)
                                        **TYCKO & ZAVAREEI LLP**
                                        1828 L Street NW, Suite 1000

Washington, D.C. 20036
P: (202) 417-3667
F: (202) 973-0950
hzavareei@tzlegal.com
kaizpuru@tzlegal.com

Tanya S. Koshy (*pro hac vice*)
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, CA 94612
P: (510) 250-3298
F: (202) 973-0950
tkoshy@tzlegal.com

Janet Varnell (Fla. Bar No. 71072)
Brian W. Warwick, (Fla. Bar No. 0605573)
**VARNELL & WARWICK, PA**
P.O. Box 1870
Lady Lake, FL 32158-1870
P: 352-753-8600
F: 352-503-3301
jvarnell@varnellandwarwick.com
bwarwick@varnellandwarwick.com

F. Paul Bland (*pro hac vice*)
Karla Gilbride (*pro hac vice*)
**PUBLIC JUSTICE, P.C.**
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600

Jennifer Bennett (*pro hac vice*)
**PUBLIC JUSTICE, P.C.**
475 14th Street, Suite 610
Oakland, CA 94612
(510) 622-8150

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 13, 2019, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing

to all counsel of record.

/s/ Hassan A. Zavareei
Hassan A. Zavareei

# EXHIBIT A

**THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

## Notice of Equal Pay Act lawsuit against Donald J. Trump for President, Inc. ("DJTFP") on behalf of female employees

### A court authorized this notice.  This is not a solicitation from a lawyer.

**TO:**  All women employed by Defendant Donald J. Trump for President, Inc. ("DJTFP") from May 13, 2016 to the present.

**DATE:**  _____, 2019

**RE:**  Equal Pay Act ("EPA") collective action lawsuit against DJTFP alleging that DJTFP discriminated against female employees nationwide by systematically paying them less than male employees for substantially similar work.

*Alva Johnson v. Donald J. Trump, et al.*, Case No. 8:19-cv-00475-WFJ-SPF, pending in the United States District Court for the Middle District of Florida.

### 1.      Why did I get this notice?

The purpose of this notice is to inform you of the existence of a collective action lawsuit against DJTFP.  The Court has determined that you may be similarly situated to Alva Johnson, the individual who brought this case.  The Court has ordered that this notice be sent to you, so that you can decide whether to join the lawsuit.

The Court has not ruled on the merits of the lawsuit.  The Court has only ruled that it is important that you be notified of the existence of the lawsuit so that you can protect your rights from expiring by joining the lawsuit.

### 2.      What is this lawsuit about?

Plaintiff Alva Johnson alleges that she and similarly situated female employees nationwide were paid less than their male counterparts for performing substantially similar work, and that this pay disparity was the result of a common scheme carried out by DJTFP's management and upheld via DJTFP's centralized decision-making and policies. Plaintiff seeks, among other relief, front- and back-pay, liquidated damages (in an amount equal to back wages) or interest, attorneys' fees, and litigation costs for herself and other similarly situated employees.

For more information, please visit [insert website]

DJTFP disputes these allegations and contends that its compensation policies are lawful.

**3.        How can I join the lawsuit?**

If you are a potential collective member as defined on page 1, you may choose to join this suit (that is, you may "opt in").  **To opt in, you must submit a "Consent to Join" form by [insert date 90 days from date of mailing].  You can submit the Consent to Join form on the web at [website], by email to [email address], by fax to [fax #], or by mail to [mailing address].  To be timely, the form must be postmarked or received by [insert date 90 days from date of mailing].  A Consent to Join form and stamped envelope are enclosed with this notice.**

**4.        What happens if I join the lawsuit?**

If you file a Consent to Join form, you agree that the Court's orders will apply to you, whether they are favorable or unfavorable (that is, whether the Plaintiff wins her case against DJTFP or not). You also agree that you will be represented by the Plaintiff and her counsel and authorize them to make decisions on your behalf regarding the lawsuit, including any settlement.  These decisions and agreements will then be binding on you.

Plaintiff's attorneys will **not** charge you directly for their work in this case.  If there is no recovery (*i.e.*, if Plaintiff recovers no money from DJTFP), you will not have to pay the attorneys for any of their work.  If there is a recovery, Plaintiff's attorneys will receive whatever attorneys' fees the Court orders.  Those fees may be subtracted from the recovery obtained from DJTFP, or they may be paid separately by DJTFP, or they may be a combination of the two.

**5.        What happens if I do not join the lawsuit?**

If you choose not to join this lawsuit, you will not be affected by any judgment in the lawsuit relating to the EPA claim, whether favorable or unfavorable.  However, you will not be able to receive any money recovered in the lawsuit.  You may file your own lawsuit and select the attorney of your choice at your own expense.

**6.        What happens next?**

The lawsuit will proceed toward trial, which could take many months or years.  If your contact information changes, and you want Plaintiff's counsel to be able to contact you (*e.g.*, to update you about the case, to send you money from any settlement or judgment, etc.), you may provide your updated contact information to Plaintiff's counsel (whose information is available at www.tzlegal.com and in Section 7, below).

For more information, please visit [insert website]

## 7.        Your legal representation if you join

If you choose to join this suit, you will be represented by the Plaintiffs through their attorneys. The attorneys are:

Hassan A. Zavareei
**Trial Counsel**
Katherine M. Aizpuru
**TYCKO & ZAVAREEI LLP**
1828 L Street NW, Suite 1000
Washington, D.C. 20036
P: (202) 417-3667
F: (202) 973-0950
hzavareei@tzlegal.com
kaizpuru@tzlegal.com

Janet Varnell (Fla. Bar No. 71072)
Brian W. Warwick, (Fla. Bar No. 0605573)
**VARNELL & WARWICK, PA**
P.O. Box 1870
Lady Lake, FL 32158-1870
P: 352-753-8600
F: 352-503-3301
jvarnell@varnellandwarwick.com
bwarwick@varnellandwarwick.com

Tanya S. Koshy
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, CA 94612
P: (510) 250-3298
F: (202) 973-0950
tkoshy@tzlegal.com

F. Paul Bland
Karla Gilbride
**PUBLIC JUSTICE, P.C.**
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600

Jennifer Bennett
**PUBLIC JUSTICE, P.C.**
475 14th Street, Suite 610
Oakland, CA 94612
(510) 622-8150

If you would like further information about this lawsuit or have questions about the procedure or deadline for filing a Consent to Join form, please contact Plaintiffs' counsel.

## 8.        This notice has been authorized by the Court.

This notice and its contents have been authorized by the United States District Court for the Middle District of Florida, Tampa Division, the Honorable William F. Jung presiding.  The Court has taken no position regarding the merits of Plaintiff's claims or of DJTFP's defenses.

For more information, please visit [insert website]

# EXHIBIT B

# Consent To Join Form

I am a woman who was employed by Donald J. Trump for President, Inc. ("DJTFP") between May 13, 2016 and the present.

I choose to participate in the lawsuit titled *Alva Johnson v. Donald J. Trump, et al.*, Case No. 8:19-cv-00475-WFJ-SPF (M.D. Fla.) to recover monetary damages under the federal Equal Pay Act ("EPA"), 29 U.S.C. § 216(b).

I choose to be represented in this action by the named plaintiff and Tycko & Zavareei LLP, Varnell & Warwick, PA, and Public Justice, P.C. ("Plaintiff's Counsel"). I agree to be bound by their decisions in the litigation and by any adjudication of this action by a court, whether it is favorable or unfavorable. I understand that reasonable costs expended by Plaintiff's Counsel on my behalf will be deducted from any settlement or judgment amount on a pro-rata basis among all other plaintiffs. I understand that Plaintiff's Counsel will petition the Court to award them attorneys' fees and costs from any settlement or judgment.

I also consent to join any separate or subsequent action to assert my claims against DJTFP, and/or any related entities or persons potentially liable.

Print Name: _____

Signature: _____

Date: _____

*PRIVILEGED ATTORNEY-CLIENT COMMUNICATION*

## Additional Information Regarding The Consent To Join Form

This form has been completed with your personal, non-work contact information, so that we (your attorneys) can stay in touch to update you regarding the lawsuit's progress, and so that we can give you your share of any money that is recovered (if any) from DJTFP on your behalf. If any of the information below is incorrect, please contact us to correct your information (our contact information is below).

Name: _____

Address: _____

City, State, Zip: _____

Telephone Number(s): _____

E-Mail Address: _____

**Additional information**

- This lawsuit asserts Equal Pay Act claims on behalf of female employees of Donald J. Trump for President, Inc. ("DJTFP") who were systematically paid less than their male counterparts for substantially similar work from May 13, 2016 to the present.

- It is illegal for any employer to retaliate against an individual for exercising his or her rights (such as by participating in this lawsuit, signing or submitting this document, or talking to attorneys about his or her rights).

- If you have any questions or wish to update your contact information, please contact Hassan Zavareei or Kate Aizpuru at Tycko & Zavareei LLP by calling (202) 973-0900, or by emailing hzavareei@tzlegal.com or kaizpuru@tzlegal.com. You may also visit [insert website] for more information.

- Please feel free to share this form and information with others who may be eligible to participate in this collective action lawsuit.

# EXHIBIT C

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

**ALVA JOHNSON,**
*Individually and On Behalf of All Others*
*Similarly Situated*                                    **Case No. 8:19-cv-475-T-02SPF**

      **Plaintiff,**

**vs.**

**DONALD J. TRUMP**
*In his Individual Capacity* and
**DONALD J. TRUMP FOR PRESIDENT,
INC.,**

      **Defendant,**
_____/

## DECLARATION OF OMAROSA MANIGAULT NEWMAN

I, Omarosa Manigault Newman, hereby declare as follows:

1. I make this Declaration based upon personal knowledge and/or upon information and belief.

2. I am over 21 years of age and fully competent to make this declaration. I live in Florida. If called and sworn as a witness, I would testify competently as to the facts in this Declaration.

## My Job Duties at Donald J. Trump for President, Inc.

3. I was employed at Donald J. Trump for President, Inc. from 2015 until 2016.

4. My job title was Director of African American Outreach. My job duties included advising the Campaign regarding African American outreach, conducting outreach via media and events for African American and women's coalitions, speaking at Republican Party events, and preparing communications to be distributed to the media.

**Common Compensation Policies and Centralized Decision-Making
at Donald J. Trump for President, Inc.**

5.   All employees of Donald J. Trump for President, Inc. throughout the country were

subjected to the same common and uniform compensation policies and practices. Such

policies governed all components of my pay, including initial salary, salary increases,

promotional salary increases, bonuses, awards, and incentive pay.

**Unequal Pay for Women at Donald J. Trump for President, Inc.**

6.   I believe that Donald J. Trump for President, Inc. paid me and other similarly situated

female employees less than male employees who performed the same or similar job duties

under similar working conditions.

7.   For example, Bryan Lanza, whose work required substantially equal skill, effort, and

responsibility as mine was paid more than me despite being similarly situated.

I declare under penalties of perjury that the foregoing is true and accurate to the best of my

knowledge and belief.

Dated:   May 13, 2019

Respectfully submitted,

Omarosa Manigault Newman

Counsel for Declarant:
John M. Phillips, B.C.S.**
The Law Offices of John M. Phillips
**Telephone**: FL: (904) 444-4444
GA: (912) 444-4444
**Email**: jmp@floridajustice.com
**Website**: www.FloridaJustice.com

*Board Certified Specialist in Civil Trial
Law by the Florida Bar
*Licensed to practice in Florida, Georgia,
Alabama and before U.S. Supreme Court

# EXHIBIT D

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**(TAMPA DIVISION)**

| | |
|---|---|
| **ALVA JOHNSON**, *Individually and On Behalf of All Others Similarly Situated*, ) ) ) ) | |
| Plaintiff, ) ) | Case No. 8:19-cv-00475-WFJ-SPF |
| v. ) ) | **DECLARATION OF PHILLIP M. JOHNSON** |
| **DONALD J. TRUMP**, *In his Individual Capacity* and **DONALD J. TRUMP FOR PRESIDENT, INC.**, ) ) ) ) ) ) | **May 13, 2019** |
| Defendants. ) ) | |

1.     I, Dr. Phillip Johnson, declare and state as follows:

## I.   Introduction

### A.  Qualifications

2.     I am an economist and a Managing Director at Econ One Research, Inc. ("Econ One"), an economic research and consulting firm with offices in Berkeley, Lafayette, Los Angeles, Houston, Sacramento, Washington, D.C., and New Delhi. I have a doctoral degree in economics from the University of California at Los Angeles and a bachelor's degree in economics from California State University at Northridge. I was formerly an Assistant Professor of Economics at Instituto Tecnológico Autónomo de México (ITAM).

3.     Since joining Econ One in 2000, I have worked extensively on the analysis of markets and the assessment of economic damages, including the calculation of damages in employment, antitrust, and intellectual property matters. I have analyzed employee pay and employment issues by a variety of types of employers, including in industries such as computer software, hardware, animation, restaurant, and finance as well as universities and newspaper. I have conducted economic and statistical analyses related to industries such as front-loading washers, dishwashers, automobiles, TFT-LCD display products, CRT products, game software, and airline tickets. I previously have provided expert testimony and submitted declarations and expert reports to federal courts. A more detailed summary of my training, past experience, and prior testimony is shown in **Exhibit 1**.

4.     A list of materials I have relied upon in preparation of this declaration is provided in **Exhibit 2**. Econ One is being compensated for the time I spent on this matter at my normal and customary rate of $515 per hour as well as for time spent by other research staff on this project at their normal and customary hourly rates.

DECLARATION OF PHILLIP M. JOHNSON, PH.D.

**B. Assignment**

5.    The Defendants in this matter are Donald J. Trump, a resident of the state of New York, and Donald J. Trump for President, Inc (the "Campaign"), a Presidential Campaign corporation organized under the laws of Virginia with a principal place of business in New York.[1] The plaintiff is Ms. Alva Johnson, a citizen and resident of the state of Alabama and an employee in the Campaign.[2] I understand that Ms. Johnson alleges she was undercompensated due to gender discrimination.[3]

6.    I have been asked by the Plaintiff's counsel to 1) describe statistical methods of assessing the impact on employee compensation of alleged discrimination against protected groups (e.g. females) and the availability of the data necessary to implement these methods, and 2) present a preliminary analysis of the Campaign's employment during the period of May through December of 2016 using publicly available disbursement records.

**C. Brief Conclusion**

7.    As described in further detail below, the preliminary analysis shows, in part, that women were consistently paid less than men on average.  Specifically, excluding Key Staff and Advisors, on average females received monthly $3,865 and males received $4,568, i.e. the average monthly compensation to females was less than that for males in every month and was 18.2% less than males' compensation for the May-December 2016 period as a whole.

---

[1] Alva Johnson vs. Donald J. Trump, Donald J. Trump for President, Inc., Jury Trial Demanded Injunctive Relief Sought Collective Action Complaint, February 25, 2019, 3. ("Complaint")

[2] Complaint, 3-4.

[3] Complaint, 28-29.

**II.      Determining Protected Group Disparities in Pay**

        **A. Method and Data**

8.     The current case relates to alleged discrimination in pay by the Campaign. Discrimination can be observed as a disparity in compensation between similarly-situated employees within a protected group (e.g. females compared to males in the case of gender discrimination).[4] Individual employees' pay can vary for a variety of reasons. To the extent data are available, Economists can use employment data on employee position, experience, and other objective factors to control for differences in pay that are not due to discrimination against members of a protected group.

9.     An initial step in this process is to compute the overall average differences in compensation between the members of the protected group allegedly affected by alleged discrimination and other employees. This initial step indicates whether or not there is a disparity in pay for those employees and can be suggestive of whether there is a discriminatory effect. A next step could be to compute "cross-tabs", average differences in compensation of affected and unaffected employees who are similarly situated, e.g., that share the same job responsibilities. A further step is to use available data to estimate the impact of membership in a protected group on pay while simultaneously controlling for multiple non-discriminatory factors.

10.    To control for multiple objective factors when estimating disparities in pay, economists use a statistical technique called multiple regression analysis. A regression analysis is a technique that is used to estimate a relationship between an outcome (the "dependent variable") and one or more explanatory factors ("explanatory variables"), including a factor of interest, such as membership in a

---

[4] "Equal Pay/Compensation Discrimination," U.S. Equal Employment Opportunity Commission, https://www.eeoc.gov/laws/types/equalcompensation.cfm. See also, Equal Pay Act, 29 U.S.C. § 206(d), https://www.law.cornell.edu/uscode/text/29/206.

protected group (e.g. female or male).[5] The dependent variable would be employee compensation which might be affected by employee characteristics such as age, length of employment with the employer, or job title. Regression analysis is a standard and widely-accepted technique that has been used in academic studies. This method has also been widely used and accepted in courts as an evidence of discrimination in pay.[6]

11. Data that might be used in a multiple regression analysis to estimate protected group pay disparities arising from discrimination in the Campaign, includes:

12. Individual employee compensation in each pay period;

13. Employee characteristics, such as gender, race, a measure of experience (e.g. age), and location of employment;

14. Job characteristics, such as role in the campaign and election stage (primary vs. general).

15. Note that it is not necessary to include all factors that affect pay to produce a reliable, unbiased estimate of the pay disparity due to membership in the protected group. The reason is that in a regression model, the estimated effect of membership in the protected group will be unbiased as long as objective factors that both affect compensation and correlate to protected group membership status are included. Objective factors that affect compensation but do not correlate with the membership to the protected group (or vice versa) would not bias the estimate of the gender pay disparity.[7]

---

[5] See e.g., Jeffrey M. Wooldridge, *Introductory Econometrics: A Modern Approach,* 5ed. (Mason: South-Western, 2013), 68-69.

[6] See e.g., H. Cristina Chen-Oster, Lisa Parisi, Shanna Orlich, Allison Gamba, and Mary De Luis, against Goldman, Sachs & Co. and The Goldman Sachs Group, Inc. Opinion and Order, March, 30, 2018.

[7] See e.g., Jeffrey M. Wooldridge, *Introductory Econometrics: A Modern Approach,* 5ed. (Mason: South-Western, 2013), 90.

DECLARATION OF PHILLIP M. JOHNSON, PH.D.

16. I understand there are general functions common to political campaigns that relate to employees' job responsibilities. These include functions related to campaign management, communications, constituent liaison, contacting voters, fundraising, policy, research, information technology, and other functions.[8] For example, staff members conducting constituent liaison work conduct outreach to the local leadership of particular interest-group communities, some staff members (sometimes referred to as "field teams") contact voters and organize events, other staff members conduct research of the opposition campaign, and others work in an information technology area.[9]

**B. Publicly Available Data**

17. Some of the required data to estimate the protected group pay disparities are readily available in the public domain. I understand that political campaigns are required to report all disbursements, including payroll-related disbursements, to the United States Federal Elections Commission (FEC). Specifically, Presidential campaigns are required to complete a "Schedule B-P" for "Itemized Disbursements" for all required campaign expenditures, which includes payroll. The FEC collects and distributes this information, which can be obtained from the FEC website.[10]

18. From the FEC, I have obtained individual compensation records of the Trump 2016 Presidential Campaign Staff.[11] These data consist of employee (recipient)

---

[8] See e.g., Sharon Kelly, Justin Levitt, Amanda Tammen Peterson, "One State, Two State, Red State, Blue State. A Quick Guide to Working On Political Campaigns," (Cambridge: Harvard Law School, 2007): 11-15, https://hls.harvard.edu/content/uploads/2008/07/guide-campaign.pdf; and "Donald Trump presidential campaign key staff and advisors, 2016," Ballotpedia, https://ballotpedia.org/Donald_Trump_presidential_campaign_key_staff_and_advisors,_2016.

[9] See e.g., Sharon Kelly, Justin Levitt, Amanda Tammen Peterson, "One State, Two State, Red State, Blue State. A Quick Guide to Working On Political Campaigns," (Cambridge: Harvard Law School, 2007): 12-15, https://hls.harvard.edu/content/uploads/2008/07/guide-campaign.pdf.

[10] "Disbursements," Federal Elections Commission United States of America, https://www.fec.gov/data/disbursements/.

[11] I have been instructed to focus on the period of May through December 2016.

1    name, whether the recipient is an individual or an organization, disbursement

2    description (e.g. payroll, consulting fee, rental fee, etc.), disbursement date,

3    disbursement amount, and the election stage (primary vs general).

4    19.   The FEC records do not indicate the gender of the individuals. To identify the

5    gender, I used data from the United States Social Security Administration (SSA).

6    The SSA keeps records on the relative frequency of names by gender in the

7    population of U.S. Births where the individual has a Social Security Number.[12] I

8    assign the individual's name in the FEC data to male (female) if the given name is

9    identified by SSA as male (female) for at least two thirds of the individuals born

10   between 1920 through 2014[13]

11   20.   Lastly, from public records, I have identified whether an individual was a top

12   member of the campaign. Ballotpedia, a non-profit and nonpartisan online

13   political encyclopedia,[14] provides the names, roles, and divisions for individuals

14   described as "Key Campaign Staff or Advisors" for the Trump 2016 Presidential

15   Campaign.[15] The individuals identified on this list include, among others, the

16   Executive chairman and Campaign manager. These individuals were matched to

17   the FEC disbursements data using full names.

18

19

20

21

22

23   [12] "Baby Names from Social Security Card Applications - National Level Data," Data.Gov,
     https://catalog.data.gov/dataset/baby-names-from-social-security-card-applications-national-level-
24   data. There is more information in the 'NationalReadMe' file within the downloaded folder. Last
     Accessed March 29, 2016.

25   [13] This methodology leaves five names unidentified, which were then manually assigned a gender
26   through additional online research.

     [14] "Ballotpedia: About," Ballotpedia, https://ballotpedia.org/Ballotpedia:About.
27   [15] "Donald Trump presidential campaign key staff and advisors, 2016," Ballotpedia,
28   https://ballotpedia.org/Donald_Trump_presidential_campaign_key_staff_and_advisors,_2016.

DECLARATION OF PHILLIP M. JOHNSON, PH.D.

### III.     Preliminary FEC Data Analysis

21.     I identified and analyzed the FEC records of individual recipients with "Payroll" disbursement types.[16] Below, I present summaries of these data records for the period of May through December of 2016.

22.     **Figure 1** shows disbursement records for the named plaintiff, Alva Johnson. Ms. Johnson was apparently paid by the Campaign with a rate of $3,000 per month between May and July 2016 which increased to $4,000 until her employment ended in October 2016. She was paid a total of $19,000 during this period.

23.     **Figure 2** shows the number of Campaign employees and total disbursements to male and female employees that were paid under "Payroll" disbursement type in each month. In total, there were 77 females and 151 males (excluding Key Staff and Advisors), who received at least one payroll disbursement during the mentioned period. The total disbursements to this staff were roughly $1.1 million for females and $2.8 million to males.

24.     **Figure 3** shows the average male and female payroll disbursements in each month, as well as the overall average for the entire period. The summary shows that women were consistently paid less than men on average. This summary is also split between members of the Key Staff and Advisors and all other employees. Excluding Key Staff and Advisors, on average females received monthly $3,865 and males received $4,568, i.e. the average monthly compensation to females was less than that for males in every month and was 18.2% less than males' compensation for the May-December 2016 period as a whole. Additionally, I conduct a statistical test of whether this observed disparity in pay (not accounting for any objective factors) is likely to have occurred by chance. I use a standard T-test for this purpose. This test rejects the hypothesis of

---

[16] The analysis is limited to the entity type description of "INDIVIDUAL". I include disbursement types of "PAYROLL", "IN-KIND: PAYROLL", and "PAYROLL-PPV".

no disparity at the 1% percent significance level, which indicates that it is unlikely to have occurred by chance.[17]

**Figure 1**
**Alva Johnson FEC Data Records**
**May 2016 - December 2016**

| Recipient Name | Transaction ID | Disbursement Date | Election Type | Disbursement Amount |
|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) |
| 1. JOHNSON, ALVA | SB23.600066 | 5/13/2016 | PRIMARY | $    1,500 |
| 2. JOHNSON, ALVA | SB23.600067 | 5/31/2016 | PRIMARY | 1,500 |
| 3. JOHNSON, ALVA | SB23.1163432 | 6/15/2016 | PRIMARY | 1,500 |
| 4. JOHNSON, ALVA | SB23.1163433 | 6/30/2016 | PRIMARY | 1,500 |
| 5. JOHNSON, ALVA | SB23.1615465 | 7/14/2016 | PRIMARY | 1,500 |
| 6. JOHNSON, ALVA | SB23.1615535 | 7/29/2016 | PRIMARY | 1,500 |
| 7. JOHNSON, ALVA | SB23.2141409 | 8/15/2016 | GENERAL | 1,500 |
| 8. JOHNSON, ALVA | SB23.2141410 | 8/31/2016 | GENERAL | 2,500 |
| 9. JOHNSON, ALVA | SB23.4235 | 9/15/2016 | GENERAL | 2,000 |
| 10. JOHNSON, ALVA | SB23.4437 | 9/29/2016 | GENERAL | 2,000 |
| 11. JOHNSON, ALVA | SB23.4748 | 10/13/2016 | GENERAL | 2,000 |
| **12. May-Dec 2016** | | | | **$    19,000** |

Sources: FEC Disbursements Data.

---

[17] The t-statistic for the difference in disbursements to staff excluding Key Staff and Advisors is -3.28 and p-value is 0.001.

**Figure 2**

**Trump Campaign**

**Employee Count by Gender**

| Year -Month | Employee Count | | Total Employee Compensation | |
| --- | --- | --- | --- | --- |
| | Female | Male | Female | Male |
| (1) | (2) | (3) | (4) | (5) |
| Staff Excluding Key Staff and Advisors | | | | |
| 1. May 2016 | 18 | 45 | $  64,957 | $  208,085 |
| 2. June 2016 | 19 | 49 | 74,423 | 235,267 |
| 3. July 2016 | 21 | 55 | 79,641 | 276,063 |
| 4. August 2016 | 40 | 91 | 142,219 | 412,230 |
| 5. September 2016 | 54 | 107 | 247,406 | 514,672 |
| 6. October 2016 | 66 | 125 | 303,094 | 626,940 |
| 7. November 2016 | 65 | 121 | 167,221 | 370,280 |
| 8. December 2016 | 3 | 15 | 26,421 | 133,523 |
| **9. May-Dec 2016** | **77** | **151** | **$ 1,105,382** | **$ 2,777,060** |
| Key Staff and Advisors | | | | |
| 10. May 2016 | 2 | 4 | $  13,350 | $  40,492 |
| 11. June 2016 | 2 | 4 | 10,733 | 39,661 |
| 12. July 2016 | 2 | 4 | 10,733 | 39,661 |
| 13. August 2016 | 2 | 5 | 15,361 | 45,262 |
| 14. September 2016 | 2 | 5 | 15,361 | 49,801 |
| 15. October 2016 | 2 | 5 | 18,291 | 50,701 |
| 16. November 2016 | 2 | 5 | 6,801 | 34,630 |
| 17. December 2016 | 0 | 1 | 0 | 20,000 |
| **18. May-Dec 2016** | **2** | **5** | **$  90,631** | **$  320,209** |

Notes: (1) Key Staff and Advisors include "State Director", "Communications Director", "Director of New Media", "Deputy Campaign Manager", and "Senior Advisor".

Sources: FEC Disbursements Data; Ballotpedia.

**Figure 3**

**Trump Campaign**

**Employee Compensation by Gender**

| Year -Month | Mean Compensation | | Female - Male | Percent Diff |
|---|---|---|---|---|
| | Female | Male | | |
| | (Dollars) | | | |
| | | | (2) - (3) | (4) / (2) |
| (1) | (2) | (3) | (4) | (5) |
| | Staff Excluding Key Staff and Advisors | | | |
| 1. May 2016 | $ 3,609 | $ 4,624 | $ -1,015 | -28.1% |
| 2. June 2016 | 3,917 | 4,801 | -884 | -22.6 |
| 3. July 2016 | 3,792 | 5,019 | -1,227 | -32.4 |
| 4. August 2016 | 3,555 | 4,530 | -975 | -27.4 |
| 5. September 2016 | 4,582 | 4,810 | -228 | -5.0 |
| 6. October 2016 | 4,592 | 5,016 | -423 | -9.2 |
| 7. November 2016 | 2,573 | 3,060 | -488 | -19.0 |
| 8. December 2016 | 8,807 | 8,902 | -95 | -1.1 |
| 9. **May-Dec 2016** | $ **3,865** | $ **4,568** | $ **-703** | **-18.2%** |
| | Key Staff and Advisors | | | |
| 10. May 2016 | $ 6,675 | $ 10,123 | $ -3,448 | -51.7% |
| 11. June 2016 | 5,367 | 9,915 | -4,549 | -84.8 |
| 12. July 2016 | 5,367 | 9,915 | -4,549 | -84.8 |
| 13. August 2016 | 7,680 | 9,052 | -1,372 | -17.9 |
| 14. September 2016 | 7,680 | 9,960 | -2,280 | -29.7 |
| 15. October 2016 | 9,146 | 10,140 | -995 | -10.9 |
| 16. November 2016 | 3,401 | 6,926 | -3,525 | -103.7 |
| 17. December 2016 | 0 | 20,000 | -20,000 | |
| 18. **May-Dec 2016** | $ **6,474** | $ **9,703** | $ **-3,230** | **-49.9%** |

Notes: (1) Key Staff and Advisors include "State Director", "Communications Director", "Director of New Media" ,"Deputy Campaign Manager", and "Senior Advisor".

Sources: FEC Disbursements Data; Ballotpedia.

DECLARATION OF PHILLIP M. JOHNSON, PH.D.

1
2
3

Phillip M. Johnson, Ph.D.
May 13, 2019

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- 11 -

DECLARATION OF PHILLIP M. JOHNSON, PH.D.



**Phillip Johnson, Ph.D.**                                           **Curriculum Vitae**

*Managing Director*
3620 Happy Valley Road, Suite. 201
Lafayette, California 94549
Email: pjohnson@econone.com
Tel: 925 403 1003

## EDUCATION

PhD, University of California, Los Angeles, Economics, 1997

MA, University of California, Los Angeles, Economics, 1993

BA, California State University Northridge, Economics, 1991

## PROFESSIONAL EXPERIENCE

*Econ One Research, Inc.,*

     Managing Director, 2012 – Present

     Senior Economist, 2009 – 2012

     Economist, 2000 – 2009

*Instituto Tecnológico Autónomo de México (ITAM),*
     Assistant Professor, 1997-2000

## AREAS OF ECONOMC EXPERTISE

Competition and antitrust analysis
Damages assessment and pass-through
Common impact in class certification
Econometric and statistical analysis
Intellectual property damages

## PUBLICATIONS AND AWARDS

Jerry S. Cohen Memorial Fund Writing Award, for "Statistical Significance and Statistical Error in Antitrust Analysis," https://www.antitrustinstitute.org/awards, June 21, 2018

"Roundtable with Economists," Antitrust, Spring 2018, with Dennis Carlton, Gregory Leonard, Maria Maher, and Carl Shapiro

"Statistical Significance and Statistical Error in Antitrust Analysis," Antitrust Law Journal, Vol. 81, 2017, with Edward Leamer and Jeffrey Leitzinger

"Increasing Focus on Information Exchanges Among Competitors," Law360, April 2017, with Niyati Ahuja

Phillip Johnson, Ph.D.
*Managing Director*
Page 2

"Regression Techniques for Estimating Overcharges Using Market Concentration Data," American Bar Association, Section of Antitrust Law, Economics Committee Newsletter, Volume 12, Number 1, Summer 2012, with Armen Markosyan

"Reasonable Royalty Damages and License Structure," Econ One Newsletter, Spring 2007

"A Surprising Result from Patent Infringement: Price Accretion Instead of Price Erosion," Econ One Newsletter, Spring 2005

"Lost Profits Damages When Infringement Raises the Patentee's Prices," American Bar Association, Section of Intellectual Property Law, Newsletter, Volume 23, Number 1, Fall 2004, with Tessie Su

"Patent Damages and Price Erosion", Econ One Newsletter, Fall 2003

"Evolution and Information in a Gift-Giving Game," Journal of Economic Theory, Volume 100, 2001, with David Levine and Wolfgang Pesendorfer

"Mergers, Alliance and Welfare in Differentiated Markets with Quality-Improving Innovations in Markets with Complementary Goods," with Tessie Su and Tridib Sharma

"Evolution and Information in a Prisoners' Dilemma," with David Levine and Wolfgang Pesendorfer

"The Stability of Monetary Institutions as a Social Institution"


## PRESENTATIONS

Statistical Issues with Regression Analysis for Antitrust Litigation, Kaplan Fox, 2015

West LegalEdCenter Patent Disputes Conference, 2013

Deposing the Expert Witness, NITA, 2012

Cross Examining Expert Witnesses, Annual Meeting of the California State Bar, 2012

West LegalEdCenter Patent Disputes Conference, 2011

Deposing the Expert Witness, NITA, 2011

Cross Examining Expert Witnesses, Trial Advocacy Group, 2011

Patent Damages Webinar, Law.com, 2010

Cross Examining Expert Witnesses, Trial Advocacy Group, 2009

Deposing the Expert Witness, NITA, 2008

Latin American Meetings of the Econometric Society, 1999

Stony Brook Summer Festival on Game Theory, 1999

University of California at Los Angeles, 1999

Allied Social Sciences Association, 1998

Academica Sinica, Taiwan, 1997

National Taiwan University, 1997

Instituto Tecnológico Autónomo de México, 1997

Stony Brook Summer Festival on Game Theory, 1996

Phillip Johnson, Ph.D.
*Managing Director*
Page 3

## SUMMARY OF PRIOR ENGAGEMENTS

HCF Insurance Agency v. Kevin Hamm, et al. Retained to address antitrust issues involving an alleged group boycott relating to the provision of workers' compensation coverage for extended care facilities. 2019  – Present.

L.A. Taxi Cooperative, et al. vs. Uber. Retained to address issues in an opposing expert economist's report regarding the analysis of Uber and taxi safety data. Submitted an expert report. Settled. 2017.

In Re Duke/UNC Antitrust. Retained to analyze data and issues relating to common impact and damages from a no-hire agreement by employees Duke and University of North Carolina medical schools. 2016 - Present.

Softwood Lumber. Retained to analyze claims that policies of Canada and its province, British Columbia resulted in below market stumpage fees that impacted trade in softwood lumber with the United States. 2015 – Present.

In Re Lithium Ion Batteries Antitrust. Retained to analyze data and issues relating to common impact and damages for a proposed class of indirect purchasers of products containing cylindrical lithium ion batteries. 2015 - Present.

Scott et al. vs. Chipotle Mexican Grill, Inc. Retained to analyze employee data and calculate damages related to the alleged misclassification of Chipotle Apprentices as salaried employees. Submitted an expert report and provided a deposition. 2015 – 2017.

Chen-Oster vs. Goldman Sachs. Retained to analyze class certification issues and damages related to alleged gender discrimination. 2013 – Present.

Consulting. Retained confidentially to analyze economic issues and data in various matters. Ongoing projects involve antitrust, trade, and employment violations (discrimination, misclassification, and/or wage and hour violations).

Margie Daniel, et al. v Ford Motor Company. Conducted an analysis of Defendant's experts' statistical procedures and provided analyses regarding a class of Ford Focus owners alleging a product defect. 2013 – 2018.

First Western Capital Management v. Kenneth D. Malamed. Retained to analyze damages relating to alleged misappropriation of trade secrets. Submitted an expert report. Settled. 2016 - 2017.

Surf City Steel, Inc. et al. vs. International Longshore and Warehouse Union, et al. Retained to analyze the competitive effects of an agreement to exclude contractors employing Ironworkers Union members from port crane modification and structural maintenance projects. Submitted an expert report and provided a deposition. Case dismissed. 2014 - 2017.

Kunkel et al v. John Wiley & Sons, Inc. Retained to analyze common impact and damages for a proposed class of photograph copyright holders who allege that Wiley infringed their copyrights in books it published. Submitted an expert report and provided a deposition. Settled. 2015 - 2017.

In Re: CRT Antitrust Litigation. Analyzed economic issues relating to class certification, liability, and damages in a price-fixing case for a class of direct purchasers of cathode ray tubes against the major manufacturers. Class certified. Settled. 2011 – 2017.

In Re: TFT-LCD Antitrust Litigation. Retained to analyze economic issues relating to antitrust liability and damages for Proview Technology Inc.'s (PTI) claims against manufacturers of TFT-LCD panels. Submitted an expert report. Settled. 2014 – 2015.

Phillip Johnson, Ph.D.
*Managing Director*
Page 4

Cobb et al. vs. BSH Home Appliances. Retained to analyze manufacturers' service data relating to the incidence of mold in front-loading washers. Submitted an expert report and provided a deposition. Settled. 2014 – 2015.

Hemy vs. Perdue Farms. Retained to analyze class certification issues and damages relating to alleged product mislabeling of chicken meat products. Settled. 2014.

Apodaca vs. Whirlpool Corporation. Retained to analyze data relating to alleged defects in Maytag dishwashers. Case settled. 2014.

Symantec vs. Veeam. Retained to analyze lost profits, reasonable royalty, and irreparable harm resulting from alleged infringement of Symantec patents. Submitted an expert report. Case dismissed with prejudice. 2013 – 2015.

Ottenberg, et al v. XY, LLC and Inguran, LLC. Retained to analyze antitrust issues and damages arising from the misuse of patents and intellectual for bovine sexing technology and related equipment and sorted semen straw markets. Submitted an expert report and provided a deposition. Settled prior to trial. 2013.

In Re: High Tech Workers Antitrust Litigation. Analyzed economic issues relating to class certification and damages for a class of employees of seven major technology companies (Apple, Adobe, Google, Intel, Intuit, Lucasfilm, and Pixar) alleging a series of agreements to limit competition for workers. Class settled. 2012 – 2015.

In Re: TFT-LCD Antitrust Litigation. Analyzed economic issues relating to class certification, liability and damages for a class of direct purchasers of TFT-LCD panels against the major manufacturers of TFT-LCD panels. Class was certified and all defendants except Toshiba settled prior to trial. Toshiba was found liable and damages were awarded to Plaintiffs. Toshiba settled following trial. 2008 – 2012.

Pecover v. Electronic Arts. Analyzed damages arising from the monopolization of football video games for a nationwide class of consumers. 2011 – 2012.

Realtime Data v. Packeteer, et al. Retained by defendant Expand Networks as economic expert to provide analysis of markets for wide-area network acceleration products and calculate damages from alleged patent infringement. Submitted expert reports and provided deposition testimony. 2008 – 2010.

In Re: Korean Airlines Co., LTD. Antitrust Litigation. Analyzed economic issues, including market definition and common impact, relating to the certification of a class of direct purchasers of travel between the U.S. and Korea against the major Korean Airlines. 2008 – 2010.

California State Foster Parent Assoc., et al. v. John A. Wagner, Director of the California Department of Social Services, in his official capacity, et al. Retained to analyze the economic and State budget impact of a change in foster care reimbursement policies. Submitted expert report. 2008 - 2009.

High Point Sarl v. Sprint Nextel Corp., et al. Analyzed cellular communications markets and reasonable royalty rate in a patent case involving digital cellular communications technology. 2008 – 2009.

Montana Food Distributors Assoc. v. International Outsourcing Services et al. Conducted preliminary damages analysis in a case involving allegations of anticompetitive behavior and fraud by coupon processors. 2008 – 2009.

DealerTrack v. RouteOne, et al. Analyzed lost profits and reasonable royalty damages, and the commercial success of patented features in a case involving credit application aggregation systems used for automotive sales. 2007 – 2009.

Phillip Johnson, Ph.D.
*Managing Director*
Page 5

Silvaco v. Cypress Semiconductor. Analyzed lost profits and unjust enrichment in a theft of trade secrets case involving providers and customers for software for the design of chips used in devices. Provided expert declarations relating to the analysis of defendant's data. 2007 – 2009.

Amado v. Microsoft. Analyzed post-trial royalty rate in a patent case involving office productivity software technology. 2008.

Amex v. MasterCard, Visa, et al. Assisted in analyzing damages issues in a monopolization case involving the major providers of credit and charge cards. 2007 – 2008.

M.I., LLC v. Halliburton Energy Services, Inc. Analyzed relevant market and damages issues in an attempted monopolization case involving the alleged misuse of a patent on deepwater oil drilling fluid technology. 2007 – 2008.

In re: Kdur Antitrust Litigation. Analyzed relevant market and impact issues in a monopolization case involving branded and generic drugs. 2006 – 2007.

In re: Tricor Direct Purchaser Antitrust Litigation. Analyzed relevant market and impact issues in a monopolization case involving branded and generic drugs. 2006 – 2007.

In re: Nifedipine Antitrust Litigation. Analyzed relevant market and impact issues in a monopolization case involving branded and generic drugs. 2006 – 2007.

Columbus Drywall, et al. v. Masco Corporation. Analyzed antitrust issues and assisted in drafting liability report in a price fixing conspiracy case alleged to involve a major insulation buyer and manufacturers. Analyzed issues relating to buyer power. 2006 – 2008.

Synopsys v. Magma. Analyzed lost profits, reasonable royalties, and unjust enrichment in a patent infringement trade secret case relating to software for the design of computer chips. 2005 – 2007.

The Regents of the University of California v. Monsanto. Analyzed reasonable royalties and license structure in a patent infringement case relating to bovine growth hormone. 2005 - 2006.

Pixion v. PlaceWare. Analyzed reasonable royalties and unjust enrichment in a trade secret and patent infringement case relating to web conferencing technology. 2004 – 2005.

Novell, Inc. Retained by Novell to analyze damages for mediation with Microsoft. Microsoft was alleged to have harmed Novell through alleged anticompetitive conduct in the workgroup operating system market. 2003 – 2004.

Affymetrix v. Agilent. Analyzed damages in a breach-of-contract arbitration. 2004.

France Telecom v. Novell. Analyzed reasonable royalties in a copyright infringement case. 2003 – 2004.

University of California, San Francisco. Analyzed the value of bovine growth hormone technology in the milk market to assist a patentee in a potential license negotiation. 2004.

DOS Class v. Microsoft. Assisted plaintiffs' expert in the analysis of defendant's damages models. 2003.

CATC v. Catalyst. Analyzed lost profits and reasonable royalties in a trade dress and copyright infringement case. 2002 – 2003.

IFPC Shareholders v. AT&T et al. Analyzed the option value of a lost business opportunity due to a breach of contract. 2002.

Martha Chapman v. El Paso Energy Corporation. Analyzed economic evidence regarding the nature and extent of control of El Paso Natural Gas by its parent, El Paso Energy Corporation. 2001.

Phillip Johnson, Ph.D.
*Managing Director*
Page 6

In re: Flat Glass Antitrust. Analyzed liability and damages issues in a price-fixing case, including industry analysis, entry barriers, concentration, firms' conduct, and facilitating industry practices. 2000 – 2005.

In re: Methionine Antitrust Litigation. Analyzed class certification issues for a price-fixing case, including industry analysis, market structure, and the impact of the alleged conspiracy on pricing. 2000 – 2001.

CONFIDENTIAL

## Exhibit 2
## List of Materials Relied Upon

| Pleadings and Orders | Date |
|---|---|
| Complaint | 2/25/2019 |
| H. Cristina Chen-Oster, Lisa Parisi, Shanna Orlich, Allison Gamba, and Mary De Luis, against Goldman, Sachs & Co. and The Goldman Sachs Group, Inc., Opinion and Order | 3/30/2018 |

**Academic Materials**

Jeffrey M. Wooldridge, Introductory Econometrics: A Modern Approach, 5ed. (Mason: South-Western, 2013).

Sharon Kelly, Justin Levitt, Amanda Tammen Peterson, "One State, Two State, Red State, Blue State. A Quick Guide to Working On Political Campaigns," (Cambridge: Harvard Law School, 2007), https://hls.harvard.edu/content/uploads/2008/07/guide-campaign.pdf.

**Publicly Available Materials**

"Baby Names from Social Security Card Applications - National Level Data," Data.Gov, https://catalog.data.gov/dataset/baby-names-from-social-security-card-applications-national-level-data.

"Disbursements," Federal Elections Commission United States of America, https://www.fec.gov/data/disbursements/.

"Donald Trump presidential campaign key staff and advisors, 2016," Ballotpedia, https://ballotpedia.org/Donald_Trump_presidential_campaign_key_staff_and_advisors,_2016.

Equal Pay Act, 29 U.S.C. § 206(d), https://www.law.cornell.edu/uscode/text/29/206.

"Equal Pay/Compensation Discrimination," U.S. Equal Employment Opportunity Commission, https://www.eeoc.gov/laws/types/equalcompensation.cfm.

# EXHIBIT E

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**ALVA JOHNSON,**
*Individually and On Behalf of All Others*
*Similarly Situated*                          **Case No.: 8:19-cv-475-T-02SPF**

      **Plaintiff,**

**vs.**

**DONALD J. TRUMP**
*In his Individual Capacity* and
**DONALD J. TRUMP FOR PRESIDENT,**
**INC.,**

      **Defendant,**
_____/

## DECLARATION OF ALVA JOHNSON

I, Alva Johnson, hereby declare as follows:

1. I make this Declaration based upon personal knowledge and/or upon information and belief.

2. I am over 21 years of age and fully competent to make this declaration. I live in Alabama. If called and sworn as a witness, I would testify competently as to the facts in this Declaration.

### My Job Duties at Donald J. Trump for President, Inc.

3. I was employed at Donald J. Trump for President, Inc. from January 2016 until October 2016.

4. My job titles during this period included Director of Outreach and Coalitions for Alabama, member of the National Strike Team, and Operations Administrative Director.

5. My job duties included as Director of Outreach and Coalitions for Alabama included minority outreach, speaking at Republican political gatherings, and helping to organize campaign rallies.  My job duties as a member of the National Strike Team included recruiting

and managing volunteers, planning volunteer events, helping to coordinate rallies, helping to distribute Campaign "collateral" such as yard signs and bumper stickers, and conducting minority outreach.

6. My job duties as Operations Administrative Director included onboarding new staff and other human resources-related tasks, assisting with the drafting of Campaign communications, and managing the Campaign's Recreational Vehicles ("RVs").

### Common Compensation Policies and Centralized Decision-Making at Donald J. Trump for President, Inc.

7. All employees of Donald J. Trump for President, Inc. throughout the country were subjected to the same common and uniform compensation policies and practices. Such policies governed all components of my pay, including initial salary, salary increases, promotional salary increases, bonuses, awards, and incentive pay.

### Unequal Pay for Women at Donald J. Trump for President, Inc.

8. I believe that Donald J. Trump for President, Inc. paid me and other similarly situated female employees less than male employees who performed the same or similar job duties under similar working conditions.

9. For example, Sidney Bowdidge, Matt Ciepielowski, Austin Browning, David Chiokadze, and Tony Ledbetter, whose work required substantially equal skill, effort, and responsibility as mine were paid more than me despite being similarly situated.

I declare under penalties of perjury that the foregoing is true and accurate to the best of my knowledge and belief.

Dated:  May 13, 2019

Respectfully submitted,

_____

Alva Johnson