# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
(TAMPA DIVISION)

| | |
|---|---|
| **ALVA JOHNSON**, *Individually and On Behalf of All Others Similarly Situated*, <br><br> Plaintiff, <br><br> v. <br><br> **DONALD J. TRUMP**, *In his Individual Capacity* and **DONALD J. TRUMP FOR PRESIDENT, INC.**, <br><br> Defendants. | Case No. 8:19-cv-00475-WFJ-SPF <br><br> **DECLARATION OF PHILLIP M. JOHNSON** <br><br> **May 13, 2019** |

DECLARATION OF PHILLIP M. JOHNSON, PH.D.

1. I, Dr. Phillip Johnson, declare and state as follows:

## I. Introduction

### A. Qualifications

2. I am an economist and a Managing Director at Econ One Research, Inc. ("Econ One"), an economic research and consulting firm with offices in Berkeley, Lafayette, Los Angeles, Houston, Sacramento, Washington, D.C., and New Delhi. I have a doctoral degree in economics from the University of California at Los Angeles and a bachelor's degree in economics from California State University at Northridge. I was formerly an Assistant Professor of Economics at Instituto Tecnológico Autónomo de México (ITAM).

3. Since joining Econ One in 2000, I have worked extensively on the analysis of markets and the assessment of economic damages, including the calculation of damages in employment, antitrust, and intellectual property matters. I have analyzed employee pay and employment issues by a variety of types of employers, including in industries such as computer software, hardware, animation, restaurant, and finance as well as universities and newspaper. I have conducted economic and statistical analyses related to industries such as front-loading washers, dishwashers, automobiles, TFT-LCD display products, CRT products, game software, and airline tickets. I previously have provided expert testimony and submitted declarations and expert reports to federal courts. A more detailed summary of my training, past experience, and prior testimony is shown in **Exhibit 1**.

4. A list of materials I have relied upon in preparation of this declaration is provided in **Exhibit 2**. Econ One is being compensated for the time I spent on this matter at my normal and customary rate of $515 per hour as well as for time spent by other research staff on this project at their normal and customary hourly rates.

### B. Assignment

5. The Defendants in this matter are Donald J. Trump, a resident of the state of New York, and Donald J. Trump for President, Inc (the "Campaign"), a Presidential Campaign corporation organized under the laws of Virginia with a principal place of business in New York.[1] The plaintiff is Ms. Alva Johnson, a citizen and resident of the state of Alabama and an employee in the Campaign.[2] I understand that Ms. Johnson alleges she was undercompensated due to gender discrimination.[3]

6. I have been asked by the Plaintiff's counsel to 1) describe statistical methods of assessing the impact on employee compensation of alleged discrimination against protected groups (e.g. females) and the availability of the data necessary to implement these methods, and 2) present a preliminary analysis of the Campaign's employment during the period of May through December of 2016 using publicly available disbursement records.

### C. Brief Conclusion

7. As described in further detail below, the preliminary analysis shows, in part, that women were consistently paid less than men on average. Specifically, excluding Key Staff and Advisors, on average females received monthly $3,865 and males received $4,568, i.e. the average monthly compensation to females was less than that for males in every month and was 18.2% less than males' compensation for the May-December 2016 period as a whole.

---

[1] Alva Johnson vs. Donald J. Trump, Donald J. Trump for President, Inc., Jury Trial Demanded Injunctive Relief Sought Collective Action Complaint, February 25, 2019, 3. ("Complaint")

[2] Complaint, 3-4.

[3] Complaint, 28-29.

## II. Determining Protected Group Disparities in Pay

### A. Method and Data

8. The current case relates to alleged discrimination in pay by the Campaign. Discrimination can be observed as a disparity in compensation between similarly-situated employees within a protected group (e.g. females compared to males in the case of gender discrimination).[4] Individual employees' pay can vary for a variety of reasons. To the extent data are available, Economists can use employment data on employee position, experience, and other objective factors to control for differences in pay that are not due to discrimination against members of a protected group.

9. An initial step in this process is to compute the overall average differences in compensation between the members of the protected group allegedly affected by alleged discrimination and other employees. This initial step indicates whether or not there is a disparity in pay for those employees and can be suggestive of whether there is a discriminatory effect. A next step could be to compute "cross-tabs", average differences in compensation of affected and unaffected employees who are similarly situated, e.g., that share the same job responsibilities. A further step is to use available data to estimate the impact of membership in a protected group on pay while simultaneously controlling for multiple non-discriminatory factors.

10. To control for multiple objective factors when estimating disparities in pay, economists use a statistical technique called multiple regression analysis. A regression analysis is a technique that is used to estimate a relationship between an outcome (the "dependent variable") and one or more explanatory factors ("explanatory variables"), including a factor of interest, such as membership in a

---

[4] "Equal Pay/Compensation Discrimination," U.S. Equal Employment Opportunity Commission, https://www.eeoc.gov/laws/types/equalcompensation.cfm. See also, Equal Pay Act, 29 U.S.C. § 206(d), https://www.law.cornell.edu/uscode/text/29/206.

protected group (e.g. female or male).[5] The dependent variable would be employee compensation which might be affected by employee characteristics such as age, length of employment with the employer, or job title. Regression analysis is a standard and widely-accepted technique that has been used in academic studies. This method has also been widely used and accepted in courts as an evidence of discrimination in pay.[6]

11. Data that might be used in a multiple regression analysis to estimate protected group pay disparities arising from discrimination in the Campaign, includes:

12. Individual employee compensation in each pay period;

13. <u>Employee characteristics</u>, such as gender, race, a measure of experience (e.g. age), and location of employment;

14. <u>Job characteristics,</u> such as role in the campaign and election stage (primary vs. general).

15. Note that it is not necessary to include all factors that affect pay to produce a reliable, unbiased estimate of the pay disparity due to membership in the protected group. The reason is that in a regression model, the estimated effect of membership in the protected group will be unbiased as long as objective factors that both affect compensation and correlate to protected group membership status are included. Objective factors that affect compensation but do not correlate with the membership to the protected group (or vice versa) would not bias the estimate of the gender pay disparity.[7]

---

[5] See e.g., Jeffrey M. Wooldridge, *Introductory Econometrics: A Modern Approach,* 5ed. (Mason: South-Western, 2013), 68-69.

[6] See e.g., <u>H. Cristina Chen-Oster, Lisa Parisi, Shanna Orlich, Allison Gamba, and Mary De Luis, against Goldman, Sachs & Co. and The Goldman Sachs Group, Inc. Opinion and Order, March, 30, 2018.</u>

[7] See e.g., Jeffrey M. Wooldridge, *Introductory Econometrics: A Modern Approach,* 5ed. (Mason: South-Western, 2013), 90.

- 4 -
DECLARATION OF PHILLIP M. JOHNSON, PH.D.

16. I understand there are general functions common to political campaigns that relate to employees' job responsibilities. These include functions related to campaign management, communications, constituent liaison, contacting voters, fundraising, policy, research, information technology, and other functions.[8] For example, staff members conducting constituent liaison work conduct outreach to the local leadership of particular interest-group communities, some staff members (sometimes referred to as "field teams") contact voters and organize events, other staff members conduct research of the opposition campaign, and others work in an information technology area.[9]

### B. Publicly Available Data

17. Some of the required data to estimate the protected group pay disparities are readily available in the public domain. I understand that political campaigns are required to report all disbursements, including payroll-related disbursements, to the United States Federal Elections Commission (FEC). Specifically, Presidential campaigns are required to complete a "Schedule B-P" for "Itemized Disbursements" for all required campaign expenditures, which includes payroll. The FEC collects and distributes this information, which can be obtained from the FEC website.[10]

18. From the FEC, I have obtained individual compensation records of the Trump 2016 Presidential Campaign Staff.[11] These data consist of employee (recipient)

---

[8] See e.g., Sharon Kelly, Justin Levitt, Amanda Tammen Peterson, "One State, Two State, Red State, Blue State. A Quick Guide to Working On Political Campaigns," (Cambridge: Harvard Law School, 2007): 11-15, https://hls.harvard.edu/content/uploads/2008/07/guide-campaign.pdf; and "Donald Trump presidential campaign key staff and advisors, 2016," Ballotpedia, https://ballotpedia.org/Donald_Trump_presidential_campaign_key_staff_and_advisors,_2016.

[9] See e.g., Sharon Kelly, Justin Levitt, Amanda Tammen Peterson, "One State, Two State, Red State, Blue State. A Quick Guide to Working On Political Campaigns," (Cambridge: Harvard Law School, 2007): 12-15, https://hls.harvard.edu/content/uploads/2008/07/guide-campaign.pdf.

[10] "Disbursements," Federal Elections Commission United States of America, https://www.fec.gov/data/disbursements/.

[11] I have been instructed to focus on the period of May through December 2016.

name, whether the recipient is an individual or an organization, disbursement description (e.g. payroll, consulting fee, rental fee, etc.), disbursement date, disbursement amount, and the election stage (primary vs general).

19. The FEC records do not indicate the gender of the individuals. To identify the gender, I used data from the United States Social Security Administration (SSA). The SSA keeps records on the relative frequency of names by gender in the population of U.S. Births where the individual has a Social Security Number.[12] I assign the individual's name in the FEC data to male (female) if the given name is identified by SSA as male (female) for at least two thirds of the individuals born between 1920 through 2014.[13]

20. Lastly, from public records, I have identified whether an individual was a top member of the campaign. Ballotpedia, a non-profit and nonpartisan online political encyclopedia,[14] provides the names, roles, and divisions for individuals described as "Key Campaign Staff or Advisors" for the Trump 2016 Presidential Campaign.[15] The individuals identified on this list include, among others, the Executive chairman and Campaign manager. These individuals were matched to the FEC disbursements data using full names.

---

[12] "Baby Names from Social Security Card Applications - National Level Data," Data.Gov, https://catalog.data.gov/dataset/baby-names-from-social-security-card-applications-national-level-data. There is more information in the 'NationalReadMe' file within the downloaded folder. Last Accessed March 29, 2016.

[13] This methodology leaves five names unidentified, which were then manually assigned a gender through additional online research.

[14] "Ballotpedia: About," Ballotpedia, https://ballotpedia.org/Ballotpedia:About.

[15] "Donald Trump presidential campaign key staff and advisors, 2016," Ballotpedia, https://ballotpedia.org/Donald_Trump_presidential_campaign_key_staff_and_advisors,_2016.

## III. Preliminary FEC Data Analysis

21. I identified and analyzed the FEC records of individual recipients with "Payroll" disbursement types.[16] Below, I present summaries of these data records for the period of May through December of 2016.

22. **Figure 1** shows disbursement records for the named plaintiff, Alva Johnson. Ms. Johnson was apparently paid by the Campaign with a rate of $3,000 per month between May and July 2016 which increased to $4,000 until her employment ended in October 2016. She was paid a total of $19,000 during this period.

23. **Figure 2** shows the number of Campaign employees and total disbursements to male and female employees that were paid under "Payroll" disbursement type in each month. In total, there were 77 females and 151 males (excluding Key Staff and Advisors), who received at least one payroll disbursement during the mentioned period. The total disbursements to this staff were roughly $1.1 million for females and $2.8 million to males.

24. **Figure 3** shows the average male and female payroll disbursements in each month, as well as the overall average for the entire period. The summary shows that women were consistently paid less than men on average. This summary is also split between members of the Key Staff and Advisors and all other employees. Excluding Key Staff and Advisors, on average females received monthly $3,865 and males received $4,568, i.e. the average monthly compensation to females was less than that for males in every month and was 18.2% less than males' compensation for the May-December 2016 period as a whole. Additionally, I conduct a statistical test of whether this observed disparity in pay (not accounting for any objective factors) is likely to have occurred by chance. I use a standard T-test for this purpose. This test rejects the hypothesis of

---

[16] The analysis is limited to the entity type description of "INDIVIDUAL". I include disbursement types of "PAYROLL", "IN-KIND: PAYROLL", and "PAYROLL-PPV".

- 7 -
DECLARATION OF PHILLIP M. JOHNSON, PH.D.

no disparity at the 1% percent significance level, which indicates that it is unlikely to have occurred by chance.[17]

### Figure 1
### Alva Johnson FEC Data Records
### May 2016 - December 2016

| Recipient Name | Transaction ID | Disbursement Date | Election Type | Disbursement Amount |
|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) |
| 1. JOHNSON, ALVA | SB23.600066 | 5/13/2016 | PRIMARY | $ 1,500 |
| 2. JOHNSON, ALVA | SB23.600067 | 5/31/2016 | PRIMARY | 1,500 |
| 3. JOHNSON, ALVA | SB23.1163432 | 6/15/2016 | PRIMARY | 1,500 |
| 4. JOHNSON, ALVA | SB23.1163433 | 6/30/2016 | PRIMARY | 1,500 |
| 5. JOHNSON, ALVA | SB23.1615465 | 7/14/2016 | PRIMARY | 1,500 |
| 6. JOHNSON, ALVA | SB23.1615535 | 7/29/2016 | PRIMARY | 1,500 |
| 7. JOHNSON, ALVA | SB23.2141409 | 8/15/2016 | GENERAL | 1,500 |
| 8. JOHNSON, ALVA | SB23.2141410 | 8/31/2016 | GENERAL | 2,500 |
| 9. JOHNSON, ALVA | SB23.4235 | 9/15/2016 | GENERAL | 2,000 |
| 10. JOHNSON, ALVA | SB23.4437 | 9/29/2016 | GENERAL | 2,000 |
| 11. JOHNSON, ALVA | SB23.4748 | 10/13/2016 | GENERAL | 2,000 |
| 12. **May-Dec 2016** | | | | $ 19,000 |

Sources: FEC Disbursements Data.

---

[17] The t-statistic for the difference in disbursements to staff excluding Key Staff and Advisors is -3.28 and p-value is 0.001.

- 8 -
DECLARATION OF PHILLIP M. JOHNSON, PH.D.

**Figure 2**

**Trump Campaign**

**Employee Count by Gender**

|  | Employee Count | | Total Employee Compensation | |
|---|---|---|---|---|
| Year -Month | Female | Male | Female | Male |
| (1) | (2) | (3) | (4) | (5) |
| Staff Excluding Key Staff and Advisors | | | | |
| 1. May 2016 | 18 | 45 | $ 64,957 | $ 208,085 |
| 2. June 2016 | 19 | 49 | 74,423 | 235,267 |
| 3. July 2016 | 21 | 55 | 79,641 | 276,063 |
| 4. August 2016 | 40 | 91 | 142,219 | 412,230 |
| 5. September 2016 | 54 | 107 | 247,406 | 514,672 |
| 6. October 2016 | 66 | 125 | 303,094 | 626,940 |
| 7. November 2016 | 65 | 121 | 167,221 | 370,280 |
| 8. December 2016 | 3 | 15 | 26,421 | 133,523 |
| **9. May-Dec 2016** | **77** | **151** | **$ 1,105,382** | **$ 2,777,060** |
| Key Staff and Advisors | | | | |
| 10. May 2016 | 2 | 4 | $ 13,350 | $ 40,492 |
| 11. June 2016 | 2 | 4 | 10,733 | 39,661 |
| 12. July 2016 | 2 | 4 | 10,733 | 39,661 |
| 13. August 2016 | 2 | 5 | 15,361 | 45,262 |
| 14. September 2016 | 2 | 5 | 15,361 | 49,801 |
| 15. October 2016 | 2 | 5 | 18,291 | 50,701 |
| 16. November 2016 | 2 | 5 | 6,801 | 34,630 |
| 17. December 2016 | 0 | 1 | 0 | 20,000 |
| **18. May-Dec 2016** | **2** | **5** | **$ 90,631** | **$ 320,209** |

Notes: (1) Key Staff and Advisors include "State Director", "Communications Director", "Director of New Media", "Deputy Campaign Manager", and "Senior Advisor".

Sources: FEC Disbursements Data; Ballotpedia.

**Figure 3**

**Trump Campaign**

**Employee Compensation by Gender**

|  | Mean Compensation | | | |
| Year -Month | Female | Male | Female - Male | Percent Diff |
|  | (Dollars) | | | |
|  |  |  | (2) - (3) | (4) / (2) |
| (1) | (2) | (3) | (4) | (5) |
| Staff Excluding Key Staff and Advisors | | | | |
| 1. May 2016 | $ 3,609 | $ 4,624 | $ -1,015 | -28.1% |
| 2. June 2016 | 3,917 | 4,801 | -884 | -22.6 |
| 3. July 2016 | 3,792 | 5,019 | -1,227 | -32.4 |
| 4. August 2016 | 3,555 | 4,530 | -975 | -27.4 |
| 5. September 2016 | 4,582 | 4,810 | -228 | -5.0 |
| 6. October 2016 | 4,592 | 5,016 | -423 | -9.2 |
| 7. November 2016 | 2,573 | 3,060 | -488 | -19.0 |
| 8. December 2016 | 8,807 | 8,902 | -95 | -1.1 |
| 9. **May-Dec 2016** | **$ 3,865** | **$ 4,568** | **$ -703** | **-18.2%** |
| Key Staff and Advisors | | | | |
| 10. May 2016 | $ 6,675 | $ 10,123 | $ -3,448 | -51.7% |
| 11. June 2016 | 5,367 | 9,915 | -4,549 | -84.8 |
| 12. July 2016 | 5,367 | 9,915 | -4,549 | -84.8 |
| 13. August 2016 | 7,680 | 9,052 | -1,372 | -17.9 |
| 14. September 2016 | 7,680 | 9,960 | -2,280 | -29.7 |
| 15. October 2016 | 9,146 | 10,140 | -995 | -10.9 |
| 16. November 2016 | 3,401 | 6,926 | -3,525 | -103.7 |
| 17. December 2016 | 0 | 20,000 | -20,000 |  |
| 18. **May-Dec 2016** | **$ 6,474** | **$ 9,703** | **$ -3,230** | **-49.9%** |

Notes: (1) Key Staff and Advisors include "State Director", "Communications Director", "Director of New Media", "Deputy Campaign Manager", and "Senior Advisor".

Sources: FEC Disbursements Data; Ballotpedia.

Phillip M. Johnson, Ph.D.
May 13, 2019

- 11 -
DECLARATION OF PHILLIP M. JOHNSON, PH.D.

Exhibit 1



**Phillip Johnson, Ph.D.**                                                                                           **Curriculum Vitae**
Managing Director
3620 Happy Valley Road, Suite. 201
Lafayette, California 94549
Email: pjohnson@econone.com
Tel: 925 403 1003

## EDUCATION

PhD, University of California, Los Angeles, Economics, 1997

MA, University of California, Los Angeles, Economics, 1993

BA, California State University Northridge, Economics, 1991

## PROFESSIONAL EXPERIENCE

*Econ One Research, Inc.,*

   Managing Director, 2012 – Present

   Senior Economist, 2009 – 2012

   Economist, 2000 – 2009

*Instituto Tecnológico Autónomo de México (ITAM),*
   Assistant Professor, 1997-2000

## AREAS OF ECONOMC EXPERTISE

Competition and antitrust analysis
Damages assessment and pass-through
Common impact in class certification
Econometric and statistical analysis
Intellectual property damages

## PUBLICATIONS AND AWARDS

Jerry S. Cohen Memorial Fund Writing Award, for "Statistical Significance and Statistical Error in Antitrust Analysis," https://www.antitrustinstitute.org/awards, June 21, 2018

"Roundtable with Economists," Antitrust, Spring 2018, with Dennis Carlton, Gregory Leonard, Maria Maher, and Carl Shapiro

"Statistical Significance and Statistical Error in Antitrust Analysis," Antitrust Law Journal, Vol. 81, 2017, with Edward Leamer and Jeffrey Leitzinger

"Increasing Focus on Information Exchanges Among Competitors," Law360, April 2017, with Niyati Ahuja

Phillip Johnson, Ph.D.
*Managing Director*
Page 2

"Regression Techniques for Estimating Overcharges Using Market Concentration Data," American Bar Association, Section of Antitrust Law, Economics Committee Newsletter, Volume 12, Number 1, Summer 2012, with Armen Markosyan

"Reasonable Royalty Damages and License Structure," Econ One Newsletter, Spring 2007

"A Surprising Result from Patent Infringement: Price Accretion Instead of Price Erosion," Econ One Newsletter, Spring 2005

"Lost Profits Damages When Infringement Raises the Patentee's Prices," American Bar Association, Section of Intellectual Property Law, Newsletter, Volume 23, Number 1, Fall 2004, with Tessie Su

"Patent Damages and Price Erosion", Econ One Newsletter, Fall 2003

"Evolution and Information in a Gift-Giving Game," Journal of Economic Theory, Volume 100, 2001, with David Levine and Wolfgang Pesendorfer

"Mergers, Alliance and Welfare in Differentiated Markets with Quality-Improving Innovations in Markets with Complementary Goods," with Tessie Su and Tridib Sharma

"Evolution and Information in a Prisoners' Dilemma," with David Levine and Wolfgang Pesendorfer

"The Stability of Monetary Institutions as a Social Institution"

**PRESENTATIONS**

Statistical Issues with Regression Analysis for Antitrust Litigation, Kaplan Fox, 2015

West LegalEdCenter Patent Disputes Conference, 2013

Deposing the Expert Witness, NITA, 2012

Cross Examining Expert Witnesses, Annual Meeting of the California State Bar, 2012

West LegalEdCenter Patent Disputes Conference, 2011

Deposing the Expert Witness, NITA, 2011

Cross Examining Expert Witnesses, Trial Advocacy Group, 2011

Patent Damages Webinar, Law.com, 2010

Cross Examining Expert Witnesses, Trial Advocacy Group, 2009

Deposing the Expert Witness, NITA, 2008

Latin American Meetings of the Econometric Society, 1999

Stony Brook Summer Festival on Game Theory, 1999

University of California at Los Angeles, 1999

Allied Social Sciences Association, 1998

Academica Sinica, Taiwan, 1997

National Taiwan University, 1997

Instituto Tecnológico Autónomo de México, 1997

Stony Brook Summer Festival on Game Theory, 1996

Phillip Johnson, Ph.D.
*Managing Director*
Page 3

**SUMMARY OF PRIOR ENGAGEMENTS**

HCF Insurance Agency v. Kevin Hamm, et al. Retained to address antitrust issues involving an alleged group boycott relating to the provision of workers' compensation coverage for extended care facilities. 2019 – Present.

L.A. Taxi Cooperative, et al. vs. Uber. Retained to address issues in an opposing expert economist's report regarding the analysis of Uber and taxi safety data. Submitted an expert report. Settled. 2017.

In Re Duke/UNC Antitrust. Retained to analyze data and issues relating to common impact and damages from a no-hire agreement by employees Duke and University of North Carolina medical schools. 2016 - Present.

Softwood Lumber. Retained to analyze claims that policies of Canada and its province, British Columbia resulted in below market stumpage fees that impacted trade in softwood lumber with the United States. 2015 – Present.

In Re Lithium Ion Batteries Antitrust. Retained to analyze data and issues relating to common impact and damages for a proposed class of indirect purchasers of products containing cylindrical lithium ion batteries. 2015 - Present.

Scott et al. vs. Chipotle Mexican Grill, Inc. Retained to analyze employee data and calculate damages related to the alleged misclassification of Chipotle Apprentices as salaried employees. Submitted an expert report and provided a deposition. 2015 – 2017.

Chen-Oster vs. Goldman Sachs. Retained to analyze class certification issues and damages related to alleged gender discrimination. 2013 – Present.

Consulting. Retained confidentially to analyze economic issues and data in various matters. Ongoing projects involve antitrust, trade, and employment violations (discrimination, misclassification, and/or wage and hour violations).

Margie Daniel, et al. v Ford Motor Company. Conducted an analysis of Defendant's experts' statistical procedures and provided analyses regarding a class of Ford Focus owners alleging a product defect. 2013 – 2018.

First Western Capital Management v. Kenneth D. Malamed. Retained to analyze damages relating to alleged misappropriation of trade secrets. Submitted an expert report. Settled. 2016 - 2017.

Surf City Steel, Inc. et al. vs. International Longshore and Warehouse Union, et al. Retained to analyze the competitive effects of an agreement to exclude contractors employing Ironworkers Union members from port crane modification and structural maintenance projects. Submitted an expert report and provided a deposition. Case dismissed. 2014 - 2017.

Kunkel et al v. John Wiley & Sons, Inc. Retained to analyze common impact and damages for a proposed class of photograph copyright holders who allege that Wiley infringed their copyrights in books it published. Submitted an expert report and provided a deposition. Settled. 2015 - 2017.

In Re: CRT Antitrust Litigation. Analyzed economic issues relating to class certification, liability, and damages in a price-fixing case for a class of direct purchasers of cathode ray tubes against the major manufacturers. Class certified. Settled. 2011 – 2017.

In Re: TFT-LCD Antitrust Litigation. Retained to analyze economic issues relating to antitrust liability and damages for Proview Technology Inc.'s (PTI) claims against manufacturers of TFT-LCD panels. Submitted an expert report. Settled. 2014 – 2015.

Phillip Johnson, Ph.D.
*Managing Director*
Page 4

Cobb et al. vs. BSH Home Appliances. Retained to analyze manufacturers' service data relating to the incidence of mold in front-loading washers. Submitted an expert report and provided a deposition. Settled. 2014 – 2015.

Hemy vs. Perdue Farms. Retained to analyze class certification issues and damages relating to alleged product mislabeling of chicken meat products. Settled. 2014.

Apodaca vs. Whirlpool Corporation. Retained to analyze data relating to alleged defects in Maytag dishwashers. Case settled. 2014.

Symantec vs. Veeam. Retained to analyze lost profits, reasonable royalty, and irreparable harm resulting from alleged infringement of Symantec patents. Submitted an expert report. Case dismissed with prejudice. 2013 – 2015.

Ottenberg, et al v. XY, LLC and Inguran, LLC. Retained to analyze antitrust issues and damages arising from the misuse of patents and intellectual for bovine sexing technology and related equipment and sorted semen straw markets. Submitted an expert report and provided a deposition. Settled prior to trial. 2013.

In Re: High Tech Workers Antitrust Litigation. Analyzed economic issues relating to class certification and damages for a class of employees of seven major technology companies (Apple, Adobe, Google, Intel, Intuit, Lucasfilm, and Pixar) alleging a series of agreements to limit competition for workers. Class settled. 2012 – 2015.

In Re: TFT-LCD Antitrust Litigation. Analyzed economic issues relating to class certification, liability and damages for a class of direct purchasers of TFT-LCD panels against the major manufacturers of TFT-LCD panels. Class was certified and all defendants except Toshiba settled prior to trial. Toshiba was found liable and damages were awarded to Plaintiffs. Toshiba settled following trial. 2008 – 2012.

Pecover v. Electronic Arts. Analyzed damages arising from the monopolization of football video games for a nationwide class of consumers. 2011 – 2012.

Realtime Data v. Packeteer, et al. Retained by defendant Expand Networks as economic expert to provide analysis of markets for wide-area network acceleration products and calculate damages from alleged patent infringement. Submitted expert reports and provided deposition testimony. 2008 – 2010.

In Re: Korean Airlines Co., LTD. Antitrust Litigation. Analyzed economic issues, including market definition and common impact, relating to the certification of a class of direct purchasers of travel between the U.S. and Korea against the major Korean Airlines. 2008 – 2010.

California State Foster Parent Assoc., et al. v. John A. Wagner, Director of the California Department of Social Services, in his official capacity, et al. Retained to analyze the economic and State budget impact of a change in foster care reimbursement policies. Submitted expert report. 2008 - 2009.

High Point Sarl v. Sprint Nextel Corp., et al. Analyzed cellular communications markets and reasonable royalty rate in a patent case involving digital cellular communications technology. 2008 – 2009.

Montana Food Distributors Assoc. v. International Outsourcing Services et al. Conducted preliminary damages analysis in a case involving allegations of anticompetitive behavior and fraud by coupon processors. 2008 – 2009.

DealerTrack v. RouteOne, et al. Analyzed lost profits and reasonable royalty damages, and the commercial success of patented features in a case involving credit application aggregation systems used for automotive sales. 2007 – 2009.

Phillip Johnson, Ph.D.
*Managing Director*
Page 5

Silvaco v. Cypress Semiconductor. Analyzed lost profits and unjust enrichment in a theft of trade secrets case involving providers and customers for software for the design of chips used in devices. Provided expert declarations relating to the analysis of defendant's data. 2007 – 2009.

Amado v. Microsoft. Analyzed post-trial royalty rate in a patent case involving office productivity software technology. 2008.

Amex v. MasterCard, Visa, et al. Assisted in analyzing damages issues in a monopolization case involving the major providers of credit and charge cards. 2007 – 2008.

M.I., LLC v. Halliburton Energy Services, Inc. Analyzed relevant market and damages issues in an attempted monopolization case involving the alleged misuse of a patent on deepwater oil drilling fluid technology. 2007 – 2008.

In re: Kdur Antitrust Litigation. Analyzed relevant market and impact issues in a monopolization case involving branded and generic drugs. 2006 – 2007.

In re: Tricor Direct Purchaser Antitrust Litigation. Analyzed relevant market and impact issues in a monopolization case involving branded and generic drugs. 2006 – 2007.

In re: Nifedipine Antitrust Litigation. Analyzed relevant market and impact issues in a monopolization case involving branded and generic drugs. 2006 – 2007.

Columbus Drywall, et al. v. Masco Corporation. Analyzed antitrust issues and assisted in drafting liability report in a price fixing conspiracy case alleged to involve a major insulation buyer and manufacturers. Analyzed issues relating to buyer power. 2006 – 2008.

Synopsys v. Magma. Analyzed lost profits, reasonable royalties, and unjust enrichment in a patent infringement trade secret case relating to software for the design of computer chips. 2005 – 2007.

The Regents of the University of California v. Monsanto. Analyzed reasonable royalties and license structure in a patent infringement case relating to bovine growth hormone. 2005 - 2006.

Pixion v. PlaceWare. Analyzed reasonable royalties and unjust enrichment in a trade secret and patent infringement case relating to web conferencing technology. 2004 – 2005.

Novell, Inc. Retained by Novell to analyze damages for mediation with Microsoft. Microsoft was alleged to have harmed Novell through alleged anticompetitive conduct in the workgroup operating system market. 2003 – 2004.

Affymetrix v. Agilent. Analyzed damages in a breach-of-contract arbitration. 2004.

France Telecom v. Novell. Analyzed reasonable royalties in a copyright infringement case. 2003 – 2004.

University of California, San Francisco. Analyzed the value of bovine growth hormone technology in the milk market to assist a patentee in a potential license negotiation. 2004.

DOS Class v. Microsoft. Assisted plaintiffs' expert in the analysis of defendant's damages models. 2003.

CATC v. Catalyst. Analyzed lost profits and reasonable royalties in a trade dress and copyright infringement case. 2002 – 2003.

IFPC Shareholders v. AT&T et al. Analyzed the option value of a lost business opportunity due to a breach of contract. 2002.

Martha Chapman v. El Paso Energy Corporation. Analyzed economic evidence regarding the nature and extent of control of El Paso Natural Gas by its parent, El Paso Energy Corporation. 2001.

Phillip Johnson, Ph.D.
*Managing Director*
Page 6

In re: Flat Glass Antitrust. Analyzed liability and damages issues in a price-fixing case, including industry analysis, entry barriers, concentration, firms' conduct, and facilitating industry practices. 2000 – 2005.

In re: Methionine Antitrust Litigation. Analyzed class certification issues for a price-fixing case, including industry analysis, market structure, and the impact of the alleged conspiracy on pricing. 2000 – 2001.

**Exhibit 2**
**List of Materials Relied Upon**

| **Pleadings and Orders** | **Date** |
|---|---|
| Complaint | 2/25/2019 |
| H. Cristina Chen-Oster, Lisa Parisi, Shanna Orlich, Allison Gamba, and Mary De Luis, against Goldman, Sachs & Co. and The Goldman Sachs Group, Inc., Opinion and Order | 3/30/2018 |

**Academic Materials**

Jeffrey M. Wooldridge, Introductory Econometrics: A Modern Approach, 5ed. (Mason: South-Western, 2013).

Sharon Kelly, Justin Levitt, Amanda Tammen Peterson, "One State, Two State, Red State, Blue State. A Quick Guide to Working On Political Campaigns," (Cambridge: Harvard Law School, 2007), https://hls.harvard.edu/content/uploads/2008/07/guide-campaign.pdf.

**Publicly Available Materials**

"Baby Names from Social Security Card Applications - National Level Data," Data.Gov, https://catalog.data.gov/dataset/baby-names-from-social-security-card-applications-national-level-data.

"Disbursements," Federal Elections Commission United States of America, https://www.fec.gov/data/disbursements/.

"Donald Trump presidential campaign key staff and advisors, 2016," Ballotpedia, https://ballotpedia.org/Donald_Trump_presidential_campaign_key_staff_and_advisors,_2016.

Equal Pay Act, 29 U.S.C. § 206(d), https://www.law.cornell.edu/uscode/text/29/206.

"Equal Pay/Compensation Discrimination," U.S. Equal Employment Opportunity Commission, https://www.eeoc.gov/laws/types/equalcompensation.cfm.