**TYCKO & ZAVAREEI LLP**
Hassan A. Zavareei (*pro hac vice*)
Katherine M. Aizpuru (*pro hac vice*)
1828 L Street NW, Suite 1000
Washington, D.C. 20036
P: (202) 417-3667
F: (202) 973-0950
hzavareei@tzlegal.com
kaizpuru@tzlegal.com

**TYCKO & ZAVAREEI LLP**
Tanya S. Koshy (*pro hac vice*)
1970 Broadway, Suite 1070
Oakland, CA 94612
P: (510) 250-3298
F: (202) 973-0950
tkoshy@tzlegal.com

*Counsel for Plaintiff*
*(Additional counsel listed on signature page)*

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
(TAMPA DIVISION)**

| | |
|---|---|
| **ALVA JOHNSON,** *Individually and On Behalf of All Others Similarly Situated,* | |
| Plaintiff, | **CASE NO. 8:19-cv-00475-WFJ-SPF** |
| vs. | **PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT DONALD J. TRUMP FOR PRESIDENT, INC.'S MOTION TO DISMISS** |
| **DONALD J. TRUMP,** *In his Individual Capacity* and **DONALD J. TRUMP FOR PRESIDENT, INC.,** | |
| Defendants. | |

## TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................1

II.   LEGAL STANDARD ............................................................................................1

III.  ARGUMENT .........................................................................................................2

    A.  The Equal Pay Act Applies to the Campaign.................................................2

        1.  Ms. Johnson Qualifies For Individual FLSA Coverage Because She Frequently and Recurrently Used the Instrumentalities of Interstate Commerce in Her Work. ...........................2

        2.  Ms. Johnson Also Qualifies for Enterprise Coverage Because the Campaign Is an Enterprise Engaged in Commerce That Annually Does More than $500,000 in Business and Competes with Private Companies. ...............................................4

    B.  Ms. Johnson Has Sufficiently Alleged Collective Claims Under the Equal Pay Act..................8

        1.  Whether Putative Collective Members Are "Similarly Situated" Is a Premature Inquiry that Should Instead Be Addressed on Conditional Certification................9

        2.  Ms. Johnson Has Sufficiently Alleged that Putative Collective Members Are "Similarly Situated." ...........................................12

    C.  Ms. Johnson Has Sufficiently Alleged Individual Wage Claims. ...................................15

IV.   CONCLUSION.....................................................................................................19

Pursuant to the Federal Rules of Civil Procedure and Local Rule 3.02(b), Plaintiff Alva Johnson opposes Donald J. Trump for President Inc.'s ("DJTFP's" or "The Campaign's") May 10, 2019 Motion to Dismiss (Dkt. No. 32) as follows:

## I.   INTRODUCTION

The Campaign wrongly asserts that Ms. Johnson's Complaint should be dismissed because: (1) there are no allegations in the Complaint that could establish either individual or enterprise coverage under the Fair Labor Standards Act ("FLSA"), (2) the Complaint makes only conclusory allegations of similar work and pay disparities in support of Ms. Johnson's collective Equal Pay Act ("EPA") claims, and (3) the Complaint insufficiently alleges individual wage discrimination claims under the EPA and 42 U.S.C. § 1981. None of the Campaign's arguments have merit.

Ms. Johnson's Complaint, as well as publicly available data (which the Court may take judicial notice of and/or which may be included in an amended Complaint), establish that both Ms. Johnson and the Campaign were engaged in interstate commerce, and that Ms. Johnson is therefore covered by the FLSA under either individual or enterprise coverage. Not only did the Campaign's commercial activities include millions of dollars' worth of transactions involving Trump-branded merchandise, Ms. Johnson's specific job duties required her to travel across state lines frequently. Accordingly, the Campaign is not exempt from the reach of the Equal Pay Act.

Ms. Johnson's Complaint also paints a detailed picture of the work she performed for the Campaign, the white male comparators who were paid more for substantially similar work, and the similarly situated female staffers who shared in her experience of pay discrimination.  In short, Ms. Johnson has plausibly alleged that the Campaign systematically discriminated against her and other female employees on the basis of sex, and has sufficiently alleged that the Campaign discriminated against her individually on the basis of race.

## II.   LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's allegations need only be "plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The standard on a 12(b)(6) motion is not whether the plaintiff will ultimately prevail in his or her theories, but whether the allegations are sufficient to allow the plaintiff to conduct discovery in an attempt to prove the allegations." *Burgeson v. Collier County*, No. 2:09-cv-220-FtM-36DNF, 2010 WL 11506949, at *2 (M.D. Fla. July 21, 2010). Courts must "accept all factual allegations in the complaint as true" and "must consider the complaint in its entirety. . . ." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). All reasonable inferences must be drawn in the plaintiff's favor, and if the combined allegations nudge the claim across the line from conceivable to plausible, the case should not be dismissed. *Twombly*, 550 U.S. at 570.

## III.   ARGUMENT

### A.   The Equal Pay Act Applies to the Campaign.

The Equal Pay Act of 1963 prohibits employers who have employees subject to the Fair Labor Standards Act ("FLSA") from discriminating on the basis of sex in paying those employees. 29 U.S.C. § 206(d)(1). Because the FLSA was enacted pursuant to Congress's Commerce Clause authority, an employee can demonstrate that she is entitled to the protections of the FLSA, and thus the EPA, by alleging either: (1) that her employer is an "enterprise engaged in commerce or the production of goods for commerce," or (2) that in her work for the employer, she herself was engaged in commerce or the production of goods for commerce. The FLSA defines "commerce" to include "trade," "transportation, transmission, or communication among the several States or between any State and any place outside thereof." 29 U.S.C. § 203(b). Accordingly, an employee is covered by the FLSA, including the EPA, if she either engaged in transportation, communication or transmission of goods or information across state lines, or if her employer was an enterprise engaged in such interstate activity. Though a plaintiff need only allege one of these connections to commerce, Ms. Johnson can satisfy both the enterprise and individual engagement tests.

> 1.   *Ms. Johnson Qualifies For Individual FLSA Coverage Because She Frequently and Recurrently Used the Instrumentalities of Interstate Commerce in Her Work.*

An employee can establish individual FLSA coverage by establishing that she "regularly us[ed] the instrumentalities of interstate commerce in her work, e.g., regular and recurrent use of interstate telephone, telegraph, mails, or travel." *See Gashlin v. Int'l Clinical Research-US, LLC*, 2014 WL 3057383, at *3 (M.D. Fla. July 7, 2014) (citation omitted). Ms. Johnson frequently traveled across state lines for her work with the Campaign. Specifically, as part of the National Strike Team, she traveled to, and opened volunteer offices in, Missouri, Utah, Wisconsin, Indiana, and California. Compl. at ¶¶39-42. She also organized rallies in Missouri, Utah, Wisconsin and Indiana, for which she served "as the point of contact for campaign accessories, like signs and stickers, that came in from out of state." *Id.* at ¶43.  Finally, in July of 2016, Ms. Johnson traveled to, and began organizing events in, Florida. *Id.* at ¶47.

These activities meet the standard that both courts and relevant agencies have set for being sufficiently "engaged in commerce" to trigger individual FLSA coverage. *See* 29 C.F.R. § 776.10(b) ("regular and recurrent" use of mail," "telephone, or similar instrumentalities for communication across State lines"); 29 C.F.R. § 779.103 ("employees who regularly travel across state lines while working"); *Lefevre v. La Cote Basque Winehouse, Inc.*, NO. 8:15-cv-1428, 2015 WL 6704107 (M.D. Fla. Nov. 3, 2015) (routine use of telephone to communicate with out-of-state customers).

*Thorne v. All Restoration Servs., Inc.*, 448 F.3d 1264, 1265 (11th Cir. 2006), cited by the Campaign, is easily distinguishable. In *Thorne*, the plaintiff performed mold and water damage restoration work for residential and commercial properties in Florida. *Id.* However, the only way in which his job implicated interstate commerce was that he sometimes used credit cards to purchase materials at Home Depot. *Id.* Otherwise, he "didn't do anything that had anything to do with any matter outside of the state." *Id.* at 1267. This proved fatal to his claim of "engaging in commerce." By Contrast, Ms. Johnson regularly traveled across state lines to perform her job duties, as detailed *supra.*

Because Ms. Johnson's Complaint alleges that she engaged in interstate commerce during her time with the Campaign, the Campaign's Motion to Dismiss Ms. Johnson's EPA claims should

be denied. In the alternative, Ms. Johnson requests leave to amend in order to supplement these allegations with additional facts, if required.

  2.  *Ms. Johnson Also Qualifies for Enterprise Coverage Because the Campaign Is an Enterprise Engaged in Commerce That Annually Does More than $500,000 in Business and Competes with Private Companies.*

Under the FLSA, an employer is an "enterprise engaged in commerce or in the production of goods for commerce" if it meets two criteria. First, it must have employees who either engage in commerce or the production of goods for commerce themselves, or who "handl[e], sell[], or otherwise work[] on goods or materials that have been moved in or produced for commerce." 29 U.S.C. § 203(s)(1)(A)(i). Second, it must have an annual gross volume of sales made or business done of at least "$500,000 (exclusive of excise taxes at the retail level that are separately stated)." 29 U.S.C. § 203(s)(1)(A)(ii). The Campaign meets both of these criteria for enterprise coverage.

As the Eleventh Circuit explained in *Polycarpe v. E&S Landscaping Serv., Inc.*, 616 F.3d 1217 (11th Cir. 2010), Congress added enterprise coverage to the FLSA in 1961 to expand its scope and protect more workers. After the 1961 amendments, FLSA coverage extended to all of a covered enterprise's employees as long as at least two of its employees were engaged in commerce, production of goods for commerce, or the handling or sale of goods previously moved in or produced for commerce. *Id.* at 1220 (citing *Dunlop v. Indus. Am. Corp.*, 516 F.2d 498, 500-01 (5th Cir. 1975)); *see also Tony and Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 295 n.8 (1985) ("Enterprise coverage substantially broadened the scope of the Act to include any employee of an enterprise engaged in interstate commerce, as defined by the Act.").

A number of facts derived from publicly available sources demonstrate that the Campaign easily satisfies the requirements of enterprise coverage.[1] For instance, the Campaign marketed and

---

[1] The Court may take judicial notice of the facts referenced in this memorandum, as their existence "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). *See U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811 (11th Cir. 2015) ("[A] district court may consider an extrinsic document even on Rule 12(b)(6) review. . . ."). In the alternative, Ms. Johnson requests leave to amend her Complaint to include these facts, which could easily be added. *Foman v. Davis*, 371 U.S. 178, 181–82 (1962) ("The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits.") (citations and internal quotation marks omitted)).

sold a large volume of "Make America Great Again" hats and other merchandise associated with Donald Trump. Specifically, a May 2016 Reuters article surveying public filings with the Federal Election Commission reported that the Campaign had raised over $6 million in gross revenue from the sale of "trademark gifts and apparel."[2] In this same article, Hope Hicks reported that the "sale of official campaign products" accounted for "a majority" of the individual contributions the Campaign had received to that point. This use of product sales to support a political campaign is similar to the use of revenue from thrift stores to support a charity, which courts have found satisfies the requirements of FLSA enterprise coverage. *See Schleicher v. Salvation Army*, 518 F.3d 472, 476 (7th Cir. 2008) (employees at Salvation Army-run thrift shops whose sales financed the Salvation Army were covered by the FLSA). Indeed, publicly available FEC data shows that the Campaign spent almost $15 million in 2016—well in excess of the $500,000 per year FLSA threshold—simply to buy official campaign merchandise[3], which it sold to campaign supporters.[4]

DJTFP argues that because the Campaign is a nonprofit organized for political rather than business purposes, it does not meet the definition of an "enterprise." *See* 29 U.S.C. § 203(r)(1) (defining "enterprise" as "related activities" performed by "one or more persons for a common business purpose"). But "the proper inquiry is not whether an entity is for profit or nonprofit, but rather to assess the entity's commercial activities and their connection to interstate commerce." *Rosell v. Area Performance, Inc.*, 2012 WL 12915303, at *2 (S.D. Fla. June 6, 2012). Accordingly, a nonprofit can qualify as an enterprise when it is engaged in "ordinary commercial activities." In such circumstances, the FLSA will apply to the nonprofit just as it would "when [the activities] are

---

[2] Trump, Sanders Fans Share Hunger for Campaign T-Shirts, Coffee Mugs by Richard Valdmanis and Grant Smith, Reuters, May 11, 2016, https://www.reuters.com/article/us-usa-election-swag/trump-sanders-fans-share-hunger-for-campaign-t-shirts-coffee-mugs-idUSKCN0Y224N (last visited May 21, 2019).

[3] Federal Election Commission, Donald J. Trump for President, Inc. Disbursements to Ace Specialties, LLC 2015–2016, *available at* https://www.fec.gov/data/disbursements/?two_year_transaction_period=2016&data_type=processed&committee_id=C00580100&recipient_name=ace+specialties&min_date=01%2F01%2F2016&max_date=12%2F31%2F2016 (last visited May 24, 2019) (showing $14,779,586.16 in payments to Ace Specialties, a supplier of Trump-branded merchandise, for "collateral" in 2016).

[4] The Woman Behind Trump Merchandise by Graham Flannigan, Business Insider, Aug. 1, 2018, https://www.businessinsider.com/make-america-great-again-hat-chfristl-mahfouz-ace-specialties-trump-campaign-merchandise-2018-7 (last visited May 21, 2019) ("Trump Merchandise").

performed by an ordinary business enterprise." *Alamo Foundation*, 471 U.S. at 297 (quoting 29 CFR § 779.214 (1984)) (finding that a religious foundation's activities were within the definition of "enterprise"). The question of whether enterprise coverage should attach is an "economic reality test" based on whether the employer competes "in the public with ordinary commercial enterprises," not a formalistic test based on the employer's status as a nonprofit. *Kitchings v. Fla. United Methodist Children's Home, Inc.*, 393 F. Supp.2d 1282, 1294 (M.D. Fla. 2005) (citations and internal quotation marks omitted); *see also, e.g.*, *Villafana v. Feeding S. Fla., Inc.*, No. 13-60760-CIV, 2013 WL 2646729, at *4 (S.D. Fla. June 12, 2013) (finding that plaintiff plausibly alleged enterprise coverage by alleging that defendant charity bid on purchases of pallets of food that would later be distributed to the needy).

The Campaign's official marketing activities satisfy the economic realities test articulated in *Kitchings* because they directly compete with sales of similar products by for-profit, "ordinary commercial enterprises."[5] During the 2016 campaign, other, less well-established entrepreneurial competitors also traveled from rally to rally selling Trump-branded gear to supporters, according to contemporaneous press accounts, despite the Campaign's occasional efforts to discourage competition by expelling these unofficial vendors from campaign events.[6] Indeed, on the Campaign's homepage at www.donaldjtrump.com, a prominent link labeled "Shop" appears next to the link labeled "Contribute." Clicking on the "Shop" link takes visitors to a Campaign webpage that seeks to distinguish its Trump-branded products from those sold by commercial competitors by declaring itself to be the "official Donald J. Trump Store." *See* https://shop.donaldjtrump.com (last visited May 20, 2019).[7]

---

[5] *See, e.g.*, https://www.amazon.com/Donald-Trump-President-America-Shirt/dp/B07BZ739BV ("Make America Great Again" T-shirts sold on amazon.com) (last visited May 20, 2019); https://www.walmart.com/ip/Donald-Trump-Make-America-Great-Again-Hats/129261379 ("Make America Great Again" hats sold online by WalMart) (last visited May 20, 2019).

[6] Cora Lewis, "These Vendors Made a Killing Selling Trump Swag," BuzzFeed (Nov. 3, 2016), https://www.buzzfeednews.com/article/coralewis/the-hawkers-of-the-traveling-trump-circus (last visited May 21, 2019).

[7] The "Official Donald J. Trump Store" claims on its site that it is operated by "Trump Make America Great Again Committee," described as a "joint fundraising committee authorized by and composed of [Defendant] Donald J. Trump for President, Inc. and the Republican National Committee." At minimum, whether the

The Campaign has employees who are engaged in the requisite "commerce," or "trade, transportation, transmission or communication among the several States or between any State and any place outside thereof" (29 U.S.C. § 203(d)) in multiple ways, including in support of the activities conducted through this website. At a minimum, given that all official campaign merchandise is distributed through the Louisiana-based company Ace Specialties and the official "Make America Great Again" hats are manufactured at a factory in California, Ms. Johnson can plausibly allege that Campaign employees who promote this merchandise and ensure that it reaches Donald Trump's supporters in multiple states are "handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce." 29 U.S.C. § 203(s)(1)(A)(i). In any event, whether Campaign employees are engaged in such activities is a question of fact for the jury. *See Polycarpe*, 616 F.3d at 1228 (holding that summary judgment was improper where there was "some evidence of 'goods' or 'materials' (or both) that employees have been handling, selling, or otherwise working on in a commercial context").

The Campaign relies heavily on *Katz v. DNC Servs. Corp.*, in which a district court in Pennsylvania declined to find enterprise coverage for the Pennsylvania Democratic Party in an FLSA action. No. 16-5800, 2018 WL 692164 (E.D. Pa. Feb. 2, 2018). But in *Katz*, the Court found that there was no evidence that "commercial competition was a primary, secondary, or even tertiary endeavor for the Pennsylvania Democratic Party." *Id.* at *6. Here, by contrast, the proliferation of Trump merchandise during and after the election establishes that the Campaign's commercial activities were significant, and the Campaign's efforts to distinguish "official" Trump-branded items from those produced by competitors demonstrates that the Campaign sought to compete in the public with ordinary commercial enterprise. *See Trump Merchandise*, *supra* note 4 (interview with Ace Specialties CEO describing how to differentiate between official MAGA hats and competitors based on color). To the extent the Court is not inclined to take judicial notice of this publicly available

---

Campaign is competing with private for-profit sellers in marketing and selling Trump paraphernalia is a question of fact unsuitable for resolution on a motion to dismiss.

information, Ms. Johnson can plausibly allege facts regarding DJTFP's commercial competition with ordinary businesses, and will add these allegations to her Complaint if granted leave to amend.

*Katz* is also distinguishable in that the plaintiffs in that case could only allege the necessary business volume (i.e., gross volume of sales or business of at least $500,000) by combining the Pennsylvania Democratic Party's financial activities with those of the Democratic National Committee and other state parties.  The court refused to perform this aggregation, finding that the various defendants did not exercise the necessary unified operations or common control to constitute a single enterprise. *Katz*, 2018 WL 692164, at *6. Here, by contrast, the Campaign—a unified, nationwide entity—spent well in excess of $500,000 per year simply to pay one vendor, Ace Specialties, for Trump merchandise.  *See Trump Merchandise, supra* note 4. If additional information about the Campaign's finances is necessary to plausibly allege enterprise coverage, Ms. Johnson should be permitted to seek such additional information through discovery. *See Perdomo v. Classic Billiards, I, Inc.*, No. 06-61663, 2007 WL 461298 (S.D. Fla. Feb. 7, 2007) (allowing the plaintiff "to develop the factual record" on enterprise coverage through discovery).

To the extent that the Complaint lacks factual allegations about DJTFP's annual business volume and other predicates of enterprise coverage, Ms. Johnson respectfully requests that this Court take judicial notice of these facts because their existence "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). In the alternative, Ms. Johnson requests leave to amend to add such allegations.

**B.     Ms. Johnson Has Sufficiently Alleged Collective Claims Under the Equal Pay Act.**

Ms. Johnson brings her EPA collective claims on behalf of "all female Campaign employees who were paid less than male employees doing the same or similar work." Compl. at ¶122. The Campaign (incorrectly) asserts that Ms. Johnson has not adequately shown that the proposed Collective is "similarly situated" to her. However, this inquiry should be addressed on Ms. Johnson's pending Motion for Conditional Certification, not on Defendant's Motion to Dismiss. And even if this question were properly addressed here, Ms. Johnson has sufficiently alleged that the members of

the purported Collective are similarly situated to her in terms of job duties and expectations, and because they were similarly subjected to the Campaign's discriminatory wage scheme.

1. *Whether Putative Collective Members Are "Similarly Situated" Is a Premature Inquiry that Should Instead Be Addressed on Conditional Certification.*

The Campaign spills much ink asserting Ms. Johnson has not shown that the putative Collective members are "similarly situated" to her (Dkt. No. 32 at 7–14), but this inquiry is premature. The Eleventh Circuit has made clear that, in a FLSA collective action, whether putative collective members are "similarly situated" to the plaintiff is a question that should not be addressed on a motion to dismiss, but should instead be evaluated, at the earliest, on conditional certification. *See, e.g., Dybach v. State of Fla. Dept. of Corrs.*, 942 F.2d 1562, 1567–68 (11th Cir. 1991) (remanding case to district court to allow plaintiff to present evidence that there "are a number of employees of the department-employer who are 'similarly situated' and who may desire to 'opt-in'"); *Hyskaj v. New York New York Pizza, LLC*, 8:18-cv-00397-MSS-TGW, 2018 WL 7458261, at *3 (M.D. Fla. Nov. 14, 2018) (finding that "dismissal of the collective would be premature" and that the defendant "may reassert these arguments in response to any future motion to conditionally certify a collective action"); *Tucker v. Labor Leasing, Inc.*, 155 F.R.D. 687, 689 (M.D. Fla. 1994) ("Plaintiffs are at least entitled to discovery of these employees so that they might make…a showing [that they are similarly situated].").  Thus, because "a mere allegation that other similarly-situated employees" suffered the same harms as Plaintiff "is enough to put [Defendant] on fair notice that [Plaintiff] may seek conditional certification of a collective action," no further factual allegations are necessary to survive a motion to dismiss. *Puleo v. SMG Prop. Mgmt.*, No. 6:08-cv-86-Orl-22DAB, WL 3889727 *3 (M.D. Fla. Aug. 20, 2008).

It is especially improper to dismiss a collective action at this early stage when there is a "considerable probability," as there is here, that the plaintiff will be able to "proffer evidence…showing that there are a number of employees…who are 'similarly situated' and who may desire to 'opt-in.'" *Dybach*, 942 F.3d at 1567–68. Ms. Johnson has already filed a Motion for Conditional Certification offering additional evidence in support of her claim that other female

staffers in the Trump Campaign were similarly situated. Dkt. No. 34. The evidence proffered in the Motion details the Campaign's "common policy, uniformly applicable to all members of the putative collective, of paying female employees less than their male counterparts for the same or similar work" Dkt. No. 34 at 2. The Motion includes information and preliminary data that demonstrates Ms. Johnson was "similarly situated" to putative Collective members in terms of (a) job requirements and expectations (Dkt. No. 35 at 5–7) and (b) being subjected to the same discriminatory compensation scheme (Dkt. No. 35 at 7–12). The Motion further includes documentary evidence, including declarations from Ms. Johnson (Dkt. No. 35–E) and Omarosa Manigault Newman (Dkt. No. 35–C), a similarly situated employee, as well as from economist Phillip M. Johnson (Dkt. No. 35–D), all of which provide support for the allegations in Ms. Johnson's Complaint. To dismiss the Complaint prematurely on a motion to dismiss would be to ignore the additional evidence proffered in Ms. Johnson's Motion for Conditional Certification, despite its showing that there are likely numerous female staffers who were similarly situated to Ms. Johnson and who would desire to "opt-in" to the collective action.

Instead of following Eleventh Circuit law holding that this inquiry should be brought instead on a motion to certify, the Campaign asks this Court to ignore the case law and rely on a few unpublished district court cases that contradict the Eleventh Circuit's binding precedent. Dkt. No. 32 at 8 n.4. The Campaign relies primarily on *St. Croix v. Genetech, Inc.*, in asserting that the Complaint should be dismissed at this premature stage. No. 8:12-cv-891-T-33EAJ, 2012 WL 2376668 (M.D. Fla. June 22, 2012). In *St. Croix*, the court dismissed the plaintiff's complaint in part because it found that the complaint should allege the specific "job requirements" and "pay provisions" of the putative collective members. *Id.* at *2. But this case is not controlling for several reasons. First and foremost, *St. Croix* is directly contrary to the binding Eleventh Circuit precedent discussed above. In granting the motion to dismiss, the court in *St. Croix* relied on one case, *Morgan v. Dollar Stores, Inc.*, which only addressed what a plaintiff must show on *conditional certification.* 551 F.3d 1233, 1259–60 (11th Cir. 2008). In *Morgan,* the court did not address whether job requirements and pay provisions must be pleaded in the complaint. Rather, *Morgan* stands only for the rule that

"before facilitating notice, a 'district court should satisfy itself that there are other employees…who desire to 'opt-in' and who are 'similarly situated' with respect to their job requirements and with regard to their pay provisions." *Id.* As discussed above, the majority of courts in this circuit have adhered to the Eleventh Circuit's instruction that whether putative collective members are "similarly situated" should be addressed, at the earliest, on a motion for conditional certification, not on a motion to dismiss.

St. Croix is also readily distinguishable. The court dismissed the complaint in *St. Croix* because the complaint was *completely* devoid of factual allegations to support plaintiff's claims. *Id.* There, the complaint provided "no dates or date ranges during which she worked overtime or any other factual basis on which this Court [could] make a 'just and reasonable inference' as to the amount and extent of her work." *Id.* By contrast, Ms. Johnson's Complaint includes numerous factual allegations regarding her own job duties and wages (Compl. at ¶¶17–55), those of her male comparators (*Id.* at ¶¶111–112), and the systemic wage discrimination that occurred throughout the Campaign (*Id.* at ¶¶113–119). The complaint in *St. Croix* also merely stated that it sought relief on behalf of "numerous individuals who were similarly situated," without providing any description whatsoever of who those individuals were. *St. Croix,* 2012 WL 2376668, at *3. Here, the Complaint specifically alleges that the putative Collective members are "all female Campaign employees who were paid less than male employees doing the same or similar work …" Compl. at ¶122. And Ms. Johnson's Complaint further explains how the putative Collective is similarly situated to her. *Id.* at ¶123–127.

For the same reasons, Defendant's citation to *Pickering v. Lorillard Tobacco* (Dkt. No. 32 at 9), is inapposite. 2011 WL 111730, at *2 (M.D. Ala. Jan. 13, 2011). Like *St. Croix, Pickering* is an unpublished, non-binding district court case that conflicts with established Eleventh Circuit precedent. Furthermore, like *St. Croix,* it is clearly distinguishable from this case. The court in *Pickering,* like the court in *St. Croix,* dismissed the case because the plaintiff's eight-page complaint did not provide any information regarding his job duties whatsoever, and did not provide any description of the proposed collective besides a fleeting reference to "all other similarly situated

employees employed by the Defendant." *Id.* The court also failed to cite to any law that would support dismissal at this early stage based solely on a plaintiff's failure to describe "similarly situated" employees. In any event, as discussed *supra*, Ms. Johnson's Complaint provides a specific class definition, a thorough description of her job duties, and relevant information about her white, male comparators and the Campaign's pattern of systemic discrimination.

Defendant's citation to *Dyer v. Lara's Trucks, Inc.*, 2013 WL 609307 (N.D. Ga. Feb. 19, 2013), is likewise misplaced. *Dyer* is yet another unpublished, non-binding district court case that conflicts with Eleventh Circuit precedent. Dkt. No. 32 at 8 n.4. Moreover, like *Pickering* and *St. Croix*, *Dyer* is distinguishable. There, the court found that the plaintiff had offered only "threadbare recitals of the elements of the cause of action, supported by mere conclusory statements." *Id.* at *3. By contrast, as discussed above, Ms. Johnson's Complaint both provides a specific class definition (Compl. at ¶122) and explains specifically how the putative Collective is similarly situated to her (*Id.* at ¶123–127). Thus, as discussed further below, even if *St. Croix*, *Pickering*, and *Dyer* are correct that FLSA collective claims can be dismissed at the pleadings stage for this reason (they cannot), Ms. Johnson has alleged significantly more facts to support her claims such that dismissal is not warranted here.

   2.   *Ms. Johnson Has Sufficiently Alleged that Putative Collective Members Are "Similarly Situated."*

Even if the "similarly situated" inquiry were properly before the Court on the Campaign's Motion to Dismiss (it is not), Ms. Johnson has nonetheless sufficiently alleged that putative Collective members are "similarly situated" to her. Even at the certification stage, the requirement that plaintiffs demonstrate they are "similarly situated" to putative collective members is "not particularly stringent" and plaintiffs "need show only that their positions are similar, not identical, to the positions held by the putative collective members." *Calderone v. Scott*, 838 F.3d 1101, 1103–04 (11th Cir. 2016).

Courts have consistently denied motions to dismiss collective FLSA claims where the complaint contained allegations much more threadbare than Ms. Johnson's. This is because, at the motion to dismiss stage, a plaintiff's allegations need only be "plausible" and do not require "detailed factual allegations." *Twombly*, 550 U.S. at 555. Indeed, courts have frequently declined to

dismiss cases where the plaintiff did not detail every job duty and wage, or failed to clearly identify putative collective members, and instead challenged the employer's systemic, company-wide wage discrimination. *See, e.g., Carter v. West Pub. Co.*, 225 F.3d 1258, 1261 (11th Cir. 2000) (affirming certification of collective consisting of "all females employed by [Defendant]" who suffered wage discrimination, regardless of their specific job duties or job titles); *Hyskaj*, 2018 WL 7458261 at *3 (denying motion to dismiss where plaintiff brought EPA claim on behalf of "other current and former employees" who did not receive overtime); *Gambino v. City of St. Cloud*, No. 6:18-cv-869-Orl-31TBS, 2018 WL 5621517, at *8 (M.D. Fla. Oct. 11, 2018) (denying motion to dismiss individual EPA claim where plaintiff alleged a "systemic pattern and practice of equal pay violations"); *see also Jarvaise v. Rand Corporation*, 212 F.R.D. 1, 3 (D.D.C. 2002) (certifying collective action including "all female Rand employees" who suffered wage discrimination pursuant to the company's "pattern and practice of paying female employees less than male employees").

Here, as discussed above, Ms. Johnson's Complaint easily meets the "plausibility" standard and includes allegations that are sufficiently detailed to survive a motion to dismiss. The Complaint adequately alleges that Ms. Johnson was similarly situated to the putative Collective members in two central respects: (1) Ms. Johnson and the putative Collective members all worked as staffers for the 2016 Trump Campaign and (2) Ms. Johnson and the putative Collective members are all women who were paid less than men for the same work. Compl. at ¶¶122–127. Ms. Johnson's Complaint specifically alleges that the putative Collective members are "all female Campaign employees who were paid less than male employees doing the same or similar work for claims under the Equal Pay Act ('EPA')" (*Id.* at ¶122); that the putative Collective is similarly situated to her because "they were female Campaign staff who were affected by policies and practices with the purpose and effect of denying them equal compensation for the same or similar work because of their gender" (*Id.* at ¶123); and that specific questions of law and fact are common to both Ms. Johnson and the putative Collective members (*Id.* at ¶ 125). Although she need not allege even this much to survive a motion to dismiss, Ms. Johnson presents additional factual allegations that support her contention that there are other similarly situated" female staffers who were paid less than men working similar positions.

In the Complaint, Ms. Johnson cites reporting by *The Boston Globe* that investigated the Campaign and found that men employed by the Campaign made "about 35% more" than women, and a *New York Times* article describing a sex discrimination claim against the Campaign; indeed, "[a]ccusations of gender-based pay discrimination by the Campaign were widely reported." Compl. at ¶115. These factual allegations, taken as true, are sufficient to allege systemic Equal Pay Act violations.

The Campaign asserts that Ms. Johnson's Complaint should be dismissed because she has not alleged specific facts concerning the "job duties" or "wages" of the putative Collective members or the purported comparators. Dkt. No. 32 at 10–14. But, as discussed above, Eleventh Circuit law does not require Ms. Johnson to detail all of the job duties and wages of potential Collective members at this early stage of litigation. While it is true that the complaint must allege more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," *Iqbal*, 556 U.S. 662, 678 (2009), Ms. Johnson's allegations are more than adequate to satisfy the lenient standard on a motion to dismiss.

*Hamilton v. Sikorsky Aircraft Corp.*, 760 Fed. Appx. 872, 877 (11th Cir. 2019) (Dkt. No. 32 at 11) is inapplicable to this inquiry. *Hamilton* evaluated whether a statement in an *affidavit* with no factual support was sufficient to contest the defendant's factual showing at *summary judgment*. The present question for the court is only whether Ms. Johnson's *complaint* is sufficient on a *motion to dismiss*. Because Ms. Johnson's complaint provides significantly more information in her Complaint than the *Hamilton* plaintiff offered at summary judgment, *Hamilton* is inapposite. Ms. Johnson's allegations are sufficient to state a claim for wage discrimination under the EPA and the Motion should be denied.

Even if the Court finds that Ms. Johnson's Complaint contains deficiencies, Ms. Johnson should be given the opportunity to amend the Complaint to cure any defects. "A grant of leave to amend is particularly appropriate following dismissal of a complaint for failure to state a claim." *Thomas v. Farmville Mfg. Co., Inc.*, 705 F.2d 1307, 1308 (11th Cir. 1983); *see Anish v. National Securities Corp.*, No. 10-80330-CIV, 2010 WL 4065433, at *3 (S.D. Fla. Oct. 15, 2010) (granting leave to amend in order to add more detail to FLSA claim).

**C.      Ms. Johnson Has Sufficiently Alleged Individual Wage Claims.**

Ms. Johnson's individual wage claims should not be dismissed at this early stage of litigation because she has sufficiently alleged that she was paid less than several male comparators. The Campaign is correct that *eventually* "Plaintiff must prove she was paid less than comparators outside her protected classes, for similar work" in order to prevail on her EPA claim (Dkt. No. 32 at 15) and that she was paid less than "similarly situated" comparators outside of her class for her race discrimination claim (Dkt. No. 32 at 18). But "the standard on a 12(b)(6) motion is *not* whether the plaintiff will *ultimately* prevail in his or her theories, but whether the allegations are sufficient to allow the plaintiff to conduct discovery in an attempt to prove the allegations." *Burgeson v. Collier County*, No. 2:09-cv-220-FtM-36DNF, 2010 WL 11506949, at *2 (M.D. Fla. July 21, 2010) (citing *Jackam v. Hsop. Corp. of Am. Mideast, Ltd.,* 800 F.2d 1577, 1579-80 (11th Cir. 1986)) (emphasis added). This is a low bar.

With regard to Ms. Johnson's sex discrimination claim under the EPA, Ms. Johnson need only supply an allegation of "discrimination in pay against an employee vis-à-vis *one* employee of the opposite sex." *E.E.O.C. v. White and Son Enterprises*, 881 F.2d 1006, 1009 (11th Cir. 1989) (emphasis added). The comparator's job duties do not need to be "identical" to Ms. Johnsons' duties; "rather, they need only be substantially equal." *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1533 (11th Cir. 1992). And the similarity of duties can be judged by over-arching similarities, including comparable goals. *See, e.g., Mulhall v. Advance Sec. Inc.*, 19 F.3d 586, 593 (11th Cir. 1994) (finding work of plaintiff and comparator to be substantially similar where both positions' main responsibility was the "economic well-being" of the company). Ms. Johnson's job duties can also be similar to those of male comparators even if Ms. Johnson has *more* job responsibilities than the comparator. *See, e.g., id.* ("If anything, we believe a jury could conclude that plaintiff's position, because of its diverse components, took *greater* effort than did the controller's. . . ."). Thus, if Ms. Johnson's allegations show that she shared certain job duties with the comparators and that she held *additional* job responsibilities, her EPA claim must survive.

With respect to her race discrimination claims under § 1981, Ms. Johnson need only allege

that she held a position similar to that of a higher paid employee who is not a member of her protected class. *Crawford v. Carroll*, 529 F.3d 961, 975 (11th Cir. 2008) (citing *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994)). Ms. Johnson's race-based wage discrimination claims can survive if she makes a plausible allegation that she "shared the same type of tasks" as a white comparator. See *Vinson v. Koch Foods of Ala.*, No. 2:12-cv-1088-MEF, 2013 WL 5441969, at *4 (M.D. Ala. Sept. 27, 2013) (citing *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1529 (11th Cir. 1992)). Ms. Johnson need only show that it is plausible that similarly situated employees outside of her class were paid more than she was.

The Campaign asserts that there are "no allegations in the Complaint sufficient to support a finding that Ms. Johnson and her alleged comparators had substantially similar job duties." (Dkt. No. 32 at 15. Yet, Ms. Johnson has demonstrated that there are at least five valid comparators:

(a) **Sidney Bowdidge** – Ms. Johnson's Complaint specifically alleges that Sidney Bowdidge, a white man, was part of the National Strike Team with Ms. Johnson and was responsible for volunteer recruitment and management, just like Ms. Johnson. Compl. at ¶ 112. The Complaint also alleges that Bowdidge was paid $3,500 per month from March through August 2016 (except for April 2016, when he was paid $6,000) and $7,000 per month for the remainder of the campaign, compared to the mere $3,000 per month that Ms. Johnson received. *Id.* at ¶112. The Campaign's only argument as to why Bowdidge did not have the same job responsibilities as Ms. Johnson is that Bowdidge did not manage RVs. Dkt. No. 32 at 17–18. But Ms. Johnson does not allege that she was in charge of managing RVs until she began working as an Operations Administrative Director in Florida, *after* working on the National Strike Team. Compl. at ¶47–51. In detailing her experience working for the National Strike Team, Ms. Johnson's Complaint specifically states that her primary responsibilities were to help "organize and manage local volunteer offices," that "[o]pening volunteer offices was a core responsibility of the National Strike Team," and that Ms. Johnson and the rest of the National Strike Team would "set up an office, build a volunteer

16

base, and generate voter engagement." *Id.* at ¶40–41. The Complaint states that Sidney Bowdidge was part of this team, shared in the joint grassroots efforts to recruit and manage volunteers, and that he was specifically responsible for "volunteer recruitment and management, just like Ms. Johnson." *Id.* at ¶112.   Taken as true, these allegations show that Ms. Johnson was paid less than Bowdidge for similar work.

(b) **Matt Ciepielowski** – Ms. Johnson's Complaint specifically alleges that Matt Ciepielowski, a white man, also worked with Ms. Johnson on the National Strike Team (*Id.* at ¶112), which was primarily responsible for organizing and managing local volunteer offices (*Id.* at ¶¶39–42). Ms. Johnson has specifically detailed what the duties of National Strike Team employees were and alleged that "Ms. Johnson *and the rest of the National Strike Team*" were responsible for setting up volunteer offices, building a volunteer base, and generating voter engagement. *Id.* at ¶¶39–42 (emphasis added). All of the members of the National Strike Team shared the same duties and responsibilities, including Matt Ciepielowski, yet, as the Complaint alleges, Ms. Johnson was paid less than men on the same team. Thus, these allegations, taken as true, are sufficient to allege that Ms. Johnson was paid less than Ciepielowski for similar work.

(c) **Austin Browning** – Ms. Johnson's Complaint alleges that Austin Browning was only a high school senior when he was hired during the general election and that he was paid significantly more than Ms. Johnson, a qualified and experienced employee. *Id.* at ¶112. Because Browning was not given more responsibilities that justified being paid significantly more than Ms. Johnson for work on the campaign, these allegations are sufficient to demonstrate that Ms. Johnson was paid less than Browning for similar work.

(d) **David Chiokadze** – Ms. Johnson's Complaint sufficiently alleges that David Chiokadze, a white man, worked closely with Ms. Johnson on the Florida team and that he prepared talking points and written statements for the Campaign. *Id.* at ¶112. Ms. Johnson's Complaint also alleges that Ms. Johnson, as Operations Administrative Director, "worked closely with members of the communications team on various projects, including writing

statements," (*Id.* at ¶50), just like Chiokadze. While Ms. Johnson was *also* responsible for the important task of managing the Trump RVs (*Id.* at ¶51), this was an additional responsibility that should have entitled Ms. Johnson to even more compensation. And because all staffers for the Campaign aided in the Campaign's larger goals of grassroots outreach and organization, Ms. Johnson has sufficiently alleged that she and Chiokadze shared the same core responsibilities such that she was paid less than Chiokadze for similar work.

(e) **Tony Ledbetter** – The Complaint sufficiently alleges that Tony Ledbetter, a white man, was responsible for representing the Campaign in the northern part of Florida in the same way that Ms. Johnson represented the Campaign in Alabama. *Id.* at ¶112. Ledbetter also was responsible for operating the RV program, just like Ms. Johnson, yet Ledbetter operated the RV program in fewer counties than Ms. Johnson did. *Id.* at ¶112). Ms. Johnson's Complaint specifically alleges that Ledbetter had the same duties to operate the RV program as she did and that these duties were less substantial because they encompassed fewer counties. *Id.* at ¶112. These allegations, taken as true, are sufficient to show that Ledbetter was paid more than Ms. Johnson for similar work.

The Complaint therefore sufficiently alleges that not only one, but at least *five* white men were paid substantially more than she was for jobs entailing similar job duties.

The Campaign's arguments regarding the degree of similarity between Ms. Johnson's job duties and those of her comparators "are questions of proof, not pleading." *Gambino v. City of St. Cloud*, No 6:18-cv-869-Orl-31TBS, 2018 WL 5621517 (M.D. Fla. Oct. 11, 2018). These arguments are not sufficient to justify dismissal at this early stage, as they involve questions that can only be properly answered by a fact-finder.  Alternatively, as discussed above, Ms. Johnson should be granted leave to amend to correct any deficiencies. *See Thomas v. Farmville Mfg. Co., Inc.*, 705 F.2d 1307, 1308 (11th Cir. 1983).

## IV.    CONCLUSION

For the foregoing reasons, Ms. Johnson requests that the Court deny Defendant's Motion to Dismiss.

DATED: May 24, 2019.                                  Respectfully submitted,

/s/ Hassan A. Zavareei
Hassan A. Zavareei (*pro hac vice*)
Trial Counsel
Katherine M. Aizpuru (*pro hac vice*)
**TYCKO & ZAVAREEI LLP**
1828 L Street NW, Suite 1000
Washington, D.C. 20036
P: (202) 417-3667
F: (202) 973-0950
hzavareei@tzlegal.com
kaizpuru@tzlegal.com

Tanya S. Koshy (*pro hac vice*)
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, CA 94612
P: (510) 250-3298
F: (202) 973-0950
tkoshy@tzlegal.com

Janet Varnell (Fla. Bar No. 71072)
Brian W. Warwick, (Fla. Bar No. 0605573)
**VARNELL & WARWICK, PA**
P.O. Box 1870
Lady Lake, FL 32158-1870
P: 352-753-8600
F: 352-503-3301
jvarnell@varnellandwarwick.com
bwarwick@varnellandwarwick.com

F. Paul Bland (*pro hac vice*)
Karla Gilbride (*pro hac vice*)
**PUBLIC JUSTICE, P.C.**
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600

19

Jennifer Bennett (*pro hac vice*)
**PUBLIC JUSTICE, P.C.**
475 14th Street, Suite 610
Oakland, CA 94612
(510) 622-8150

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 24, 2019, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing

to all counsel of record.

/s/ Hassan A. Zavareei
Hassan A. Zavareei